2019 JAN 31 PM 5:16

CLERK US DISTRICT COURT
CEN-RAL DIST CALIF
LOS ANGELES

FILED

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

June 2018 Grand Jury

| UNITED STATES OF AMERICA, | CR **19 CR00055** -FMO |
|---|---|
| Plaintiff, | I N D I C T M E N T |
| v. | [18 U.S.C. § 1962(d): Racketeer Influenced and Corrupt Organizations Conspiracy; 18 U.S.C. §§ 1959(a)(3), (5): Violent Crime in Aid of Racketeering; 21 U.S.C. § 846: Conspiracy to Possess with Intent to Distribute and Distribute Controlled Substances; 21 U.S.C. §§ 841(a)(1), (b)(1)(A), (b)(1)(B), (b)(1)(C): Possession with Intent to Distribute and Distribution of Controlled Substances; 21 U.S.C. § 856(a)(5): Maintaining Drug-Involved Premises; 21 U.S.C. § 860(a): Distribution of Methamphetamine Within 1,000 Feet of a School or Park; 21 U.S.C. § 860a: Distribution of Methamphetamine in Premises Where a Minor Resides or is Present; 18 U.S.C. §§ 924(c)(1)(A)(i), (ii), (iii): Possessing, Using, Carrying, Brandishing, and Discharging Firearms in Furtherance of, and During and in Relation to, a Crime of Violence or a Drug Trafficking Crime; 18 U.S.C. § 922(a)(1)(A): Engaging in the Business of Dealing Firearms Without a |
| MARIO ALBERTO MIRANDA,<br>  aka "Last,"<br>  aka "L,"<br>  aka "Ultimo,"<br>  aka "Shot-Caller,"<br>MARK ANTHONY ESPINOSA,<br>  aka "Fatman,"<br>  aka "Marcos,"<br>ULISES BOTELLO,<br>  aka "Squirt,"<br>  aka "SQ,"<br>LUIS ALBERTO MORA,<br>  aka "Liar,"<br>  aka "Liar Liar,"<br>  aka "Little L,"<br>  aka "Uno,"<br>JESUS GONZALEZ, JR.,<br>  aka "Lil Chito,"<br>  aka "Chito,"<br>  aka "Gunner,"<br>  aka "Chuy,"<br>  aka "Chuyito,"<br>LUIS FERNANDO RAMIREZ,<br>  aka "Frosty,"<br>  aka "Frost,"<br>IGNACIO JESUS CONTRERAS,<br>  aka "Nacho,"<br>ANTHONY CARLOS AVILA,<br>  aka "Baby Raskal,"<br> | |

1    aka "Casper,"
JOSE LUIS BANDA,
2    aka "Lil Raskal,"
     aka "Donkey,"
3  JOSEPH PETER HERRERA,
     aka "Baby Shadow,"
4    aka "Shadow,"
     aka "Baby Shitface,"
5  JOSE MANUEL GALLO,
     aka "Rooster,"
6  DAVID ROQUE FONSECA,
     aka "Monster,"
7  DAVID VASQUEZ,
     aka "Malo,"
8    aka "Sonic,"
     aka "Evil,"
9  FRANCISCO JAVIER NAVARRETE,
     aka "Chowder,"
10 OSCAR CARDENAS,
     aka "Taliban,"
11   aka "Tali,"
KEVIN JASON PAZ,
12   aka "Cheesecake,"
     aka "Firme,"
13 IVAN LAUREL,
     aka "Little Gallo,"
14   aka "Little Psycho,"
DENNIS ALEXIS MOLINA,
15   aka "Laso,"
OSBALDO ZUNIGA,
16   aka "Bayo,"
SERGIO ESPINOZA SOLANO,
17   aka "Cholo,"
JOSE ALBERTO ACEVES,
18   aka "Chito,"
ALENA ROSEANNA RODRIGUEZ,
19 APRIL CHRISTINE HARREL,
     aka "April Dawn Harrell,"
20   aka "Loca,"
ERNESTO SALVADOR MEDINA,
21   aka "Kid,"
AREANA NORONA,
22 AKOP DARMANDZHYAN,
     aka "Armenian Jack,"
23   aka "Jack,"
JORGE MARCIAL VASQUEZ,
24   aka "T,"
OSCAR QUINTERO JIMENEZ,
25   aka "Cheech,"
     aka "Alex Ramos Banuelos,"
26 LUIS FRANCISCO LOPEZ,
     aka "Substitute,"
27   aka "Subs,"
OSCAR ALVARADO,
28   aka "Smurf," and

License; 18 U.S.C. § 922(g)(1):
Felon in Possession of Firearms
and Ammunition; 18 U.S.C.
§ 922(g)(9): Prohibited Person in
Possession of Firearms and
Ammunition; 26 U.S.C. § 5861(d):
Possession of an Unregistered
Firearm; 18 U.S.C. § 2(a): Aiding
and Abetting; 18 U.S.C. § 1963, 21
U.S.C. § 853, 18 U.S.C. § 924(d),
and 28 U.S.C. § 2461(c): Criminal
Forfeiture]

2

JESUS HERNANDEZ,
  aka "Jesse,"

      Defendants.

The Grand Jury charges:

GENERAL ALLEGATIONS

A.   THE RACKETEERING ENTERPRISE

1.   At all relevant times, defendants MARIO ALBERTO MIRANDA, also known as ("aka") "Last," aka "L," aka "Ultimo," aka "Shot-Caller" ("MIRANDA"), MARK ANTHONY ESPINOSA, aka "Fatman," aka "Marcos" ("ESPINOSA"), ULISES BOTELLO, aka "Squirt," aka "SQ" ("BOTELLO"), LUIS ALBERTO MORA, aka "Liar," aka "Liar Liar," aka "Little L," aka "Uno" ("MORA"), JESUS GONZALEZ, JR., aka "Lil Chito," aka "Chito," aka "Gunner," aka "Chuy," aka "Chuyito" ("GONZALEZ"), LUIS FERNANDO RAMIREZ, aka "Frosty," aka "Frost" ("RAMIREZ"), IGNACIO JESUS CONTRERAS, aka "Nacho" ("CONTRERAS"), ANTHONY CARLOS AVILA, aka "Baby Raskal," aka "Casper" ("AVILA"), JOSE LUIS BANDA, aka "Lil Raskal," aka "Donkey" ("BANDA"), JOSEPH PETER HERRERA, aka "Baby Shadow," aka "Shadow," aka "Baby Shitface" ("HERRERA"), JOSE MANUEL GALLO, aka "Rooster" ("GALLO"), DAVID ROQUE FONSECA, aka "Monster" ("FONSECA"), and DAVID VASQUEZ, aka "Malo," aka "Sonic," aka "Evil" ("D. VASQUEZ"), and co-conspirators Francisco Javier Navarrete, aka "Chowder" ("Navarrete"), Oscar Cardenas, aka "Taliban," aka "Tali" ("Cardenas"), Kevin Jason Paz, aka "Cheesecake," aka "Firme" ("Paz"), Ivan Laurel, aka "Little Gallo," aka "Little Psycho" ("Laurel"), Dennis Alexis Molina, aka "Laso" ("Molina"), Osbaldo Zuniga, aka "Bayo" ("Zuniga"), Sergio Espinoza Solano, aka "Cholo" ("Solano"), Jose Alberto Aceves, aka "Chito" ("Aceves"), Alena Roseanna Rodriguez ("Rodriguez"), April Christine Harrel, aka "April Dawn Harrell," aka

"Loca" ("Harrel"), Ernesto Salvador Medina, aka "Kid" ("Medina"),
Areana Norona ("Norona"), Akop Darmandzhyan, aka "Armenian Jack," aka
"Jack" ("Darmandzhyan"), Jorge Marcial Vasquez, aka "T" ("J.
Vasquez"), Oscar Quintero Jimenez, aka "Cheech," aka "Alex Ramos
Banuelos" ("Quintero"), Luis Francisco Lopez, aka "Substitute," aka
"Subs" ("Lopez"), Oscar Alvarado, aka "Smurf" ("Alvarado"), and Jesus
Hernandez, aka "Jesse" ("Hernandez"), and others known and unknown to
the Grand Jury, were members and associates of the Vineland Boys
street gang, otherwise known as "VBS," a criminal organization
operating in and around Sun Valley, California, whose members and
associates engaged in, among other things, numerous acts of violence
and other crimes, including murder, attempted murder, robbery,
assault with deadly weapons, extortion, conspiracy to traffic in
narcotics, narcotics trafficking, possessing firearms while
prohibited from so doing, engaging in the business of dealing
firearms without a license, and intimidation of witnesses.  At all
times relevant to this Indictment, the Vineland Boys gang operated
within the Central District of California and elsewhere.  The
Vineland Boys gang, including its leaders, members, and associates,
constituted an "enterprise," as defined by Title 18, United States
Code, Section 1961(4), that is, a group of individuals associated in
fact, although not a legal entity, which was engaged in, and the
activities of which affected, interstate and foreign commerce.  The
enterprise constitutes an ongoing organization whose members and
associates functioned as a continuing unit for a common purpose of
achieving the objectives of the enterprise.

B.   GENERAL BACKGROUND OF THE VINELAND BOYS GANG

        At all times relevant to this Indictment:

4

2.    The VBS gang was a multi-generational criminal street gang formed in the late 1980's by former members and associates of the 18th Street gang.  The VBS gang originated in the Sun Valley area of the San Fernando Valley in Los Angeles, California, and derived its name from a faction that played football along Vineland Avenue. Within a few years of its formation, VBS had absorbed several other local street gangs and had established itself as one of the most violent criminal street gangs in the San Fernando Valley.  VBS operated and claimed control of a large area in the San Fernando Valley, including parts of Sun Valley, North Hollywood, and Burbank. Throughout the years, VBS grew to become one of the largest gangs in the San Fernando Valley, with over 500 people identified by law enforcement as members or associates.

3.    VBS members committed crimes on behalf of the gang, including drug trafficking, firearms trafficking, robbery, carjacking, kidnapping, witness intimidation, extortion, credit card fraud, identity theft, murder, and assaults of members of rival gangs, and law enforcement.  VBS members marked their territory with distinctive graffiti, or "tagging."  Their overt presence created an environment of fear and intimidation and asserted the VBS gang's control over the neighborhood.

4.    Law enforcement identified eight distinct active cliques of the VBS gang: Jokers Town, Pequeños (also known as Pee Wees or the PQ's), Dukes, Lake View Terrace, 129, Night Owls, Winos, and Locos, the original Vineland Boys clique.  Additionally, there were a number of "tagging crews" who were authorized by the Vineland Boys to write graffiti in Vineland Boys gang territory and to use the identifier "Sun Valley" in their names.  One example was a tagging crew called

5

the Ghetto Boys.  In some instances, a tagging crew could become
absorbed into the gang, which was referred to as being "cliqued up."
For example, the 129 clique had been a tagging crew that was "cliqued
up" in 2016 to become a recognized Vineland Boys clique.

5.    The Vineland Boys gang was concentrated mainly in the
northeastern end of the San Fernando Valley in the Sun Valley area of
Los Angeles County.  Their primary territory was bordered by the 170
"Hollywood" Freeway to the west, Sheldon Street and Glenoaks
Boulevard to the north, the Bob Hope Burbank Airport to the east, and
Victory Boulevard to the south.  Vineland Avenue runs through this
area.  The Lake View Terrace clique controlled a separate area to the
northwest, bordered by Van Nuys Boulevard, Terra Vista Way, Osborne
Street, and the 210 Freeway.  The Lake View Terrace area, although
not contiguous to VBS's primary territory, was nonetheless considered
to be under VBS control.

6.    Vineland Boys members wrote or painted graffiti in the
areas they controlled to identify the area as part of VBS territory.
There were certain locations within VBS territory that were central
to the gang's activities, where Vineland Boys members frequently
gathered to meet, deal or use drugs, drink alcohol, tag graffiti,
intimidate other residents, and otherwise assert their control and
presence in the neighborhood.  Such locations included Sun Valley
Park; a pizza restaurant and a barbershop located on Sunland
Boulevard; a fitness center on Vineland Avenue; the family residence
of a high-ranking incarcerated Vineland Boys member; the Chandler
fire road, where Vineland Boys members tagged VBS graffiti and
confronted rival gang members; an area known as "Joker's Alley,"
which runs parallel to De Garmo Avenue and the 5 Freeway and abuts De

Garmo Park in Sun Valley, where Vineland Boys conducted drug and
firearms transactions; an alley known as "Pequeños Alley" located by
a laundromat near Vineland Avenue and Sherman Way; residences on the
7700 block of Vineland Avenue; a residence on Strathern Avenue; and
an apartment complex on the 10800 block of White Street, where many
Vineland Boys members resided and conducted drug and firearms
trafficking activities.

    7.    From the beginning, VBS operated independently of some
typical Southern California gang norms, adhering mostly to its own
internal rules and guidelines.  For example, most Southern California
Hispanic gangs were part of a larger gang network controlled by the
"Mexican Mafia" prison gang, commonly referred to as "La Eme."  The
Mexican Mafia controlled criminal activities within California's
state jails and prisons and exerted authority over the Hispanic
street gangs of Southern California.  Mexican Mafia members came from
the ranks of local gang members, commonly referred to as "sureños,"
which is Spanish for "southerners."  Typically, local street gangs
made payments, commonly referred to as "paying taxes," to the Mexican
Mafia.  In return, the gang received the Mexican Mafia's recognition
of the gang's authority over its territory, as well as protection for
any members of that gang who were incarcerated in California state
prisons.  If a gang failed to make its payments, failed to recognize
the Mexican Mafia's authority and rules, or otherwise disrespected
the Mexican Mafia, the Mexican Mafia punished the gang by ordering a
"green light" for members of other sureño gangs to assault or kill
members of the offending gang.  The "green lit" gang's members were
targeted both on the streets, and, more importantly, in the prisons,

1  where the targeted individuals were vulnerable to attacks from other

2  inmates following and executing the "green light" order.

3      8.    However, from its inception, VBS refused to make payments

4  to the Mexican Mafia or agree to be controlled by an Eme member.

5  Because of VBS's defiance, the Mexican Mafia ordered a "green light"

6  against VBS members soon after VBS was formed.  VBS gang members thus

7  began to operate "under the radar" by abandoning overt signs of gang

8  membership like displaying visible tattoos.  VBS members also began

9  to deny gang membership to law enforcement to avoid detection in the

10 corrections system, the Mexican Mafia's stronghold.  Minimizing

11 exposure not only allowed VBS to avoid rival gangs but also helped

12 VBS conceal criminal activity from law enforcement.  As a result, the

13 gang's drug and firearms trafficking activity flourished.

14     9.    Around 2000, as the gang's power grew in the drug trade,

15 VBS negotiated a truce with the Mexican Mafia, which lifted the

16 "green light" order against VBS.  Since then, VBS at times agreed to

17 pay "taxes" to the Mexican Mafia, and newer VBS members returned to a

18 more overt gang lifestyle.  However, Vineland Boys members continued

19 to take steps to conceal and disguise their criminal activities from

20 law enforcement, such as by using coded language in telephone calls

21 and text messages when discussing illegal conduct, and by temporarily

22 curtailing criminal activities when gang members perceive the

23 neighborhood to be "hot," that is, subject to increased attention by

24 law enforcement.

25     10.    Even while staying "under the radar" to avoid the Mexican

26 Mafia's "green light," VBS members over the years engaged in several

27 brazen confrontations with law enforcement.  For example, in 1988, a

28 VBS gang member shot and killed Los Angeles Police Department

("LAPD") Officer J.B.  In 2003, two VBS members shot Burbank Police
Department Officers G.C. and M.P. during a traffic stop, and Officer
M.P. later died at the hospital from his injuries.  In 2006,
California Highway Patrol officers conducted a traffic stop of a VBS
gang member, who shot and wounded one of the officers, then attempted
to carjack nearby civilians at gunpoint, including shooting at a
civilian's car.

    11.  In 2005, nearly 50 Vineland Boys members and associates
were indicted and arrested on a myriad of federal charges, including
racketeering offenses.  Since that time, the gang reorganized,
established new leadership in and out of the prisons, and expanded
its membership.  Some members who were prosecuted in that case served
their sentences and resumed their activities with VBS upon their
release from custody.  Others continued to lead or participate in
Vineland Boys activities from prison.

    12.  The Vineland Boys gang continued to have an inconsistent
relationship with the Mexican Mafia.  While some VBS members
associated with Mexican Mafia leaders and engaged in EME-related
activities, they viewed such activities as separate from VBS.  The
VBS gang had the general attitude that "what's Mafia is Mafia; what's
hood is hood."  By attempting to dissociate from the Mexican Mafia,
VBS was sometimes targeted by Mexican Mafia leaders who tried to
claim VBS under their authority and demand that VBS make payments to
the Mexican Mafia.  The ongoing question of whether the gang should
acquiesce to Mexican Mafia control was a divisive issue among the
Vineland Boys leaders.

    13.  The leadership structure of VBS consisted of prison-level
leaders and street-level "shot-callers."  The prison-level leaders

were high-ranking incarcerated Vineland Boys members serving lengthy prison sentences who were sometimes referred to as the "homies," "prison homies," or the "older homies."  These prison-level leaders selected street-level "shot-callers" to execute the prison-level leaders' directives and orders.  VBS leadership could change based on internal conflicts and power struggles among members seeking to gain influence and authority within the gang, referred to as "politicking," which could also involve ongoing attempts by the Mexican Mafia to increase its influence over VBS through a member's association with the Eme.

14.  VBS prison-level leaders were able to control and direct VBS's activities in the neighborhood through constant communication with the shot-callers and other VBS members.  The incarcerated VBS members often used contraband cell phones that had been smuggled into prison to communicate with one another and with individuals on the outside.  They also sent smuggled messages, called "kites," or used family members as go-betweens to relay messages.  The gang was expected to provide financial support to these incarcerated members by sending them a portion of the drug and firearms trafficking proceeds made by active VBS members on the streets.

15.  The street-level VBS shot-callers were generally responsible for executing the prison-level leaders' orders, communicating the orders to the VBS members, and overseeing the gang's activities by managing the drug and firearms trafficking operations and other crimes conducted in Vineland Boys gang territory and/or by Vineland Boys members, directing the collecting of extortion proceeds and other monetary payments to the gang, deciding and enforcing gang rules and policies, ordering disciplinary action,

1  resolving internal disputes, addressing conflicts and relations with

2  rival gangs and the Mexican Mafia, organizing gang meetings, and

3  controlling VBS membership.

4       16.  A prospective VBS member was someone, usually from the

5  neighborhood, who had demonstrated loyalty to VBS, avoided running

6  afoul of any VBS rules or members, and participated in criminal

7  conduct on behalf of the gang, known as "putting in work" for the

8  neighborhood, which augmented the gang's authority in its territory.

9  Any prospective member needed a current member to "vouch" for him in

10 order to be admitted.  Once the shot-caller and other members agreed

11 to allow a new member to join VBS, the new member was often "jumped

12 in" to the gang, by physically fighting several existing members of

13 the VBS gang for 13 seconds to prove his physical strength and

14 dedication to the Vineland Boys gang.  Once jumped in, a Vineland

15 Boys member was expected to participate fully in the gang's criminal

16 activities to generate funds for the gang, build his own reputation

17 within the gang, enforce the gang's rules, fight the gang's rivals,

18 and enhance the overall reputation of the Vineland Boys gang itself.

19      17.  Only Vineland Boys members who had been jumped in or

20 otherwise officially recognized as members could claim to be a VBS

21 member or display VBS tattoos or gang signs.  However, the Vineland

22 Boys criminal enterprise also included non-member associates who

23 acted on behalf of and for the benefit of the Vineland Boys gang.

24 VBS associates assisted the gang by relaying messages from

25 incarcerated VBS members to other VBS members, engaged in drug and

26 firearms trafficking, and participated in other criminal activity in

27 furtherance of the gang.

28

18.   The VBS gang enforced its rules and promoted discipline among its members and associates by murdering, conspiring to murder, assaulting, and threatening those members and associates who violated gang rules or posed a threat to the enterprise.  Depending on the severity of the violation, leaders of the Vineland Boys would decide whether the violator would receive a beating for 13, 26, or 39 seconds, all factors of 13, and would select three to four Vineland Boys members to administer the beatings as one member counted the seconds out loud.  This form of discipline was known as a "calentada."  Once a Vineland Boys member had been disciplined, the gang might also eject the disciplined member, a decision that could be made by the Vineland Boys leaders or the gang as a whole.  If a member was voted out of the Vineland Boys gang, he had to be "jumped out," which means the offending member would receive another beating from current members.  A former member who had been "jumped out" could no longer claim any authority or affiliation with Vineland Boys or else risk physical retaliation or even murder by the Vineland Boys gang.  In some circumstances, the Vineland Boys shot-caller might determine that a Vineland Boys member was "no good," that is, no longer in good standing with VBS.  The shot-caller might then issue a "green light" as to that person, also referred to as being "on sight," which is an order to the Vineland Boys members to attack or kill that person on sight.  The shot-caller could also order members to target, kill, or take other violent actions against rival gang members, non-members who claimed to be VBS members, or other individuals who were considered to be enemies of the gang or to have disrespected the gang.

19. The Vineland Boys gang had zero tolerance for members and associates who cooperated with law enforcement. Evidence that someone had cooperated with law enforcement was referred to as "paperwork" and could include law enforcement reports, court documents, or other documents or recordings. Vineland Boys members also discussed whether an incarcerated member had "PC'd up," referring to an inmate's placement in protective custody upon his cooperation with law enforcement. Once the Vineland Boys gang had evidence that someone had cooperated with law enforcement, the Vineland Boys shot-caller might issue a "green light" and direct VBS members to assault or kill the suspected cooperator.

20. VBS had longstanding and violent rivalries with other gangs. Because the 18th Street gang considered the formation of VBS a betrayal and also occupied territory adjacent to VBS, the two gangs were bitter rivals and were engaged in a turf war. Similarly, gangs located in Pacoima and North Hollywood neighborhoods adjacent to VBS territory were also VBS's enemies, including Pacoima ("Pacas") 13, North Hollywood Boys, North Hollywood Felons, and North Hollywood Locos. Other gangs that the Vineland Boys considered rivals were Clanton, Sun Valley Diablos, Grumpy Wynos, Blythe Street, Elmwood 13, and San Fer.

21. Vineland Boys members also engaged in acts of violence ranging from battery to murder against individuals not associated with a gang but perceived to be disrespectful of the Vineland Boys gang or of a VBS member, both within and outside of VBS territory. A VBS member earned respect within the gang by participating in violent acts on behalf of the gang. Additionally, commission of violent acts by VBS members enhanced the gang's overall reputation for violence in

1  the community.   Terrorizing residents in and near VBS territory

2  helped establish VBS's control and authority over the neighborhood.

3      22.  As a further means of intimidating and controlling the

4  residents in areas controlled by the Vineland Boys and enhancing

5  their own reputations within the Vineland Boys gang, and the overall

6  reputation of the Vineland Boys gang itself, VBS members engaged in

7  activities including, but not limited to: possessing and carrying

8  firearms to retaliate against rival gang members and for self-

9  protection; resisting arrest by fighting or running from law

10  enforcement; intimidating, threatening, and assaulting potential

11  witnesses who would testify in court about their crimes; and spray-

12  painting graffiti on businesses and residences within VBS territory.

13      23.  VBS "tagging" graffiti included the words "Vineland,"

14  "VBS," and "SV" (referring to Sun Valley or, in Spanish, "Sol

15  Valle"), as well as the tagging member's gang moniker and clique.

16  VBS members engaged in tagging both to identify territory claimed by

17  the VBS gang and to intimidate the community, such as tagging the

18  phrase "COP KILLERS."  VBS members often wrote or drew VBS-related

19  graffiti symbols and words on gang-related documents, such as prison

20  letters and pay-owe sheets and ledgers for drug and firearms

21  trafficking.

22      24.  VBS gang members generally, but not exclusively, tattooed

23  "SV," "Vineland," or "VBS" on their bodies to show their membership

24  and loyalty to the gang.  Likewise, others wore sports hats that

25  displayed "S," for Sun Valley, such as Chicago White Sox and Seattle

26  Mariners caps, or "V," for Vineland, like Virginia Cavaliers hats.

27  Vineland Boys members also wore hats and clothes that displayed the

28  word "Villan."  Only Vineland Boys members could have VBS tattoos,

including "VINELAND," "VB," "SUN VALLEY," "SV," and "91352," which is
the zip code for Sun Valley, California.  VBS gang members identified
themselves by "throwing gang signs," in which they formed the letter
"V" with the index and middle finger.  VBS gang members had slogans,
such as "V's up 'til my day's up."

25.  Although VBS did not consistently make payments to the
Mexican Mafia, VBS members had to fund other gang-related expenses,
like sending money to incarcerated members, purchasing firearms to
arm VBS members, and obtaining drugs for re-sale.  Accordingly, the
VBS gang collected money as directed by the prison-level leaders
and/or the shot-callers.  VBS members were called on to pay a portion
of their proceeds derived from the criminal activity they conducted
with the authority of the gang.  VBS member payments might be
voluntarily given, or VBS leadership might order that active members
who contributed either too little or not at all be physically
disciplined.  Non-gang-affiliated individuals who sold drugs or
firearms in VBS territory were also required to pay VBS for the right
to conduct criminal activity in the neighborhood, and with this
authorization came protection from VBS members and members from rival
gangs.  A trafficker who refused to pay may be subject to fines,
robbery, kidnapping, and threatened or actual violence from VBS
members.  Finally, VBS also collected extortion proceeds by
threatening property damage or physical harm to legitimate business
owners operating in VBS territory, particularly marijuana
dispensaries.

C.   PURPOSES OF THE ENTERPRISE

26.  The word "member" below refers to a full member of the VBS
gang.  Individuals who were affiliated with the Vineland Boys gang

15

1  and who assist the members were referred to as Vineland Boys

2  "associates."  Both members of the Vineland Boys gang and their

3  associates were participants in the Vineland Boys criminal

4  enterprise.

5      27.  At all times relevant to this Indictment, the purposes of

6  the Vineland Boys criminal enterprise included, but were not limited

7  to, the following:

8          a.  Enriching the members and associates of the Vineland

9  Boys gang through criminal activities, including, but not limited to,

10  drug sales, gun sales, and extortion, as well as payments made to the

11  gang from proceeds generated as a result of VBS members' criminal

12  activities;

13          b.  Preserving, promoting, and protecting the power,

14  territory, and profits of the Vineland Boys gang and its members and

15  associates through threats of violence and actual acts of violence,

16  including robbery, extortion, assault, attempted murder and murder;

17          c.  Exposing and punishing Vineland Boys members and

18  associates who are perceived to have violated the Vineland Boys

19  gang's codes of conduct;

20          d.  Maintaining the Vineland Boys gang's control and

21  authority over its territory, often through threats, intimidation and

22  acts of violence committed against local residents and rival gangs;

23  and

24          e.  Violently retaliating against rival gang members or

25  perceived outsiders who challenge the Vineland Boys gang's authority

26  or who fail to pay debts owed to VBS members and associates.

27

28

D.    THE MEANS AND METHODS OF THE ENTERPRISE

28.    At all times relevant to this Indictment, the means and methods by which the defendants and their associates conducted and participated in the conduct of the affairs of the Vineland Boys criminal enterprise included the following:

a.    Members and associates of the Vineland Boys gang used the enterprise to attempt, threaten, conspire to commit, and to commit acts of violence to protect and expand the enterprise's criminal operations, including acts of violence directed against rival gang members, law enforcement officers, neighborhood residents and visitors, as well as the intimidation of victims and witnesses in criminal cases;

b.    Members and associates of the enterprise acquired, possessed, carried, and used deadly weapons, including firearms, in the course of the enterprise's criminal activities;

c.    Members and associates of the enterprise promoted a climate of fear in the community through violence and threats of violence;

d.    Members and associates of the enterprise promulgated certain rules to be followed by all participants in the enterprise, including the rule that a participant in the enterprise not act as an informant to law enforcement authorities regarding the activities of the enterprise;

e.    To enforce the rules of the enterprise and to promote discipline, the members of the Vineland Boys gang used the enterprise to murder, attempt to murder, assault, and threaten Vineland Boys members and associates and others who violate the rules or pose a threat to the enterprise;

17

1   f. Members and associates of the enterprise were entitled

2 to conduct and did conduct illegal activities under the protection of

3 the enterprise to generate income, including participating in drug

4 trafficking, firearms trafficking, extortion, robberies, and

5 burglaries;

6   g. Members and associates of the enterprise frequently

7 engaged in criminal activity in the presence of other Vineland Boys

8 members and/or associates in order to enhance the status in Vineland

9 Boys of those affirmatively conducting criminal acts; and

10   h. Members and associates of the enterprise used various

11 techniques to avoid law enforcement scrutiny of the enterprise's

12 criminal activities and to evade and frustrate law enforcement, such

13 as the use of coded language to discuss criminal activities and other

14 counter-surveillance techniques to conceal the identity of its

15 participants, the ways in which it conducts its affairs, and the

16 locations at which it discusses and conducts its affairs.

1      COUNT ONE

2      [18 U.S.C. § 1962(d)]

3      Paragraphs 1 through 28 of the General Allegations are re-

4   alleged and incorporated by reference as if fully set forth herein.

5   A.    OBJECT OF THE RACKETEERING CONSPIRACY

6      Beginning on a date unknown, and continuing to the date of this

7   Indictment, in Los Angeles County, within the Central District of

8   California, and elsewhere, defendants MIRANDA, ESPINOSA, BOTELLO,

9   MORA, GONZALEZ, RAMIREZ, CONTRERAS, AVILA, BANDA, HERRERA, GALLO,

10  FONSECA, and D. VASQUEZ, and others known and unknown to the Grand

11  Jury, being persons employed by and associated with the Vineland Boys

12  criminal enterprise, an enterprise which was engaged in, and the

13  activities of which affected, interstate and foreign commerce,

14  knowingly and intentionally conspired to violate Title 18, United

15  States Code, Section 1962(c), that is, to conduct and participate,

16  directly and indirectly, in the conduct of the affairs of that

17  enterprise through a pattern of racketeering activity, as that term

18  is defined in Title 18, United States Code, Sections 1961(1) and

19  1961(5), consisting of multiple acts involving:

20      1.    Murder, in violation of California Penal Code Sections 21a,

21  31, 182, 187, 188, 189, 190, 653f, and 664;

22      2.    Extortion, in violation of California Penal Code Sections

23  21a, 31, 32, 182, 518, 519, 520, 653f, and 664;

24      3.    Robbery, in violation of California Penal Code Sections

25  21a, 31, 32, 182, 211, 212, 212.5, 213, 653f, and 664; and

26      4.    Multiple offenses involving trafficking in controlled

27  substances, including methamphetamine, heroin, cocaine, and

28

marijuana, in violation of Title 21, United States Code, Sections
841(a)(1) and 846.

It was a further part of the conspiracy that each defendant
agreed that a conspirator would commit at least two acts of
racketeering in the conduct of the affairs of the enterprise.

B.   MEANS BY WHICH THE OBJECT OF THE CONSPIRACY WAS TO BE
     ACCOMPLISHED

The object of the conspiracy was to be accomplished, in
substance, as follows:

1.   Incarcerated members of the Vineland Boys gang would pass
messages from within the California state prison system to defendant
MIRANDA, and others known and unknown to the Grand Jury, for
defendant MIRANDA and other Vineland Boys gang leaders to direct the
activities of the Vineland Boys gang, including activities involving
the distribution of firearms and controlled substances and the
collection and distribution of "taxed" proceeds, and to authorize and
direct acts of violence.

2.   Defendants MIRANDA, ESPINOSA, BOTELLO, and MORA would
authorize Vineland Boys members and associates to extort and collect
"tax" proceeds from drug traffickers, firearms traffickers, and other
legal and illegal businesses operating in the areas controlled by the
Vineland Boys gang.

3.   Defendants MIRANDA, ESPINOSA, MORA, GONZALEZ, and RAMIREZ,
and others known and unknown to the Grand Jury, would direct Vineland
Boys members to conduct robberies, murders, extortion, witness
intimidation, and drug trafficking in order to promote and further
the activities of the Vineland Boys gang.

1      4.    Defendants MIRANDA, BOTELLO, MORA, GONZALEZ, CONTRERAS,
2   AVILA, BANDA, HERRERA, GALLO, and D. VASQUEZ, and others known and
3   unknown to the Grand Jury, would obtain, possess, and sell firearms
4   and ammunition for Vineland Boys members to enforce the authority of
5   the Vineland Boys gang.

6      5.    Defendants MIRANDA, ESPINOSA, BOTELLO, MORA, GONZALEZ,
7   RAMIREZ, CONTREREAS, BANDA, HERRERA, GALLO, FONSECA, and D. VASQUEZ,
8   and others known and unknown to the Grand Jury, would possess and
9   distribute controlled substances within and outside of the
10  neighborhoods controlled by the Vineland Boys gang and supply
11  controlled substances to other Vineland Boys members.

12     6.    Defendants MIRANDA, BOTELLO, and MORA, and others known and
13  unknown to the Grand Jury, would direct individuals selling drugs in
14  Vineland Boys gang territory, to pay money to the Vineland Boys gang
15  in exchange for "authorization" to sell drugs in Vineland Boys gang
16  territory.

17     7.    Defendants MIRANDA, ESPINOSA, BOTELLO, RAMIREZ, and
18  CONTRERAS, and others known and unknown to the Grand Jury, would pay
19  a portion of their proceeds from drug and firearms trafficking to be
20  used for the benefit of the Vineland Boys gang, including purchasing
21  firearms for Vineland Boys members and sending money to incarcerated
22  Vineland Boys members.

23     8.    Defendants BOTELLO and MORA, and others known and unknown
24  to the Grand Jury, would deliver payments collected by Vineland Boys
25  members to defendant MIRANDA.

26     9.    Defendants MIRANDA, BOTELLO, and MORA would send money to
27  incarcerated Vineland Boys members via third parties.

28

1          10.   Defendants MIRANDA, ESPINOSA, MORA, GONZALEZ, RAMIREZ,
2    CONTRERAS, AVILA, HERRERA, and GALLO, and others known and unknown to
3    the Grand Jury, would use firearms and dangerous weapons to commit
4    robberies, kidnappings, and assaults, and to retaliate against,
5    attempt to kill, and kill individuals who obstructed the purposes of
6    the Vineland Boys enterprise, including rival gang members, law
7    enforcement officers, potential witnesses to criminal activities
8    committed by Vineland Boys members, and residents in the
9    neighborhoods controlled by the Vineland Boys gang, and Vineland Boys
10   members in bad standing with the gang, in order to enforce the
11   authority of the Vineland Boys gang.

12   C.   OVERT ACTS

13         In furtherance of the conspiracy, and to accomplish the object
14   of the conspiracy, on or about the following dates, defendants
15   MIRANDA, ESPINOSA, BOTELLO, MORA, GONZALEZ, RAMIREZ, CONTRERAS,
16   AVILA, BANDA, HERRERA, GALLO, FONSECA, and D. VASQUEZ, and co-
17   conspirators Navarrete, Cardenas, Paz, Laurel, Molina, Zuniga,
18   Solano, Aceves, Rodriguez, Harrel, Medina, Norona, Darmandzhyan, J.
19   Vasquez, Quintero, Lopez, Alvarado, and Hernandez, and others known
20   and unknown to the Grand Jury, committed various overt acts within
21   the Central District of California, and elsewhere, including, but not
22   limited to, the following:

23         Overt Act No. 1:   On January 14, 1996, defendant BOTELLO and
24   an unindicted co-conspirator possessed a 9mm Bryco handgun, 12 rounds
25   of ammunition, and brass knuckles in Vineland Boys gang territory as
26   they attempted to flee from police.

27

28

1    Overt Act No. 2:    On November 15, 2003, two unindicted

2    Vineland Boys members shot Burbank Police Officers M.P. and G.C.

3    during a traffic stop, killing M.P.

4    Overt Act No. 3:    On November 19, 2003, defendant RAMIREZ sold

5    approximately four pounds of methamphetamine to a confidential

6    informant and possessed approximately five additional pounds that he

7    also intended to sell to the informant as part of an arrangement to

8    sell the informant nine pounds of methamphetamine for $74,400.

9    Overt Act No. 4:    On March 15, 2007, defendant BOTELLO

10   possessed methamphetamine, a digital scale, plastic baggies, rubber

11   bands, $527 in cash, a stolen iPod, and a vehicle with a hidden

12   compartment containing methamphetamine, at his residence in Newhall,

13   California.

14   Overt Act No. 5:    On October 25, 2007, at his residence in Sun

15   Valley, California, in Vineland Boys gang territory, co-conspirator

16   Quintero possessed methamphetamine, cocaine base in the form of crack

17   cocaine, marijuana, two bulletproof vests, two digital scales, pay-

18   owe sheets, approximately $379 in cash, a "cane sword," an envelope

19   on which co-conspirator Quintero had written "TRUCHA PUTOS, VINELAND

20   BOYS GANG," meaning, "Watch out assholes, Vineland Boys," and which

21   contained a newspaper article featuring then-Burbank Police Chief

22   T.S., with the handwritten word "DEAD!" and the name of another

23   Vineland Boys member.

24   Overt Act No. 6:    On January 10, 2008, defendant HERRERA

25   spray-painted Vineland Boys graffiti on the walls of two residences

26   located in Vineland Boys gang territory.

27   Overt Act No. 7:    On September 9, 2008, defendant MIRANDA and

28   two other Vineland Boys members possessed a loaded handgun while

1  driving in the area of Radford Avenue and Saticoy Street in Sun
2  Valley, California, in Vineland Boys gang territory.

3      Overt Act No. 8:    On October 2, 2008, defendant FONSECA and an
4  unindicted co-conspirator drove a Volvo that had been stolen from a
5  residence in Vineland Boys gang territory and possessed tools used to
6  steal cars.

7      Overt Act No. 9:    On February 5, 2010, defendant BANDA placed
8  "Vineland Boys" stickers on walls in Vineland Boys gang territory.

9      Overt Act No. 10:    On February 14, 2010, defendant AVILA and
10 four unindicted Vineland Boys members approached victims R.O. and
11 P.H. who were in R.O.'s vehicle, parked in the area of Sunland
12 Boulevard and San Fernando Road in Sun Valley, California, in
13 Vineland Boys gang territory, armed with a firearm, stated that this
14 was "Vineland Barrio," forcefully pulled R.O. out of his vehicle,
15 demanded R.O.'s keys and cell telephone, and then drove off in R.O.'s
16 vehicle, which they crashed into the surrounding wall of a residence
17 on Bakman Avenue, and then fled from police on foot.

18     Overt Act No. 11:    On February 20, 2010, defendant HERRERA
19 possessed a loaded .32 caliber revolver while driving with other
20 Vineland Boys members and associates in an area controlled by rival
21 gangs in Pacoima, California.

22     Overt Act No. 12:    On November 10, 2011, defendant BANDA and an
23 unindicted Vineland Boys member were driving in Vineland Boys gang
24 territory while they possessed marijuana and approximately 3.51 grams
25 of methamphetamine, and defendant BANDA threw the methamphetamine out
26 of the car window when he saw police officers.

27     Overt Act No. 13:    On May 4, 2012, defendant HERRERA drove
28 through an area of Sunland-Tujunga controlled by a rival gang while

possessing a loaded Ruger 9mm firearm, a hat with a VBS-related logo, a small amount of marijuana, and cloth gloves.

Overt Act No. 14:   On June 7, 2012, defendant FONSECA drove on Glenoaks Boulevard in Sun Valley, California, along the border of Vineland Boys gang territory, while in possession of a nine-inch switchblade and approximately .09 grams of methamphetamine.

Overt Act No. 15:   On July 17, 2012, at a restaurant in San Fernando, California, defendant ESPINOSA, along with an unindicted co-conspirator, offered to sell a confidential informant working at the direction of law enforcement ("CHS-8") methamphetamine for less than $700 per ounce or $8,000 per pound, then offered to provide an ounce of methamphetamine as a sample.

Overt Act No. 16:   On July 20, 2012, using coded language in a telephone call, an unindicted co-conspirator referred CHS-8 to defendant ESPINOSA to confirm the price of methamphetamine and to supply firearms.

Overt Act No. 17:   On September 15, 2012, co-conspirator Molina and another Vineland Boys gang member threw a glass bottle at J.C.'s car and told J.C. and J.C.'s father that they were in "Vineland Boys hood," and when J.C.'s father called the police, co-conspirator Molina yelled: "Call the police, I don't give a fuck — When I get out, I know where you live, and Vineland Boys are going to get you."

Overt Act No. 18:   On January 3, 2013, co-conspirator Lopez drove in Vineland Boys gang territory with two unindicted Vineland Boys members, one of whom was armed with a concealed, loaded 9mm handgun, and they attempted to flee from police.

Overt Act No. 19:   On March 26, 2013, defendant CONTRERAS possessed ammunition for a shotgun and approximately 1.53 grams of methamphetamine in his vehicle in Vineland Boys gang territory.

Overt Act No. 20:   On January 24, 2014, co-conspirator Molina possessed ammunition at his residence in Sun Valley, California, in Vineland Boys gang territory, and fled from law enforcement.

Overt Act No. 21:   On three separate occasions on unknown dates following the murder of Vineland Boys member M.R. on March 4, 2014, defendant RAMIREZ and an unindicted Vineland Boys member drove while armed with firearms for the purpose of looking for and shooting the rival gang member suspected of murdering M.R.

Overt Act No. 22:   On March 26, 2014, defendant AVILA and an unindicted co-conspirator drove in a stolen vehicle in Vineland Boys gang territory.

Overt Act No. 23:   On May 30, 2014, defendant GALLO and an unindicted co-conspirator were driving in Vineland Boys gang territory, and defendant GALLO threw a firearm out of the window after he spotted nearby law enforcement officers.

Overt Act No. 24:   On June 13, 2014, while driving in Vineland Boys gang territory on Ledge Avenue in Sun Valley, California, co-conspirator Laurel possessed a loaded, unregistered 9mm semiautomatic handgun.

Overt Act No. 25:   On September 10, 2014, defendant AVILA told a confidential informant working at the direction of law enforcement ("CHS-2") that defendants BANDA and MIRANDA could sell methamphetamine to CHS-2.

1    Overt Act No. 26:   On September 23, 2014, using coded language

2  in a telephone call, co-conspirator Aceves agreed to sell CHS-2 three

3  ounces of methamphetamine for $300 per ounce on the following day.

4    Overt Act No. 27:   On September 24, 2014, co-conspirator Aceves

5  met CHS-2 at co-conspirator Aceves's residence on Norris Avenue in

6  Sun Valley, California, in Vineland Boys gang territory, to sell

7  three ounces of methamphetamine in exchange for $900.

8    Overt Act No. 28:   In or around November 2014, defendant

9  MIRANDA ordered defendant FONSECA to collect money from an unindicted

10  Vineland Boys member who had been selling heroin in Vineland Boys

11  gang territory.

12    Overt Act No. 29:   In or around November 2014, defendant

13  MIRANDA collected $200 to $300 from an unindicted Vineland Boys gang

14  member's heroin trafficking proceeds for the gang.

15    Overt Act No. 30:   On November 20, 2014, defendant GONZALEZ

16  possessed a stolen "Vineland Avenue" street sign at his residence on

17  Keswick Street, in Sun Valley, California, in Vineland Boys gang

18  territory.

19    Overt Act No. 31:   On January 15, 2015, using coded language in

20  a telephone call, co-conspirator Aceves told CHS-2 to contact co-

21  conspirator Harrel to obtain methamphetamine and provided co-

22  conspirator Harrel's telephone number.

23    Overt Act No. 32:   On January 16, 2015, using coded language in

24  telephone calls, co-conspirator Harrel agreed to sell CHS-2 three

25  ounces of methamphetamine the following week, and she noted that she

26  supplies methamphetamine to co-conspirator Aceves and that the

27  current leaders of the Vineland Boys gang included defendant MIRANDA.

28

Overt Act No. 33:   On January 22, 2015, co-conspirator Harrel had CHS-2 drive them to the residence of her methamphetamine supplier, where she obtained approximately 82.8 grams of methamphetamine that she then sold to CHS-2 in exchange for $1,200.

Overt Act No. 34:   On January 26, 2015, co-conspirator Alvarado possessed 100 rounds of .22 caliber ammunition while driving in Vineland Boys gang territory with an unindicted Vineland Boys member.

Overt Act No. 35:   On May 28, 2015, in Vineland Boys gang territory, when police stopped defendant MIRANDA in a car containing a loaded Glock .40 caliber pistol and driven by an unindicted co-conspirator, defendant MIRANDA threatened to report the driver to the Vineland Boys members if the driver agreed to speak with the police.

Overt Act No. 36:   On May 29, 2015, at his residence in Vineland Boys gang territory, co-conspirator Darmandzhyan possessed heroin, methamphetamine, marijuana, a digital scale, two firearms, ammunition, and approximately $1,190 in cash.

Overt Act No. 37:   On June 2, 2015, defendants AVILA and GONZALEZ, and two unindicted co-conspirators drove in Vineland Boys gang territory with a loaded, stolen Smith & Wesson .38 caliber revolver, a loaded Ruger model P89 9mm semiautomatic pistol with an extended 25-round ammunition magazine, and approximately 90 ecstasy pills, and defendants AVILA and GONZALEZ threw the firearms out of the car when they saw the police.

Overt Act No. 38:   On July 4, 2015, co-conspirator Molina possessed a loaded .22 caliber semiautomatic rifle with a high-capacity magazine and three rounds of .22 caliber ammunition while driving in Vineland Boys gang territory with defendant AVILA and two other Vineland Boys members.

1    Overt Act No. 39:   On July 4, 2015, using coded language in a
2    Facebook chat conversation, an unindicted co-conspirator asked
3    defendant GONZALEZ if he would like to be the main shot-caller for
4    the Vineland Boys gang.

5    Overt Act No. 40:   On November 5, 2015, using coded language in
6    a telephone call, defendant HERRERA told an unindicted Vineland Boys
7    member to get heroin from defendant BANDA.

8    Overt Act No. 41:   On November 12, 2015, using coded language
9    in telephone calls and text messages, after defendant BANDA offered
10   to sell defendant HERRERA a half-ounce of drugs for $150, defendant
11   HERRERA instead arranged to obtain the half-ounce from defendant
12   MIRANDA for $130, which defendant HERRERA then immediately sold to
13   his drug customer.  When defendant HERRERA later learned that
14   defendant BANDA was coming to deliver a half-ounce of drugs to him,
15   he told defendant BANDA to "front" him the drugs on credit.

16   Overt Act No. 42:   On November 13, 2015, using coded language
17   in telephone calls, defendant HERRERA arranged to rent a warehouse
18   for an upcoming Vineland Boys gang meeting and updated defendant
19   MIRANDA about the warehouse's availability.

20   Overt Act No. 43:   On November 14, 2015, using coded language
21   in a telephone call with defendant HERRERA, when co-conspirator
22   Navarrete admitted that he had shot someone he believed was a member
23   of a tagging crew, defendant HERRERA explained that the victim was
24   actually the brother of another Vineland Boys member and threatened
25   to stop providing co-conspirator Navarrete with additional firearms.

26   Overt Act No. 44:   On November 14, 2015, during a meeting at a
27   residence on Bromwich Street in Pacoima, California, used by
28   defendant MIRANDA for drug trafficking activities ("defendant

29

MIRANDA's stash house on Bromwich Street"), defendant MIRANDA told a
confidential informant working at the direction of law enforcement
("CHS-1") that defendant MIRANDA was owed $2,800 by one drug customer
and $2,500 by another, and defendant MIRANDA agreed to sell to CHS-1
three or four pounds of methamphetamine for $2,700 per pound.

Overt Act No. 45:   On November 14, 2015, during the meeting at
defendant MIRANDA's stash house on Bromwich Street, defendant MIRANDA
described an incident in which a rival gang member shot at him, and
he ran to his car to retrieve his 9mm Smith & Wesson handgun, noting
that this was similar to a firearm he had previously sold to CHS-1.

Overt Act No. 46:   On November 14, 2015, during the meeting at
defendant MIRANDA's stash house on Bromwich Street, defendant MIRANDA
acknowledged that he took his orders from high-ranking incarcerated
VBS members, discussed how CHS-1 was to collect extortion payments on
behalf of the Vineland Boys gang, and advised CHS-1 to refer anyone
who refused to pay to defendant ESPINOSA.

Overt Act No. 47:   On November 15, 2015, using coded language
in text messages, an unindicted Vineland Boys member told defendant
HERRERA he was hiding from police after shooting at a rival gang, and
defendant HERRERA said the rival gang was asking for it.

Overt Act No. 48:   On November 17, 2015, using coded language
in a telephone call, defendant MIRANDA agreed to sell drugs to CHS-1
the following day.

Overt Act No. 49:   On November 17, 2015, using coded language
in a telephone call, defendant AVILA offered to sell a firearm that
he possessed at that time to CHS-1 for $400, which he described as a
black Burgo handgun with a four-inch barrel and a wooden handle, and

1   agreed to text a photo of the handgun to CHS-1, then defendant AVILA
2   texted CHS-1 a photograph of a black handgun with a wooden handle.

3       Overt Act No. 50:   On November 18, 2015, defendant AVILA
4   directed CHS-1 to a location on Sunland Park Drive in Sun Valley,
5   California, in Vineland Boys gang territory, where defendant AVILA
6   sold CHS-1 a loaded Burgo .38 caliber revolver with an obliterated
7   serial number and two rounds of ammunition for $400, and during this
8   conversation, defendant AVILA said he had been hunting for members of
9   a rival gang to carry out defendant MIRANDA's prior green light
10  orders to assault and kill the rival gang members.

11      Overt Act No. 51:   On November 18, 2015, during a meeting at
12  defendant MIRANDA's stash house on Bromwich Street, defendant MIRANDA
13  sold CHS-1 approximately 111.4 grams of methamphetamine for $800.

14      Overt Act No. 52:   On November 18, 2015, during a meeting at
15  defendant MIRANDA's stash house on Bromwich Street, defendants
16  MIRANDA and ESPINOSA discussed how defendant ESPINOSA, in his
17  capacity as an associate of the Mexican Mafia member who controlled a
18  particular prison, had ordered a Vineland Boys member incarcerated at
19  that prison to be given a disciplinary beating, and defendants
20  MIRANDA and ESPINOSA praised the Vineland Boys member for refusing to
21  tell law enforcement who had attacked him, even though he had been
22  stabbed during the attack.

23      Overt Act No. 53:   On November 18, 2015, during a meeting at
24  defendant MIRANDA's stash house on Bromwich Street, defendant
25  ESPINOSA described previously ordering defendant MORA not to pay any
26  money to the Mexican Mafia because the Vineland Boys gang would not
27  pay the Mexican Mafia.

28

31

Overt Act No. 54:   On November 19, 2015, using coded language in a text message, co-conspirator Laurel asked defendant HERRERA to supply black tar heroin.

Overt Act No. 55:   On November 20, 2015, using coded language in a telephone call, defendant MIRANDA directed defendant HERRERA to repair or sell their broken 9mm firearm and to pay defendant MIRANDA for the firearm, and defendant HERRERA suggested that defendant GONZALEZ could repair the firearm.

Overt Act No. 56:   On November 21, 2015, using coded language in a text message, co-conspirator Laurel asked if defendant HERRERA had cocaine.

Overt Act No. 57:   On November 21, 2015, using coded language in a telephone call, an incarcerated unindicted Vineland Boys member who is a prison-level leader of the gang ("Unindicted Member 1" or "UM-1") told CHS-1 that the prison-level VBS leaders would address the ongoing attempt by defendant RAMIREZ and another unindicted Vineland Boys member to seize control of the Vineland Boys gang away from defendant MIRANDA.

Overt Act No. 58:   On November 23, 2015, using coded language in a telephone call, defendant HERRERA agreed to provide defendant GALLO with drugs later that day, then met with defendant GALLO near Roscoe Elementary School in Sun Valley, California.

Overt Act No. 59:   On November 23, 2015, using coded language in telephone calls, defendant HERRERA agreed to sell CHS-1 half a "piece" of heroin for $500 and an ounce of methamphetamine for $380 the following day.

Overt Act No. 60:   On November 24, 2015, using coded language in telephone calls, defendant HERRERA attempted to obtain an ounce of

methamphetamine from defendant MIRANDA to sell, and he and defendant GALLO arranged to have a supplier deliver to defendant HERRERA approximately 12.1 grams of heroin that he then sold to CHS-1 outside his residence on Cleon Avenue in Sun Valley, California for $500, which resulted in a profit of $100 to split between defendants HERRERA and GALLO.

Overt Act No. 61:  On November 25, 2015, using coded language in a text message, defendant HERRERA asked co-conspirator Laurel to get him "fronted" cocaine on credit.

Overt Act No. 62:  On November 30, 2015, using coded language in a telephone call, defendant MIRANDA agreed to sell methamphetamine to CHS-1 the following day.

Overt Act No. 63:  On December 1, 2015, during a meeting at defendant MIRANDA's stash house on Bromwich Street, defendant MIRANDA sold CHS-1 approximately 110.9 grams of methamphetamine for $800, and defendant MIRANDA told CHS-1 that prison-level Vineland Boys leaders would address the attempt by defendant RAMIREZ and an unindicted Vineland Boys member to take over defendant MIRANDA's leadership of the gang, praised an unindicted Vineland Boys member who worked as defendant MIRANDA's enforcer, and complained that defendant FONSECA appeared weak by refusing to fight defendant RAMIREZ.

Overt Act No. 64:  On December 2, 2015, using coded language in text messages and telephone calls, defendant GALLO agreed to sell CHS-1 heroin for $450 the following day.

Overt Act No. 65:  On December 3, 2015, in a meeting outside a Wendy's restaurant on Roscoe Boulevard in Panorama City, California, defendant GALLO sold approximately 12.6 grams of heroin to CHS-1 in

1  exchange for $450, noting that he could also supply heroin with
2  better quality, then asked to buy a firearm from CHS-1.

3      Overt Act No. 66:   On December 6, 2015, using coded language in
4  a telephone call, UM-1 told CHS-1 that he and other prison-level
5  Vineland Boys leaders wanted defendant MIRANDA to remain the gang's
6  shot-caller and would have defendant RAMIREZ and the other Vineland
7  Boys member disciplined.

8      Overt Act No. 67:   On December 6, 2015, in the area of South
9  Walton Avenue and 38th Street in Los Angeles, California, defendants
10  GONZALEZ, AVILA, and GALLO, and other Vineland Boys members, fired
11  shots at members of a rival gang believed to have shot and killed a
12  Vineland Boys member, and during the ensuing shoot-out, defendant
13  GALLO crashed his car into another car.

14      Overt Act No. 68:   On December 6, 2015, defendant GALLO falsely
15  reported to the police that his car had been stolen in order to
16  conceal his involvement in the shooting on Walton Avenue.

17      Overt Act No. 69:   On December 7, 2015, using coded language in
18  a telephone call, defendant GONZALEZ told CHS-1 about being in a
19  fight between Vineland Boys members and members from the Street
20  Villains gang that occurred the day before in an area controlled by
21  the Street Villains gang.

22      Overt Act No. 70:   On December 7, 2015, during a meeting in Sun
23  Valley Park, in Vineland Boys gang territory, defendant GONZALEZ told
24  CHS-1 about the incident in which defendants GONZALEZ, AVILA, and
25  GALLO, and other Vineland Boys members, got in a shootout with
26  members of a gang suspected of killing a Vineland Boys member in
27  which defendant GALLO crashed his car.

28

Overt Act No. 71:   On December 14, 2015, using coded language in a telephone call, defendant GALLO agreed to sell 1.5 ounces of methamphetamine to CHS-1 the following day.

Overt Act No. 72:   On December 15, 2015, in Sylmar, California, defendant GALLO sold approximately 54.7 grams of methamphetamine to CHS-1 in exchange for $450.

Overt Act No. 73:   On December 22, 2015, defendant BANDA possessed marijuana, approximately 3.22 grams of methamphetamine, and a loaded Taurus 9mm semi-automatic pistol with a 17-round high-capacity magazine in his vehicle in Vineland Boys gang territory.

Overt Act No. 74:   On January 2, 2016, using coded language in a telephone call with CHS-1, defendant HERRERA described how he and an unindicted Vineland Boys member had, at defendant MIRANDA's direction, administered a "calentada" beating to another Vineland Boys member.

Overt Act No. 75:   On January 3, 2016, using coded language in a telephone call, defendant AVILA told CHS-1 that defendant GONZALEZ had multiple firearms available.

Overt Act No. 76:   On January 6, 2016, using coded language in a telephone call, defendant BANDA told CHS-1 that another Vineland Boys gang member was trying to sell a Glock firearm for $650 and would have additional firearms for sale soon.

Overt Act No. 77:   On January 6, 2016, at a meeting with CHS-1 and another Vineland Boys member at defendant MIRANDA's stash house on Bromwich Street, where defendant MIRANDA was maintaining marijuana plants, defendant MIRANDA ordered CHS-1 to go with two or three other Vineland Boys members to extort a marijuana dispensary located in Vineland Boys gang territory but to avoid identifying themselves as

1  Vineland Boys members because of the business's security cameras, and
2  defendant MIRANDA noted that another business that the gang had been
3  extorting had closed down, then defendant MIRANDA said that certain
4  Vineland Boys members, including defendants ESPINOSA, CONTRERAS,
5  BOTELLO, and RAMIREZ, co-conspirator Cardenas, and defendant MIRANDA
6  himself, would give money to CHS-1 to be sent to incarcerated
7  Vineland Boys members and to buy firearms and other items for the
8  gang's use.

9      Overt Act No. 78:   On January 7, 2016, using coded language in
10 a telephone call, UM-1 discussed with CHS-1 defendant MIRANDA's plan
11 to collect money from Vineland Boys members, insisting that members
12 who used the Vineland Boys name to make money through criminal
13 activities would have to pay.

14     Overt Act No. 79:   On January 10, 2016, using coded language in
15 a text message, defendant HERRERA offered to sell CHS-1 a .32 caliber
16 handgun for $380.

17     Overt Act No. 80:   On January 12, 2016, defendant HERRERA
18 texted CHS-1 a video with two photographs of the .32 caliber handgun
19 that defendant HERRERA was offering to sell.

20     Overt Act No. 81:   On January 12, 2016, outside his residence
21 on Cleon Avenue in Sun Valley, California, in Vineland Boys
22 territory, defendant HERRERA accepted $400 from CHS-1 to pay for a
23 firearm that he had given to CHS-1, and he explained that the broken
24 firearm had belonged primarily to defendant MIRANDA.

25     Overt Act No. 82:   On January 12, 2016, while at the residence
26 of defendant GALLO and co-conspirator Laurel on White Street in Sun
27 Valley, California, in Vineland Boys gang territory, defendants
28

1 | HERRERA and GALLO and co-conspirator Laurel sold CHS-1 a loaded

2 | Fabrique Nationale .32 caliber pistol in exchange for $360.

3 |     Overt Act No. 83:   On January 13, 2016, using coded language in

4 | a telephone call with CHS-1, defendant BANDA said he had recently

5 | sold a firearm to defendant GONZALEZ and had an additional firearm

6 | available to sell.

7 |     Overt Act No. 84:   On January 13, 2016, using coded language in

8 | text messages with CHS-1, co-conspirator Paz explained that his

9 | firearms supplier had recently sold a Ruger firearm and agreed to

10 | inquire about other firearms.

11 |     Overt Act No. 85:   On January 14, 2016, defendant GALLO and an

12 | unindicted Vineland Boys gang associate possessed approximately 3.22

13 | grams of a mixture and substance containing methamphetamine, a

14 | digital scale, approximately 13 stolen or fraudulent checks, 11

15 | stolen or fraudulent debit cards, stolen or fraudulent vehicle

16 | registration documents, including a stolen car registration document,

17 | a stolen California identification card, approximately 22 pieces of

18 | stolen mail, and $159, while driving in a stolen vehicle.

19 |     Overt Act No. 86:   On January 16, 2016, using coded language in

20 | telephone calls, defendant MIRANDA, who was using co-conspirator

21 | Cardenas's telephone, ordered CHS-1 to go to a Norm's restaurant in

22 | Van Nuys, California, to assault a Vineland Boys member who was in

23 | bad standing with the gang, and to remind him of his debt owed to

24 | defendant ESPINOSA, then told CHS-1 to have defendant HERRERA carry

25 | out the assault if CHS-1 was unable to go.

26 |     Overt Act No. 87:   On January 29, 2016, an unindicted Vineland

27 | Boys member told CHS-1 that defendant CONTRERAS and another

28 | unindicted Vineland Boys member had shot at co-conspirator Harrel's

1  brother for attempting to steal a .50 caliber firearm from defendant
2  CONTRERAS's residence on Strathern Street in North Hollywood,
3  California, in Vineland Boys gang territory.

4      Overt Act No. 88:   On January 31, 2016, using coded language in
5  telephone calls and text messages, UM-1 ordered CHS-1 to retrieve
6  "paperwork" on a Vineland Boys member suspected of cooperating with
7  law enforcement to deliver to defendant MIRANDA.

8      Overt Act No. 89:   On January 31, 2016, using coded language in
9  text messages, defendant GONZALEZ offered to sell CHS-1 a Bersa .380
10 caliber handgun, as well as two other firearms that he later said
11 were already sold.

12     Overt Act No. 90:   On February 2, 2016, defendant GONZALEZ
13 obtained a Bersa .380 caliber handgun from his firearms supplier
14 outside a residence in Glendale, California, where he then sold the
15 handgun to CHS-1 for $450.

16     Overt Act No. 91:   On February 2, 2016, during the meeting with
17 CHS-1, defendant GONZALEZ said that he possessed three fully-
18 automatic firearms, and that he, defendant AVILA, and co-conspirator
19 Navarrete had recently shot at a car with a fully-automatic AR-15
20 type machine gun.

21     Overt Act No. 92:   On February 2, 2016, during a meeting with
22 CHS-1, defendant GONZALEZ said that co-conspirator Molina would be
23 physically disciplined with a 39-second "calentada" beating because
24 he allowed another Vineland Boys member to be arrested for contraband
25 that actually belonged to co-conspirator Molina, noting that co-
26 conspirator Laurel had properly accepted a "calentada" for a similar
27 incident.

28

Overt Act No. 93:   On February 2, 2016, in an alley between White Street and Ratner Street in Sun Valley, California, in Vineland Boys gang territory, defendant GONZALEZ sold CHS-1 an APOC Armory .556 caliber AR-15 type rifle with no serial number and 13 rounds of .223 caliber ammunition for $1,400, and he offered to sell CHS-1 additional firearms.

Overt Act No. 94:   On February 2, 2016, co-conspirator Cardenas offered to sell one ounce of cocaine to CHS-1 in exchange for $750.

Overt Act No. 95:   On February 3, 2016, using coded language in an Instagram Messenger message, an unindicted co-conspirator asked to buy methamphetamine from defendant GONZALEZ.

Overt Act No. 96:   On February 4, 2016, defendant MIRANDA reviewed "paperwork" on a Vineland Boys member suspected of cooperating with law enforcement that CHS-1 had been ordered by UM-1 to deliver, and defendant MIRANDA concluded that the "paperwork" was proof that this individual had "snitched."

Overt Act No. 97:   On February 4, 2016, using coded language in a telephone call, UM-1 directed CHS-1 to preserve the "paperwork" for a Vineland Boys member suspected of cooperating with law enforcement, insisting that the Vineland Boys gang would not allow one member to make the entire gang look bad.

Overt Act No. 98:   On February 5, 2016, in an alley by co-conspirator Cardenas's residence on De Garmo Avenue in Sun Valley, California, in Vineland Boys gang territory, co-conspirator Cardenas sold approximately 28.2 grams of cocaine to CHS-1 in exchange for $750, and he offered to sell CHS-1 a pound of marijuana for $2,000.

Overt Act No. 99:   On February 8, 2016, at a meeting with CHS-1 at defendant MIRANDA's stash house on Bromwich Street, defendant

1    ESPINOSA declared that no one could tell Vineland Boys how to "run
2    our hood," and he suggested jumping out an unindicted Vineland Boys
3    member whom he and defendant MIRANDA had confronted for falsely
4    claiming that the Mexican Mafia had given him control of the Vineland
5    Boys gang.

6        Overt Act No. 100:  On February 8, 2016, during a meeting with
7    CHS-1 at defendant MIRANDA's stash house on Bromwich Street,
8    defendant ESPINOSA said he believed he was being investigated by law
9    enforcement and so was conducting all of his drug sales through
10   defendant MIRANDA.

11       Overt Act No. 101:  On February 8, 2016, during a meeting at
12   defendant MIRANDA's stash house on Bromwich Street, defendant
13   ESPINOSA and CHS-1 discussed whether the gang would discipline an
14   unindicted Vineland Boys member for shooting a fellow Vineland Boys
15   member.

16       Overt Act No. 102:  On February 10, 2016, using coded language
17   in a telephone call, co-conspirator Paz offered to sell CHS-1 a pound
18   of methamphetamine for $3,000, a 12-gauge shotgun for $1,000, and a
19   new 9mm firearm for $650, the last of which he suggested that CHS-1
20   could re-sell for $750.

21       Overt Act No. 103:  On February 18, 2016, using coded language
22   in a telephone call with CHS-1, defendant HERRERA and co-conspirator
23   Laurel said they heard from defendant MIRANDA and others that an
24   unindicted Vineland Boys member was "no good" for cooperating with
25   law enforcement and would be punished with a "calentada" beating.

26       Overt Act No. 104:  On February 20, 2016, defendant MIRANDA sold
27   one half-pound of methamphetamine to an unidentified buyer for $2,000

28

1  in a parking lot near San Fernando Road and Osborne Street in Los

2  Angeles, California.

3    Overt Act No. 105:   On February 20, 2016, defendant MIRANDA

4  distributed marijuana to an unknown buyer at an apartment in the area

5  of Saticoy Street and Vineland Avenue in Sun Valley, California, in

6  Vineland Boys gang territory.

7    Overt Act No. 106:   On February 20, 2016, defendants MIRANDA,

8  ESPINOSA, GONZALEZ, RAMIREZ, CONTRERAS, AVILA, BANDA, HERRERA, GALLO,

9  FONSECA, and D. VASQUEZ, and co-conspirators Navarrete, Cardenas,

10  Paz, Laurel, and Molina, and other unindicted Vineland Boys members

11  attended a Vineland Boys gang meeting held at a residence on Dora

12  Street in Sun Valley, California, in Vineland Boys gang territory.

13    Overt Act No. 107:   On February 20, 2016, at the Vineland Boys

14  gang meeting, defendant GONZALEZ, who was armed with a Glock 17 9mm

15  handgun that he claimed was fully automatic, told CHS-1 about

16  engaging in a recent shootout with rival gang members while they were

17  stopped at a red light near the intersection of Glenoaks Boulevard

18  and Osborne Street in Pacoima, California, in an area controlled by a

19  rival gang, then he showed CHS-1 an article about an unindicted co-

20  conspirator whom defendant GONZALEZ had planned to sponsor for VBS

21  membership and who had recently been arrested for shooting a rival

22  gang member at a park in Burbank, California.

23    Overt Act No. 108:   On February 20, 2016, at the Vineland Boys

24  gang meeting, defendant MIRANDA, using coded language, instructed the

25  members that an unindicted Vineland Boys gang member was no longer in

26  good standing with the gang and would be disciplined with a

27  "calentada" beating of "at least a hard 39," that is, lasting 39

28  seconds, and defendant RAMIREZ ordered Vineland Boys members to

1  assault the disfavored member upon sight, and if he were to talk

2  back, then to bring him back to the group to receive more severe

3  discipline.

4      Overt Act No. 109:  On February 20, 2016, at the Vineland Boys

5  gang meeting, defendant MIRANDA explained that no member should be

6  paying "taxes" to the Mexican Mafia and ordered members to beat up

7  anyone who asked questions about which Mexican Mafia member

8  controlled the gang, but that any drug dealers selling drugs in

9  Vineland Boys gang territory who were not Vineland Boys members had

10  to pay extortion "taxes" to the Vineland Boys gang that would be

11  given to defendant MIRANDA.

12      Overt Act No. 110:  On February 20, 2016, at the Vineland Boys

13  gang meeting, defendant RAMIREZ insisted that members drive out any

14  African-American drug dealers selling drugs in Vineland Boys gang

15  territory, and an unindicted Vineland Boys member agreed to "smash on

16  them myself."

17      Overt Act No. 111:  On February 20, 2016, at the Vineland Boys

18  gang meeting, defendant MIRANDA announced that the "129" tagging crew

19  was now an official Vineland Boys clique, and that any "129" member

20  who claimed allegiance to a rival gang was to be attacked "on sight,"

21  and when defendant GALLO asked if the new "129" members would be

22  physically jumped in, defendant RAMIREZ explained that the entire

23  "129" membership could be "cliqued up" into the Vineland Boys gang

24  without being individually jumped in, then defendant MIRANDA

25  introduced defendant D. VASQUEZ, the leader of the "129" clique, and

26  suggested that defendant D. VASQUEZ could be jumped in at the

27  meeting.

28

1   Overt Act No. 112:  On February 20, 2016, at the Vineland Boys
2   gang meeting, defendant MIRANDA ordered the assault of any Vineland
3   Boys member caught using heroin.

4   Overt Act No. 113:  On March 1, 2016, at a meeting with CHS-1 at
5   a Carl's Jr. restaurant on Glenoaks Boulevard in Sun Valley,
6   California, in Vineland Boys gang territory, defendant ESPINOSA
7   offered to sell three or four pounds of methamphetamine to CHS-1,
8   noting that he was expecting to acquire ten pounds of methamphetamine
9   by the end of the week and adding that he had helped establish
10  defendant MIRANDA's drug trafficking business.

11  Overt Act No. 114:  On March 1, 2016, at a meeting with CHS-1,
12  defendant ESPINOSA said that the Vineland Boys gang should primarily
13  collect extortion "taxes" from non-member "paisas" who were selling
14  drugs in Vineland Boys gang territory, rather than to force Vineland
15  Boys members to pay from their own drug trafficking proceeds.

16  Overt Act No. 115:  On March 1, 2016, during the meeting with
17  CHS-1, defendant ESPINOSA recounted an incident in which he and a
18  fellow Vineland Boys member had encountered another Vineland Boys
19  member in the alleys who "tried taxing me," that is, demanding a
20  monetary payment on behalf of the Mexican Mafia, so the other
21  Vineland Boys member put his gun to the extortionist's head as
22  defendant ESPINOSA declared that the Vineland Boys gang did not pay
23  taxes to the Mexican Mafia.

24  Overt Act No. 116:  On March 15, 2016, using coded language in a
25  telephone call, co-conspirator Paz offered to sell CHS-1 an ounce of
26  methamphetamine for $300 and asked to purchase "white," referring to
27  other drugs.

28

43

Overt Act No. 117:  On March 15, 2016, at defendant MIRANDA's
stash house on Bromwich Street, defendants MIRANDA and ESPINOSA
discussed an upcoming leadership meeting organized by a high-ranking
incarcerated Vineland Boys gang member, and defendant ESPINOSA
insisted that no one should tell defendant MIRANDA what to do as
shot-caller of the gang.

Overt Act No. 118:  On March 16, 2016, defendants MIRANDA,
BOTELLO, RAMIREZ, CONTRERAS, and D. VASQUEZ, co-conspirator Alvarado,
and several other unindicted Vineland Boys members attended a
Vineland Boys gang leadership meeting at the La Sirenita restaurant
in Panorama City, California, where a senior Vineland Boys member
told the others that the gang members needed to focus on retaliating
against rival gang members instead of fighting with one another,
declaring that "at the end of the day we're either going to die for
Vineland or we're going to get locked up for Vineland."

Overt Act No. 119:  On March 16, 2016, at the Vineland Boys gang
leadership meeting, defendants MIRANDA and RAMIREZ explained that
they had resolved the conflict arising from the attempt by defendant
RAMIREZ and an unindicted Vineland Boys member to take over the
leadership of the gang.

Overt Act No. 120:  On March 16, 2016, at the Vineland Boys gang
leadership meeting, defendant BOTELLO first complained that Vineland
Boys members who had problems with other members were reaching out to
non-Vineland Boys to resolve Vineland Boys-related issues and
insisted that members send money to incarcerated Vineland Boys
members instead of to non-members, adding that he had sent money to
incarcerated members, and that the gang should prioritize helping an

44

incarcerated Vineland Boys member become a made member of the Mexican Mafia.

Overt Act No. 121:  On March 16, 2016, at the Vineland Boys gang leadership meeting, defendants MIRANDA and BOTELLO agreed that the Vineland Boys gang was not "under" any particular Mexican Mafia member but acknowledged that the gang would eventually be expected to pay the Mexican Mafia, and when the members discussed various plans to pay money to Mexican Mafia members who were affiliated with San Fernando Valley gangs, defendant MIRANDA insisted that the Vineland Boys would not pay without consensus among the members.

Overt Act No. 122:  On March 16, 2016, at the Vineland Boys gang leadership meeting, defendant MIRANDA reported an increase in tagging and other activity of rival gangs in Vineland Boys gang territory, including an incident where rival gang members had shot at a Vineland Boys member on the street, and defendant RAMIREZ said the rival gang members were coming into Vineland Boys gang territory to catch Vineland Boys members "slipping," or off guard, then referenced his prior attempt with defendant MIRANDA to retaliate against a rival gang member who had allegedly shot another Vineland Boys member on Vineland and Saticoy Streets.

Overt Act No. 123:  On March 16, 2016, at the Vineland Boys gang leadership meeting, defendant BOTELLO asked what the gang needed, defendant MIRANDA said the gang needed firearms, and defendant RAMIREZ said he had given a couple hundred dollars to other Vineland Boys members to purchase a firearm.

Overt Act No. 124:  On March 16, 2016, at the Vineland Boys gang leadership meeting, defendant RAMIREZ complained that homeless Vineland Boys members living on the street should be beaten up for

1  making the gang look bad, insisted that African Americans seen in
2  Vineland Boys gang territory be beaten up or driven out, described
3  how he had beaten up Vineland Boys members he had caught stealing,
4  then declared he would assault an individual he believed had betrayed
5  him to law enforcement.

6      Overt Act No. 125:  On March 16, 2016, at the Vineland Boys gang
7  leadership meeting, defendant MIRANDA suggested that CHS-1 be
8  responsible for collecting and keeping the gang's extortion payments,
9  and defendants BOTELLO and RAMIREZ emphasized the importance of that
10  role before defendant BOTELLO called for a vote.

11      Overt Act No. 126:  On March 16, 2016, at the Vineland Boys gang
12  leadership meeting, defendant D. VASQUEZ, the leader of the 129
13  tagging crew that had recently been absorbed into the Vineland Boys
14  gang, reported that 129 clique members who did not join the gang were
15  now afraid to enter Vineland Boys gang territory because he had told
16  them that they would be beaten up or shot if spotted in the
17  neighborhood, and he described confronting and threatening rival gang
18  members attempting to sell drugs at a location in Vineland Boys gang
19  territory.

20      Overt Act No. 127:   On March 16, 2016, defendant CONTRERAS
21  offered to sell CHS-1 firearms and noted that he would provide
22  firearms only to fellow Vineland Boys members.

23      Overt Act No. 128:  On March 18, 2016, using coded language in a
24  telephone call with CHS-1, UM-1 announced that defendants MIRANDA and
25  CONTRERAS were the street level leaders of the Vineland Boys gang in
26  general, defendant D. VASQUEZ was the leader of the new 129 clique,
27  and an unindicted Vineland Boys member was the leader of the Lake
28  View Terrace clique, that all gang-related matters would be handled

1    initially by these four street-level leaders and then by prison-level

2    leaders, and that the gang members were to enforce their collection

3    of payments from drug dealers by "terrorizing" any drug dealers who

4    refused to pay by stealing, breaking, and burning their cars,

5    explaining that the collected money would be "invested in the

6    neighborhood."

7         Overt Act No. 129:  On March 23, 2016, using coded language in a

8    telephone call, defendant CONTRERAS offered to sell firearms to CHS-

9    1, explaining that he currently had three revolvers and could obtain

10   additional firearms to sell.

11        Overt Act No. 130:  On March 24, 2016, at defendant CONTRERAS's

12   residence on Strathern Street in North Hollywood, California, in

13   Vineland Boys gang territory, where other Vineland Boys members were

14   present, including co-conspirator Alvarado, defendant CONTRERAS sold

15   CHS-1 a Bryco Arms .380 caliber pistol loaded with six rounds of .380

16   Auto caliber ammunition in exchange for $400, and during this

17   meeting, defendant CONTRERAS showed CHS-1 a second .380 caliber

18   pistol and explained that he had lent a third .380 caliber pistol to

19   defendant D. VASQUEZ.

20        Overt Act No. 131:  On March 26, 2016, using coded language in a

21   telephone call, defendant HERRERA offered to sell CHS-1 a "piece" of

22   heroin for $850 and confirmed that the Vineland Boys were fighting

23   with a rival gang.

24        Overt Act No. 132:  On April 3, 2016, at a party at the

25   residence of an unindicted Vineland Boys member on Clybourn Avenue in

26   Sun Valley, California, in Vineland Boys gang territory, defendants

27   GONZALEZ and AVILA, co-conspirator Navarrete, and other Vineland Boys

28

members got into a fistfight with J.P., A.F., and others and yelled "Vineland!" during the fight.

Overt Act No. 133:   On April 3, 2016, outside the party on Clybourn Avenue, an unindicted Vineland Boys member drove defendant GONZALEZ, who leaned out the window of the car and fired several shots at J.P. and an occupied car, injuring J.P. and A.A. (the "Clybourn Avenue Shooting").

Overt Act No. 134:   On April 5, 2016, using coded language in a telephone call, defendant BANDA offered to sell CHS-1 an ounce of methamphetamine he claimed was high quality in exchange for $275.

Overt Act No. 135:   On April 5, 2016, at defendant BANDA's residence on Elkwood Street in North Hollywood, California, in Vineland Boys gang territory, defendant BANDA sold approximately 27.52 grams of methamphetamine to CHS-1 in exchange for $270.

Overt Act No. 136:   On April 5, 2016, outside defendant BANDA's residence, co-conspirator Laurel told CHS-1 that he had recently shot three people at a party in Palmdale with a .380 Lorcin pistol that he said was a weak gun that he wanted to replace with a firearm that would "kill someone quicker," then noted that the Clybourn Avenue Shooting had increased the police's presence in the area.

Overt Act No. 137:   On April 7, 2016, using coded language in telephone calls, co-conspirator Laurel agreed to sell CHS-1 a .380 caliber handgun and hollow-point ammunition for $350 later that day.

Overt Act No. 138:   On April 7, 2016, at co-conspirator Laurel's residence on White Street in Sun Valley, California, in Vineland Boys gang territory, co-conspirator Laurel sold CHS-1 a .380 Lorcin handgun loaded with seven rounds of hollow-point ammunition, which

co-conspirator Laurel described as the firearm he had used to shoot someone at the party in Palmdale, California, in exchange for $350.

Overt Act No. 139:  On April 9, 2016, using coded language in an Instagram Messenger message, an unindicted co-conspirator asked to purchase a firearm from defendant GONZALEZ in order to be armed while in Vineland Boys gang territory.

Overt Act No. 140:  On April 14, 2016, using coded language in a telephone call, defendant BANDA agreed to sell CHS-1 an ounce of methamphetamine for $250.

Overt Act No. 141:  On April 14, 2016, at a liquor store on Strathern Street and Laurel Canyon Boulevard in North Hollywood, California, in Vineland Boys gang territory, defendant BANDA sold CHS-1 approximately 28.92 grams of methamphetamine for $250, during which time co-conspirator Laurel waited in defendant BANDA's car and greeted CHS-1 by making Vineland Boys gang signs.

Overt Act No. 142:  On April 19, 2016, using coded language in telephone calls, co-conspirator Paz offered to sell CHS-1 three ounces of methamphetamine for $900, suggesting that CHS-1 re-sell the methamphetamine for $400 an ounce, then agreed to sell CHS-1 two ounces of methamphetamine for $500 and a shotgun for $300.

Overt Act No. 143:  On April 20, 2016, in the parking lot of a Carl's Jr. restaurant on Glenoaks Boulevard, in Sun Valley, California, in Vineland Boys gang territory, co-conspirator Paz sold CHS-1 approximately 53.19 grams of methamphetamine for $500, then directed CHS-1 to an alley outside a residence near Crockett Street in Sun Valley, California, in Vineland Boys gang territory, where he sold CHS-1 an Iver Johnson Champion .410 gauge shotgun for $200.

1        Overt Act No. 144:   On April 23, 2016, on Lankershim Boulevard
2    in Vineland Boys gang territory, defendant GONZALEZ shot A.G., a
3    rival gang member, in the shoulder and the arm, as co-conspirator
4    Navarrete pushed A.G.'s girlfriend out of the way.

5        Overt Act No. 145:   On April 27, 2016, using coded language in a
6    telephone call with CHS-1, defendant BANDA said he had a .40 caliber
7    Beretta firearm with a laser sight for his personal use.

8        Overt Act No. 146:   On May 3, 2016, using coded language in a
9    telephone call, co-conspirator Paz agreed to sell two ounces of
10   methamphetamine to CHS-1 for $500 later that day at a Carl's Jr.
11   restaurant.

12       Overt Act No. 147:   On May 3, 2016, outside a Carl's Jr.
13   restaurant on Glenoaks Boulevard in Sun Valley, California, in
14   Vineland Boys gang territory, co-conspirator Paz sold CHS-1
15   approximately 54.91 grams of methamphetamine for $500.

16       Overt Act No. 148:   On May 3, 2016, using coded language in
17   telephone calls and text messages, defendant GONZALEZ offered to sell
18   CHS-1 two rifles that he described as "a tactical brand that the
19   professionals use," as well as a "cuerno," referring to an AK-47-type
20   firearm, and agreed to sell one rifle to CHS-1 later that day for
21   $1,700.

22       Overt Act No. 149:   On May 3, 2016, outside a McDonald's
23   restaurant on Glenoaks Boulevard in San Fernando, California,
24   defendant GONZALEZ, who had arrived with defendant AVILA and other
25   Vineland Boys members, sold CHS-1 a 5.56 caliber rifle for $1,700,
26   then showed CHS-1 a firearm that defendant GONZALEZ described as a
27   fully-automatic Glock 17 handgun that he had recently fired near
28   Tujunga and La Tuna Canyon.

1    Overt Act No. 150:  On or prior to May 6, 2016, on the 11700

2  block of Vose Street in North Hollywood, California, in disputed gang

3  territory, defendant AVILA spray-painted graffiti reading "SV VBS X3

4  JKS RASKAL," which identified him by his moniker, "Raskal," and his

5  membership in the Jokers Town clique of the Vineland Boys gang in Sun

6  Valley.

7    Overt Act No. 151:  On May 9, 2016, using coded language in

8  telephone calls and text messages, defendant GONZALEZ agreed to sell

9  CHS-1 a handgun for $800 and texted CHS-1 a photograph of the

10  handgun.

11    Overt Act No. 152:  On May 11, 2016, outside a Burger King

12  restaurant on Glenoaks Boulevard in San Fernando, California,

13  defendant GONZALEZ sold CHS-1 a Beretta 9mm pistol and two magazines

14  loaded with a total of eight rounds of 9mm ammunition, in exchange

15  for $800.

16    Overt Act No. 153:  On May 11, 2016, at the meeting with CHS-1

17  on Glenoaks Boulevard, defendant GONZALEZ described the Clybourn

18  Avenue Shooting, explaining that he, defendant AVILA, co-conspirator

19  Navarrete, and other Vineland Boys members had gotten into a

20  fistfight at the party with individuals he said had disrespected

21  Vineland Boys and at whom he then fired several shots later that

22  night as he was driven past the victims' car by another Vineland Boys

23  member and co-conspirator Navarrete, who had told him which victim to

24  shoot.  Defendant GONZALEZ told CHS-1 that defendant AVILA then

25  claimed him he was being followed by police as he drove away from the

26  shooting, so he arranged to obtain another firearm to "go at it with

27  the cops," adding that he and defendant AVILA later urinated on

28  defendant GONZALEZ's hands to conceal evidence that defendant

1   GONZALEZ had fired a gun.  Defendant GONZALEZ noted to CHS-1 that the
2   victim he shot several times had been in the hospital for two weeks,
3   could not breathe, and "was gonna die."

4       Overt Act No. 154:  On May 11, 2016, at the meeting with CHS-1
5   on Glenoaks Boulevard, defendant GONZALEZ said that the Vineland Boys
6   had been feuding with the rival 18th Street gang for "a whole month
7   straight" and described two confrontations with the same rival gang
8   member, first when he, co-conspirator Navarrete and two other
9   Vineland Boys members, accosted the victim at gunpoint near a 7-
10  Eleven on Saticoy Street and Vineland Avenue in Vineland Boys gang
11  territory and forced the victim to denounce his own gang as the
12  Vineland Boys members videotaped him, then two weeks later, defendant
13  GONZALEZ and co-conspirator Navarrete ambushed the victim on
14  Lankershim Boulevard near Sherman Way at 2:00 a.m., and defendant
15  GONZALEZ shot the victim several times as co-conspirator Navarrete
16  moved the victim's girlfriend when she tried to stop defendant
17  GONZALEZ.

18      Overt Act No. 155:  On May 11, 2016, at the meeting with CHS-1
19  on Glenoaks Boulevard, defendant GONZALEZ described how the day
20  before he and defendant AVILA had confronted members of another rival
21  gang in an alley and announced they were from the Vineland Boys gang,
22  threatened to shoot one of the members, and ordered the victim to
23  call his family to say "you ain't gonna make it home tonight."

24      Overt Act No. 156:  On May 11, 2016, at the meeting with CHS-1
25  on Glenoaks Boulevard, defendant GONZALEZ described hiding with nine
26  other Vineland Boys members behind bushes on Glenoaks Boulevard,
27  armed with six firearms, to ambush and threaten rival gang members at

28

gunpoint, and confronting a rival gang member at gunpoint at that location with another Vineland Boys member.

Overt Act No. 157:  On May 19, 2016, in a safe at his residence in Sun Valley, California, in Vineland Boys gang territory, co-conspirator Laurel possessed approximately 182 rounds of ammunition, a bulletproof vest, and an 18-inch machete knife.

Overt Act No. 158:  On May 20, 2016, using coded language in telephone calls and text messages, defendant GONZALEZ sent CHS-1 photographs of defendant GONZALEZ holding a black and gold rifle and a handgun, and he agreed to sell CHS-1 the rifle, which he described as having a red dot sight, a 30-round magazine, and an exchangeable barrel, for $2,000.

Overt Act No. 159:  On May 20, 2016, outside a McDonald's restaurant on Glenoaks Boulevard in San Fernando, California, defendant GONZALEZ sold CHS-1 a black and gold AR-style rifle bearing no serial number and a large-capacity 30-round magazine loaded with 26 rounds of ammunition in exchange for $2,000, then offered to sell a gold-plated AK-47 with a grenade launcher, noting that he was unwilling to sell his own tactical rifle, and that he had access to a 100-round drum magazine for a .556 caliber AR-15 type rifle.

Overt Act No. 160:  On May 25, 2016, using coded language in text messages, defendant GONZALEZ told defendant RAMIREZ he had seen members of a rival gang driving in Vineland Boys gang territory, and defendant RAMIREZ answered, "Fuck them fools."

Overt Act No. 161:  On May 26, 2016, co-conspirator Molina and other Vineland Boys members were gathered near Sun Valley Magnet School, in Vineland Boys gang territory, attending an outdoor memorial service of a Vineland Boys member recently killed in a car

accident, when members of a rival gang shot at the Vineland Boys members, hitting one member in the leg.

Overt Act No. 162:  On May 27, 2016, members of the Vineland Boys gang, including defendants MIRANDA, ESPINOSA, GONZALEZ, AVILA, and FONSECA and co-conspirator Navarrete, attended a memorial service for a deceased Vineland Boys member in Sun Valley.

Overt Act No. 163:  On May 28, 2016, using coded language in text messages, defendant GONZALEZ offered to sell methamphetamine to a drug customer, then offered to match the prices another supplier had charged the drug customer, that is, $2,500 for one pound and $1,600 for a half-pound.

Overt Act No. 164:  On May 28, 2016, while driving on Lankershim Boulevard in North Hollywood, California, defendant GONZALEZ and an unindicted Vineland Boys member pulled up next to a car occupied by S.L. and E.L., then as defendant GONZALEZ asked "Where are you from?" he fired a handgun into the victims' car, striking S.L. in the back.

Overt Act No. 165:  On May 29, 2016, using coded language in text messages, defendant GONZALEZ agreed to go with an unindicted Vineland Boys member to retaliate against members of a rival gang for attacking a Vineland Boys associate, noting that he had just shot a member of the rival gang, and the other Vineland Boys member counted three rivals that the Vineland Boys gang had shot, adding: "let them keep falling vboy."

Overt Act No. 166:  On May 29, 2016, using coded language in an Instagram Messenger message, defendant GONZALEZ offered an unindicted co-conspirator firearms or the assistance of the Vineland Boys members.

Overt Act No. 167:  On June 1, 2016, using coded language in text messages, defendant GONZALEZ arranged to obtain pounds of methamphetamine from a supplier, then agreed to sell one pound of methamphetamine for $2,500 or $2,800 to defendant RAMIREZ, who asked to inspect the drugs first, and defendant GONZALEZ also agreed to sell one pound of methamphetamine to defendant MIRANDA.

Overt Act No. 168:  On June 2, 2016, using coded language in text messages, defendant GONZALEZ and other Vineland Boys members arranged to go out together later that day to spray paint Vineland Boys gang graffiti.

Overt Act No. 169:  On June 6, 2016, using coded language in a telephone call, co-conspirator Paz agreed to sell CHS-1 one ounce of methamphetamine for $250.

Overt Act No. 170:  On June 7, 2016, using coded language in text messages, defendants MIRANDA and GONZALEZ arranged to sell one pound of methamphetamine to a drug customer for $2,400, and defendant GONZALEZ assured the customer that the supplier would "hook you up" because he had "a lot of" methamphetamine.

Overt Act No. 171:  On June 7, 2016, outside a Carl's Jr. restaurant on Glenoaks Boulevard in Sun Valley, California, in Vineland Boys gang territory, co-conspirator Paz sold CHS-1 approximately 23.27 grams of methamphetamine for $250.

Overt Act No. 172:  On June 8, 2016, as defendant CONTRERAS drove a vehicle with no license plates in Vineland Boys gang territory, he possessed approximately 23.33 grams of of a mixture and substance containing methamphetamine, two firearms, hollow-point ammunition, pay-owe sheets, and $1,614 in U.S. currency.

1     Overt Act No. 173:  On June 9, 2016, using coded language in an
2  Instagram Messenger conversation, defendant GONZALEZ berated an
3  unindicted co-conspirator and his associates for tagging graffiti on
4  a business in Vineland Boys gang territory owned by the relative of a
5  Vineland Boys gang member that was under the protection of the gang,
6  warned the unindicted co-conspirator that he and his associates would
7  get "touched up," that is, disciplined with a physical beating, and
8  demanded the names of Vineland Boys members who had allegedly allowed
9  the tagging to occur.

10     Overt Act No. 174:  On June 13, 2016, defendant MIRANDA ordered
11  CHS-1 to contribute $100 toward the purchase of a contraband cell
12  telephone for UM-1.

13     Overt Act No. 175:  On June 17, 2016, at defendant FONSECA's
14  residence on De Garmo Avenue in Sun Valley, California, in Vineland
15  Boys gang territory ("defendant FONSECA's residence"), defendant
16  FONSECA and an unindicted co-conspirator sold CHS-1 approximately
17  55.13 grams of methamphetamine, which defendant FONSECA said had been
18  supplied by defendant MIRANDA, in exchange for $500, and they
19  discussed a campaign by a prison-level gang leader to have defendant
20  MIRANDA replaced as the gang's shot-caller.

21     Overt Act No. 176:  On June 17, 2016, at defendant FONSECA's
22  residence, defendant FONSECA and two unindicted co-conspirators sold
23  CHS-1 approximately 27.81 grams of cocaine in exchange for $900, and
24  during this meeting, defendant FONSECA described seeing a video of
25  defendant GONZALEZ threatening a rival gang member and telling the
26  gang member to call his mother, then speculated that if defendant
27  AVILA had assisted law enforcement in defendant GONZALEZ's recent

28

1  arrest, then the gang would "take him out," meaning attack or kill
2  defendant AVILA.

3       Overt Act No. 177:  On June 21, 2016, while meeting with other
4  Vineland Boys members, including co-conspirator Aceves, on Norris
5  Avenue in Sun Valley, California, in Vineland Boys gang territory,
6  defendant D. VASQUEZ possessed approximately 9.19 grams of a mixture
7  and substance containing methamphetamine, a digital scale, 37 empty
8  plastic baggies, marijuana, approximately $699 in cash, and a stolen
9  North American Arms model HGLR .22 caliber pistol loaded with five
10 rounds of hollow point ammunition.

11      Overt Act No. 178:  On June 23, 2016, using coded language in
12 telephone calls, defendant MIRANDA agreed to sell CHS-1 four ounces
13 of methamphetamine for $700 and directed CHS-1 to pick up the
14 methamphetamine from defendant ESPINOSA at defendant MIRANDA's stash
15 house on Bromwich Street and to pay defendant ESPINOSA for the drugs.

16      Overt Act No. 179:  On June 23, 2016, at defendant MIRANDA's
17 stash house on Bromwich Street, defendant ESPINOSA sold CHS-1
18 approximately 109 grams of methamphetamine in exchange for $700, and
19 during this meeting, defendant ESPINOSA said he had advised defendant
20 MIRANDA to "smash" individuals who were attempting to remove
21 defendant MIRANDA as shot-caller of the Vineland Boys gang.

22      Overt Act No. 180:  On July 6, 2016, using coded language in
23 telephone calls and text messages, defendant HERRERA agreed to sell
24 CHS-1 two ounces of methamphetamine for $460 later that day.

25      Overt Act No. 181:  On July 6, 2016, outside a Carl's Jr.
26 restaurant in Sun Valley, California, defendant HERRERA sold CHS-1
27 approximately 55.03 grams of methamphetamine in exchange for $460.

28

1     Overt Act No. 182:  On July 22, 2016, defendant FONSECA agreed
2  to sell CHS-1 an ounce of methamphetamine for $240 and drove with
3  CHS-1 to obtain methamphetamine from defendant RAMIREZ at a residence
4  on De Garmo Avenue in Sun Valley, California, in Vineland Boys gang
5  territory, where defendant BOTELLO told them that defendant RAMIREZ
6  was not there and agreed to have defendant RAMIREZ deliver two ounces
7  of methamphetamine to defendant FONSECA's residence later that day.

8     Overt Act No. 183:  On July 22, 2016, while driving with CHS-1,
9  defendant FONSECA pointed out a "trap" or stash location on Lorne
10  Street in Sun Valley, California, in Vineland Boys gang territory,
11  noting that he was allowing an unindicted Vineland Boys member to
12  live there and sell drugs for defendant MIRANDA.

13     Overt Act No. 184:  On August 18, 2016, using coded language in
14  a telephone call with CHS-1, defendant HERRERA explained that he had
15  sold a firearm he had previously offered to CHS-1 to another buyer
16  for $450, explained that he was trying to obtain co-conspirator
17  Molina's mini assault rifle, confirmed that seven new members had
18  recently joined the Vineland Boys gang, offered to sell CHS-1
19  methamphetamine for $230 per ounce and heroin for $800 per piece, and
20  added that he was supplying cocaine to an unindicted Vineland Boys
21  gang member to transport to Colorado.

22     Overt Act No. 185:  On August 18, 2016, using coded language in
23  telephone calls, defendant HERRERA asked CHS-1 to go with him to
24  commit an armed robbery of a marijuana grow house in Palmdale,
25  California, adding that he had previously taken defendant GALLO on a
26  similar attempted robbery.

27     Overt Act No. 186:  On August 22, 2016, using coded language in
28  telephone calls and text messages, co-conspirator Molina offered to

sell CHS-1 an M-15 machine gun for $700 and 12 ounces of
methamphetamine for $230 per ounce.

Overt Act No. 187:  On August 22, 2016, at a residence in San
Fernando, California, co-conspirator Molina obtained approximately
116 grams of methamphetamine from an unindicted co-conspirator that
co-conspirator Molina then sold to CHS-1 in exchange for $920 and
offered to sell CHS-1 more methamphetamine, heroin, and a firearm.

Overt Act No. 188:  On August 23, 2016, using coded language in
telephone calls, defendant HERRERA offered to sell CHS-1 heroin for
$830 and a .22 caliber firearm with a 10-round magazine for $300,
adding that the firearm was with co-conspirator Laurel.

Overt Act No. 189:  On August 24, 2016, at defendant HERRERA's
residence in Vineland Boys gang territory, defendant HERRERA sold
CHS-1 a Mossberg .22 caliber rifle and 106 rounds of .22 caliber
ammunition for $300.

Overt Act No. 190:  On September 8, 2016, using coded language
in a telephone call with defendant MIRANDA, CHS-1 relayed a complaint
from an unindicted Vineland Boys member that several armed Vineland
Boys members had gone to his residence to accuse him of cooperating
with law enforcement, and defendant MIRANDA said that the accused
Vineland Boys member should fight the others.

Overt Act No. 191:  On September 13, 2016, using coded language
in telephone calls, defendant MIRANDA arranged to sell heroin to co-
conspirator Quintero and later met him by an In-N-Out restaurant on
Sand Canyon Road in Santa Clarita, California.

Overt Act No. 192:  On September 13, 2016, using coded language
in telephone calls, defendant MIRANDA said that CHS-1 could purchase
one pound of methamphetamine from co-conspirator Cardenas for $2,000

1  or pay defendant MIRANDA $2,400 for a pound of methamphetamine that
2  was of higher quality.

3     Overt Act No. 193:  On September 14, 2016, using coded language
4  in telephone calls, defendant MIRANDA assured an unindicted
5  incarcerated Vineland Boys member ("UM-2") that he could package
6  marijuana to be smuggled into a prison facility in a way that would
7  conceal the marijuana's odor but agreed to supply the drug courier
8  with heroin and methamphetamine.

9     Overt Act No. 194:  On September 14, 2016, using coded language
10  in telephone calls, defendant MIRANDA and UM-2 discussed selling
11  heroin and methamphetamine to a second buyer.

12     Overt Act No. 195:  On September 14, 2016, using coded language
13  in telephone calls, UM-2 complained to defendant MIRANDA that an
14  unindicted Vineland Boys member did not know how to package drugs to
15  be swallowed and smuggled into prisons, and defendant MIRANDA
16  recounted an incident in which a courier who had swallowed drugs to
17  smuggle to another incarcerated Vineland Boys member had died when
18  the packaging had burst, which defendant MIRANDA described to UM-2 as
19  a waste of the drugs.

20     Overt Act No. 196:  On September 14, 2016, using coded language
21  in a telephone call, defendant MIRANDA arranged to sell heroin to co-
22  conspirator Quintero the following day.

23     Overt Act No. 197:  On September 14, 2016, using coded language
24  in a telephone call with defendant MIRANDA, UM-2 said he had told an
25  incarcerated Vineland Boys leader to have defendant BOTELLO send
26  money to another incarcerated Vineland Boys member and suggested that
27  defendant MIRANDA have other members "chip in" money as well, then

28

they discussed having defendant MIRANDA confront an unindicted Vineland Boys member over an outstanding drug debt.

Overt Act No. 198:  On September 14, 2016, using coded language in a telephone call with defendant MIRANDA and UM-1, UM-1's fellow inmate thanked defendant MIRANDA for supplying drugs in a transaction outside of prison that the inmate brokered, and defendant MIRANDA said he had deliberately broken the drugs in small pieces because he thought the drugs were going to be smuggled into prison.

Overt Act No. 199:  On September 14, 2016, using coded language in a text message, an unidentified Vineland Boys member asked defendant MIRANDA whether another member who was not in good standing with the gang should be "jumped out" of the gang, noting that he had advised the others to wait for defendant MIRANDA to "give the ok" to jump him out.

Overt Act No. 200:  On September 15, 2016, at a shopping center in Palmdale, California, defendant MIRANDA delivered drugs to co-conspirator Quintero, who then hid the drugs in the engine compartment of his car.

Overt Act No. 201:  On September 15, 2016, using coded language in a telephone call with defendant HERRERA, defendant MIRANDA confirmed that he had heroin.

Overt Act No. 202:  On September 15, 2016, using coded language in telephone calls with UM-2, defendant MIRANDA confirmed that he had previously agreed to supply methamphetamine to UM-2's customers for $2,300 per pound but suggested charging $2,400 or $2,500 to increase their profit, and defendant MIRANDA agreed to "front" a half-pound of methamphetamine for $1,250 to a female drug dealer from Whittier, California, who had assured UM-2 that she could sell, and thus pay

for, the methamphetamine in a week, and defendant MIRANDA told UM-2 that he would supply her with a whole pound of methamphetamine once she sold the half-pound.

Overt Act No. 203:  On September 16, 2016, in Sun Valley, California, in Vineland Boys gang territory, defendant MIRANDA gave a half-pound of methamphetamine to a female drug dealer from Whittier.

Overt Act No. 204:  On September 16, 2016, defendant AVILA and co-conspirator Navarrete attended a party on Potter Avenue in North Hollywood, California, in Vineland Boys gang territory, and during a confrontation with victim J.G., they each held a handgun to J.G.'s head and threatened him, then co-conspirator Navarrete pistol-whipped J.G. across the face.

Overt Act No. 205:  On September 17, 2016, using coded language in telephone calls, defendant MIRANDA and UM-2 discussed the arrest of the female drug dealer from Whittier, the police's seizure of the half-pound of methamphetamine defendant MIRANDA had supplied, the resulting drug debt owed to defendant MIRANDA, and whether an informant had been involved in the arrest.

Overt Act No. 206:  On September 18, 2016, using coded language in text messages, defendant MIRANDA said he had attempted to send money via PayPal to an incarcerated Vineland Boys member, who then directed defendant MIRANDA to send $40 via MoneyGram to a third party located in Corona, California.

Overt Act No. 207:  On September 19, 2016, using coded language in a telephone call with defendant MIRANDA, UM-2 said that one of their drug customers wanted to pay defendant MIRANDA with Visa debit cards, but defendant MIRANDA insisted on payment in cash.

Overt Act No. 208:  On September 19, 2016, defendant MIRANDA met co-conspirator Quintero at a gas station on Laurel Canyon Boulevard in North Hollywood, California, in Vineland Boys gang territory, for co-conspirator Quintero to pay defendant MIRANDA $600 for a prior drug debt and $200 for more drugs.

Overt Act No. 209:  On September 20, 2016, at his residence on Klump Avenue in Sun Valley, California, in Vineland Boys gang territory, defendant AVILA possessed six rounds of ammunition, a sword, and 22 knives with blades that were 7 to 16 inches long.

Overt Act No. 210:  On September 20, 2016, using coded language in a telephone call, defendant MIRANDA told CHS-1 that co-conspirator Cardenas had one pound of methamphetamine available, then handed the telephone to co-conspirator Cardenas, who agreed to sell CHS-1 one pound of methamphetamine for $2,000 the following day.

Overt Act No. 211:  On September 21, 2016, on a street in Arleta, California, defendant MIRANDA and co-conspirator Cardenas sold CHS-1 approximately 408 grams of methamphetamine in exchange for $2,000.

Overt Act No. 212:  On September 22, 2016, using coded language in a telephone call with defendant MIRANDA, co-conspirator Cardenas asked for the keys to the marijuana grow house in order to tend to the marijuana plants.

Overt Act No. 213:  On September 24, 2016, using coded language in text messages, defendant MIRANDA asked an unindicted co-conspirator to deliver 40 marijuana plants to defendant MIRANDA the following day.

Overt Act No. 214:  On September 24, 2016, using coded language in text messages, defendant MIRANDA assured UM-2 that defendant

1   FONSECA would have a half-pound of methamphetamine packaged to be
2   smuggled into prison, labeled "P1922" to identify the intended
3   recipient, delivered by 9:30 p.m. that evening.

4       Overt Act No. 215:  On September 25, 2016, using coded language
5   in telephone calls with CHS-1, UM-1 said that although co-conspirator
6   Alvarado wanted to have another Vineland Boys member jumped out of
7   the gang, that member would only receive a "calentada" beating if it
8   were his first offense but could get jumped out for repeat offenses.

9       Overt Act No. 216:  On September 25, 2016, defendants MIRANDA,
10  BOTELLO, RAMIREZ, and HERRERA, co-conspirators Cardenas and Laurel,
11  and other unindicted Vineland Boys members attended a Vineland Boys
12  gang fundraising event held at a residence on Dora Street in Sun
13  Valley, California, in Vineland Boys gang territory, for the purpose
14  of collecting donations to pay for the funeral of the mother of
15  Vineland Boys members.

16      Overt Act No. 217:  On September 25, 2016, at the Vineland Boys
17  gang fundraiser meeting, when CHS-1 asked to purchase
18  methamphetamine, defendant BOTELLO first referred CHS-1 to defendant
19  RAMIREZ and then offered to "front" three or four pounds of
20  methamphetamine to CHS-1 on credit.

21      Overt Act No. 218:  On September 25, 2016, at the Vineland Boys
22  gang fundraiser meeting, defendant RAMIREZ offered to sell CHS-1
23  methamphetamine for $2,500 per pound.

24      Overt Act No. 219:  On September 25, 2016, in the conversation
25  with CHS-1 at the Vineland Boys gang fundraiser meeting, defendant
26  RAMIREZ described using a baseball bat to attack an individual for
27  allegedly robbing defendant RAMIREZ's brother, and defendant RAMIREZ
28

1  insisted that other Vineland Boys members also target that
2  individual.

3      Overt Act No. 220:  On September 25, 2016, in the conversation
4  with CHS-1 at the Vineland Boys gang fundraiser meeting, defendant
5  RAMIREZ declared that he was going to beat up a Vineland Boys member
6  for failing to intervene when rival gang members he had been with
7  pulled out a gun during a confrontation with defendant RAMIREZ in
8  Vineland Boys gang territory.

9      Overt Act No. 221:  On September 25, 2016, in the conversation
10 with CHS-1 at the Vineland Boys gang fundraiser meeting, defendant
11 RAMIREZ indicated that defendant MIRANDA was a marijuana supplier.

12     Overt Act No. 222:  On September 25, 2016, using coded language
13 in a telephone call, UM-1 directed CHS-1 to give the money that had
14 been collected at the Vineland Boys gang fundraiser earlier that day
15 to defendant BOTELLO to deliver to the intended recipient and praised
16 defendant BOTELLO for sending money to other incarcerated Vineland
17 Boys members.

18     Overt Act No. 223:  On September 27, 2016, using coded language
19 in telephone calls, defendant BOTELLO agreed to sell one pound of
20 methamphetamine to CHS-1 for $2,300, noting that he would not sell
21 methamphetamine in quantities of less than one pound, and arranged to
22 have co-conspirator J. Vasquez deliver the methamphetamine to CHS-1
23 later that day.

24     Overt Act No. 224:  On September 27, 2016, using coded language
25 in a telephone call, co-conspirator J. Vasquez arranged to meet CHS-1
26 at a Church's Chicken restaurant in Arleta, California, to conduct
27 the methamphetamine transaction on behalf of defendant BOTELLO.

28

Overt Act No. 225:  On September 27, 2016, co-conspirator J. Vasquez sold approximately 224 grams of methamphetamine to CHS-1 in exchange for $1,150 outside of a Church's Chicken restaurant in Arleta, California.

Overt Act No. 226:  On September 27, 2016, using coded language in a telephone call with CHS-1, defendant BOTELLO apologized for having sent co-conspirator J. Vasquez with only one half-pound of methamphetamine and promised to provide a full pound the next time.

Overt Act No. 227:  On October 5, 2016, using coded language in text messages, defendant MIRANDA agreed to sell CHS-1 an ounce of methamphetamine for $180 at a barbershop on Sunland Avenue in Sun Valley, California, in Vineland Boys gang territory.

Overt Act No. 228:  On October 5, 2016, outside a barbershop on Sunland Avenue in Sun Valley, California, co-conspirator Cardenas sold CHS-1 approximately 28.01 grams of methamphetamine on behalf of defendant MIRANDA and accepted $180 as payment for the methamphetamine.

Overt Act No. 229:  On October 12, 2016, using coded language in telephone calls, defendant GALLO offered to sell CHS-1 a Glock 27 firearm for $575, as well as drugs.

Overt Act No. 230:  On October 12, 2016, in the area of Venice Boulevard and Motor Avenue in Los Angeles, California, defendant GALLO sold CHS-1 a loaded Glock .40 caliber firearm and ten rounds of .40 caliber ammunition in exchange for $575, and defendant GALLO offered to sell CHS-1 additional firearms and high-quality heroin.

Overt Act No. 231:  On October 17, 2016, using coded language in a telephone call, defendant MIRANDA agreed to sell CHS-1 four pounds of methamphetamine for $2,300 per pound or one pound of

methamphetamine for $2,350, then noted that the marijuana he was growing would be ready for harvest in two weeks.

Overt Act No. 232:  On October 25, 2016, using coded language in telephone calls, co-conspirator Lopez offered to sell CHS-1 an AR-15 assault rifle and a revolver for $1,300.

Overt Act No. 233:  On October 27, 2016, using coded language in a telephone call with UM-2, defendant MIRANDA complained that defendant RAMIREZ and an incarcerated Vineland Boys member owed him $1,000 for drugs, and that another incarcerated Vineland Boys member owed him and UM-2 a separate $6,000 drug debt.

Overt Act No. 234:  On October 28, 2016, using coded language in a telephone call, defendant MIRANDA told an unindicted co-conspirator that a Vineland Boys member suspected of cooperating with law enforcement was to be cut off from the gang.

Overt Act No. 235:  On October 29, 2016, outside co-conspirator Lopez's residence in Reseda, California, co-conspirator Lopez sold CHS-1 an assault rifle, a .22 caliber revolver, and 57 rounds of ammunition for $1,300.  During this meeting, defendant LOPEZ said he wanted a Springfield Armory .40 caliber semiautomatic pistol for his personal use, noted that he had recently denied selling guns or associating with a gang to unfamiliar potential firearms customers, told CHS-1 that defendant MIRANDA sold heroin, and then offered to call his drug supplier to obtain heroin that he suggested CHS-1 sell for $900.

Overt Act No. 236:  On November 2, 2016, using coded language in a telephone call with defendant MIRANDA, co-conspirator Quintero reported that he had received only half of the half-pound of drugs that defendant MORA was supposed to deliver to him, and defendant

1  MIRANDA agreed to have defendant MORA deliver the remaining quarter-
2  pound, then defendant MIRANDA said he had received the $600 paid to
3  defendant MORA by co-conspirator Quintero, whose outstanding debt was
4  now $1,300.

5      Overt Act No. 237:  On November 3, 2016, using coded language in
6  telephone calls, defendant MIRANDA agreed to supply methamphetamine
7  and to pick up a firearm for defendant HERRERA.

8      Overt Act No. 238:  On November 3, 2016, while driving with co-
9  conspirator Cardenas near defendant MIRANDA's stash house on Bromwich
10  Street, defendant MIRANDA conducted counter-surveillance and
11  confronted an individual he believed to be undercover law
12  enforcement.

13      Overt Act No. 239:  On November 3, 2016, using coded language in
14  a telephone call, co-conspirator Cardenas reassured defendant MIRANDA
15  that they could avoid law enforcement detection and still make a lot
16  of money by changing up the way they sold drugs.

17      Overt Act No. 240:  On November 4, 2016, using coded language in
18  a telephone call, defendant HERRERA asked to buy more drugs from
19  defendant MIRANDA, who warned defendant HERRERA about an increased
20  police presence in the neighborhood and refused to supply the drugs
21  until the following day.

22      Overt Act No. 241:  On November 4, 2016, using coded language in
23  a telephone call and text message, defendant MIRANDA agreed to sell
24  CHS-1 two ounces of methamphetamine.

25      Overt Act No. 242:  On November 5, 2016, at a parking lot near
26  the intersection of Tujunga Avenue and Saticoy Street in Sun Valley,
27  California, in Vineland Boys gang territory, defendant MIRANDA sold
28  CHS-1 approximately 54.93 grams of methamphetamine in exchange for

1   $320, then suggested that CHS-1 purchase four ounces of

2   methamphetamine for $650 the next time.

3       Overt Act No. 243:   On November 6, 2016, using coded language in

4   a telephone call, co-conspirator Quintero said he had given $500 to

5   defendant MORA to deliver to defendant MIRANDA and would pay

6   defendant MIRANDA another $800 within two to three days, then asked

7   defendant MIRANDA to have defendant MORA deliver heroin to co-

8   conspirator Quintero.

9       Overt Act No. 244:   On November 8, 2016, using coded language in

10  a telephone call, defendant RAMIREZ asked defendant MIRANDA to supply

11  drugs, and defendant MIRANDA agreed to have someone deliver drugs to

12  defendant RAMIREZ.

13      Overt Act No. 245:   On November 8, 2016, using coded language in

14  a text message and a telephone call with co-conspirator Quintero,

15  defendant MIRANDA agreed to send defendant MORA to co-conspirator

16  Quintero's location to pick up the money that co-conspirator Quintero

17  owed him and to deliver more drugs, including heroin.

18      Overt Act No. 246:   On November 16, 2016, using coded language

19  in a telephone call with an incarcerated Vineland Boys member,

20  defendant MIRANDA agreed to provide drugs for co-conspirator Paz to

21  deliver to the caller.

22      Overt Act No. 247:   On December 4, 2016, in Joker's Alley behind

23  De Garmo Avenue in Sun Valley, California, in Vineland Boys gang

24  territory, defendant GALLO confronted and stabbed a rival gang

25  member, M.R. in the neck and hand, and M.R. shot defendant GALLO in

26  the face.

27      Overt Act No. 248:   On December 26, 2016, while running away

28  from police near his residence in Sun Valley, California, in Vineland

1  Boys gang territory, co-conspirator Laurel threw a loaded .45 caliber
2  handgun with a chambered round over a fence and possessed
3  approximately 27.18 grams of a mixture and substance containing
4  methamphetamine in his pants pocket.

5      Overt Act No. 249:  On January 3, 2017, at a meeting at
6  defendant GALLO's residence on White Street in Sun Valley,
7  California, in Vineland Boys gang territory, defendant GALLO told
8  CHS-1 about how he had gotten shot in the face as he stabbed M.R.,
9  the rival gang member, who defendant GALLO said had been with an
10 unindicted Vineland Boys member considered to be "no good" and who
11 had handed M.R. the firearm that M.R. used to shoot defendant GALLO,
12 and defendant GALLO said he wanted to "smoke" them and anyone who
13 would get in his way.

14     Overt Act No. 250:  On January 5, 2017, co-conspirator Quintero
15 possessed approximately 21 grams of a mixture and substance
16 containing methamphetamine, approximately 5 grams of heroin, plastic
17 baggies, and approximately $3,192 in cash, while driving in
18 Lancaster, California.

19     Overt Act No. 251:  On January 11, 2017, using coded language in
20 a telephone call with CHS-1, UM-1 announced that defendant BOTELLO
21 would be the new shot-caller and that he was going to require
22 Vineland Boys members to make mandatory payments to the gang.

23     Overt Act No. 252:  On January 13, 2017, using coded language in
24 telephone calls with CHS-1, UM-1 described to CHS-1 a plan to collect
25 money from Vineland Boys members on the 15th of every month, noting
26 that defendant MIRANDA had approved the plan, that defendants BOTELLO
27 and MORA would participate, and that any member who refused to pay
28 would get beaten up, then ordered CHS-1 to collect the payments and

1  to use violent force against anyone who did not pay enough, adding
2  that the gang's main priority was to collect money from its
3  unincarcerated members.

4      Overt Act No. 253:  On January 13, 2017, using coded language in
5  telephone calls with CHS-1, UM-1 said he was attempting to obtain
6  "paperwork" as proof that defendant FONSECA had cooperated with law
7  enforcement, then said that any member who missed the upcoming gang
8  meeting would be disciplined.

9      Overt Act No. 254:  On January 22, 2017, using coded language in
10  a telephone call with CHS-1, UM-1 said that at the upcoming Vineland
11  Boys gang member meeting defendants MIRANDA and BOTELLO would
12  announce the gang leaders' decision to have the gang make payments to
13  a Mexican Mafia member from Pacoima, California, then UM-1 instructed
14  CHS-1 to go with defendant MIRANDA to collect money, noting that any
15  money left after the payments to the Mexican Mafia member would be
16  kept by the gang, and also ordered CHS-1 to report any gang members
17  who missed the gang meeting.

18      Overt Act No. 255:  On January 22, 2017, defendants MIRANDA,
19  MORA, HERRERA (who was armed with a Sig Sauer .45 caliber handgun),
20  GALLO, and FONSECA, co-conspirators Cardenas, Solano, Lopez, and
21  Alvarado, and other unindicted Vineland Boys members attended a
22  Vineland Boys gang meeting held at a residence on Dora Street in Sun
23  Valley, California, in Vineland Boys gang territory.

24      Overt Act No. 256:  On January 22, 2017, at the Vineland Boys
25  gang meeting, co-conspirator Cardenas told CHS-1 that he had sold two
26  pounds of marijuana for $1,000 to an unindicted Vineland Boys member
27  who then re-sold it for $1,700.

28

Overt Act No. 257:  On January 22, 2017, at the Vineland Boys gang meeting, defendant MIRANDA relayed complaints from the prison-level leaders that the Vineland Boys members were doing drugs and associating with rival gang members instead of "putting in work" for the gang, and insisted that the members needed to put more effort into retaliating against rival gang members for the recent shootings of defendant GALLO and an unindicted Vineland Boys member.

Overt Act No. 258:  On January 22, 2017, at the Vineland Boys gang meeting, defendant MIRANDA complained that only one-third of the members had firearms and ordered each Vineland Boys member to get access to a firearm by next month's gang meeting, suggesting that members could pool their money to buy guns to share.

Overt Act No. 259:  On January 22, 2017, at the Vineland Boys gang meeting, defendant MIRANDA announced that any member had the authority to physically discipline another member observed breaking gang rules without having to obtain separate permission first.

Overt Act No. 260:  On January 22, 2017, at the Vineland Boys gang meeting, defendant MIRANDA identified several individuals as possible "snitches" cooperating with law enforcement who were "no good," ordered the Vineland Boys members to assault those individuals, including an individual who was falsely claiming to be a Vineland Boys member whom co-conspirator Lopez said he had previously beaten up by a liquor store.

Overt Act No. 261:  On January 22, 2017, at the Vineland Boys gang meeting, defendant MIRANDA ordered that an unindicted Vineland Boys member who was not in good standing be given a "calentada" beating, and co-conspirator Lopez ordered co-conspirator Cardenas and others to jump him out of the gang.

Overt Act No. 262:  On January 22, 2017, at the Vineland Boys gang meeting, defendant MIRANDA reported that the gang would not be held to an unindicted Vineland Boys member's unauthorized promise to pay a Mexican Mafia member $5,000 with a monthly $500 payment, and defendant MIRANDA ordered the "calentada" beating and assault of any member who paid the Mexican Mafia, any member who attempted to exert influence over the gang based on an association with the Mexican Mafia or someone outside of the gang, and any rival gang members who sought to collect taxes from Vineland Boys members on behalf of the Mexican Mafia.

Overt Act No. 263:  On January 22, 2017, at the Vineland Boys gang meeting, co-conspirator Cardenas said they should "smash" and assault any member seen associating with rival gang members or allowing rival gang members to sell drugs in Vineland Boys gang territory, and defendant MIRANDA ordered the members to "catch it" happening.

Overt Act No. 264:  On January 22, 2017, at the Vineland Boys gang meeting, co-conspirator Lopez ordered the members to "take flight," or assault, any member seen violating gang rules and demanded that everybody "be on the same page."

Overt Act No. 265:  On January 22, 2017, at the Vineland Boys gang meeting, defendant MIRANDA told the members that unless anyone had proof in the form of "paperwork," the members had to stop accusing defendant FONSECA of cooperating with law enforcement, and defendant GALLO agreed.

Overt Act No. 266:  On January 22, 2017, at the Vineland Boys gang meeting, defendant MIRANDA ordered that two prospective members, for whom defendant FONSECA and an unindicted Vineland Boys member had

73

1   "vouched" and sponsored, be "jumped in" to the gang, and defendant

2   HERRERA and co-conspirator Cardenas and other Vineland Boys members

3   then "jumped in" two new members by physically assaulting them, while

4   defendant MIRANDA timed the beatings by counting out loud.

5       Overt Act No. 267:  On January 22, 2017, at the Vineland Boys

6   gang meeting, defendant MIRANDA asked the members to contribute money

7   for the gang, and the members present collectively donated $251.

8       Overt Act No. 268:  On January 22, 2017, using coded language in

9   a telephone call with CHS-1, UM-1 emphasized that under the Vineland

10  Boys gang's new extortion scheme, the gang would collect money from

11  non-gang members and any Vineland Boys members who were selling

12  drugs, and he ordered CHS-1 to go with defendant MORA to collect

13  money.

14      Overt Act No. 269:  On January 26, 2017, using coded language in

15  a telephone call with CHS-1, defendant MORA said he and defendants

16  MIRANDA and BOTELLO would resume collecting money for the gang after

17  they finished cutting the marijuana plants at the marijuana grow

18  house in Palmdale, California.

19      Overt Act No. 270:  On January 28, 2017, at a party attended by

20  defendants MORA, ESPINOSA, and MIRANDA, and other Vineland Boys

21  members at a residence on Bakman Avenue in Sun Valley, California, in

22  Vineland Boys gang territory, defendants MORA and ESPINOSA gave CHS-1

23  instructions on how to collect monetary payments for the gang, and

24  defendant MORA said the payments were a contribution to the

25  neighborhood and for gang members in prison.

26      Overt Act No. 271:  On January 28, 2017, during the party at the

27  residence on Bakman Avenue, defendant MORA offered to sell CHS-1 a

28  pound of methamphetamine for $2,200 or a quarter-pound of

74

methamphetamine for $600, adding that defendant BOTELLO had methamphetamine immediately available to sell to CHS-1.

Overt Act No. 272:  On January 28, 2017, using coded language in a telephone call, defendant MIRANDA and CHS-1 discussed the payment collection plan proposed by defendants BOTELLO and MORA and other Vineland Boys members and UM-1's order to give "calentada" beatings to certain Vineland Boys members who had not attended the last gang meeting.

Overt Act No. 273:  On January 30, 2017, using coded language in a telephone call, defendant MORA confirmed that he could sell CHS-1 methamphetamine the following day in Palmdale, California.

Overt Act No. 274:  On January 31, 2017, defendant MORA sold CHS-1 approximately 83.04 grams of methamphetamine for $450 at defendant MIRANDA's marijuana grow house on Comet Court in Palmdale, California (the "Comet Court grow house").

Overt Act No. 275:  On January 31, 2017, during the meeting at the Comet Court grow house, defendant MORA showed CHS-1 approximately 125 marijuana plants growing in the house, explained that the marijuana had already been sold to a buyer for $60,000, and gave CHS-1 a sample of marijuana from a bag that he said cost $800.

Overt Act No. 276:  On January 31, 2017, during the meeting with CHS-1 at the Comet Court grow house, defendant MORA said that he and defendants MIRANDA and BOTELLO and co-conspirator Cardenas operated a second marijuana grow house.

Overt Act No. 277:  On January 31, 2017, during the meeting with CHS-1 at the Comet Court grow house, defendant MORA said that defendant MIRANDA had made him a partner in one venture but required

1  him to live at the Comet Court grow house to care for the marijuana
2  plants.

3      Overt Act No. 278:  On January 31, 2017, during the meeting with
4  CHS-1 at the Comet Court grow house, defendant MORA said that the
5  Vineland Boys gang would be paying taxes to a Mexican Mafia member
6  from Pacoima.

7      Overt Act No. 279:  On February 1, 2017, using coded language in
8  a telephone call, defendant MORA asked if CHS-1 was satisfied with
9  the methamphetamine that defendant MORA had sold on January 31, 2017,
10 and offered to sell more methamphetamine to CHS-1.

11     Overt Act No. 280:  On February 2, 2017, at the Comet Court grow
12 house, where defendant MORA was tending marijuana plants, defendant
13 MORA sold CHS-1 approximately 222 grams of methamphetamine for
14 $1,200, and he said that this half-pound was the last of his three
15 pounds, as he had sold two pounds to co-conspirator Quintero and a
16 half-pound to another customer.  During this meeting, defendant MORA
17 offered to sell CHS-1 "China white" heroin for $1,200, then said he
18 had confronted one individual who falsely claimed to be a Vineland
19 Boys member and threatened to shoot a second individual who was
20 claiming to be a member even after he was jumped out.

21     Overt Act No. 281:  On February 2, 2017, at the Comet Court grow
22 house, defendant MORA said that he and defendants MIRANDA and RAMIREZ
23 had recently attempted to ambush a rival gang member they believed
24 was behind the previous month's drive-by shooting of a Vineland Boys
25 member outside his home in Vineland Boys gang territory.

26     Overt Act No. 282:  On February 8, 2017, during a meeting with
27 defendants MIRANDA and ESPINOSA, co-conspirator Cardenas, and CHS-1
28 at defendant MIRANDA's stash house on Bromwich Street, defendant

1  MIRANDA said that he and defendants BOTELLO and RAMIREZ would pay
2  money to the gang.

3    Overt Act No. 283:  On February 8, 2017, during the meeting at
4  the Bromwich stash house, defendant MIRANDA and co-conspirator
5  Cardenas discussed an order given by an incarcerated Vineland Boys
6  gang leader to give a "calentada" to an individual who had allegedly
7  provided law enforcement with information against an 18th Street gang
8  member.

9    Overt Act No. 284:  On March 6, 2017, using coded language in
10  text messages with CHS-1, co-conspirator Alvarado agreed to sell a
11  firearm to CHS-1.

12    Overt Act No. 285:  On March 8, 2017, outside a liquor store on
13  Laurel Canyon Boulevard in Sun Valley, California, in Vineland Boys
14  gang territory, co-conspirator Alvarado sold CHS-1 a Glock pistol and
15  42 rounds of ammunition for $500, and he told CHS-1 that he planned
16  to smuggle drugs with him into jail when he self-surrendered to
17  police on an outstanding warrant, then he pointed out an underground
18  casino on Woodman Avenue in Vineland Boys gang territory that was
19  frequented by gang members.

20    Overt Act No. 286:  On March 15, 2017, using coded language in a
21  telephone call with CHS-1, defendant HERRERA said that he and an
22  unindicted Vineland Boys member were "cruising by" rival gang
23  neighborhoods, adding that he had been carrying a firearm while
24  working in rival gang territory, and he offered to sell CHS-1 an M1
25  rifle for $1,000, and 9mm handguns for approximately $450 each.

26    Overt Act No. 287:  On March 16, 2017, using coded language in a
27  three-way telephone call with CHS-1 and co-conspirator Lopez, UM-1
28  insisted that any Vineland Boys member making money from criminal

1  activity in the neighborhood was obligated to "show some love" by

2  giving CHS-1 money to pay to the Mexican Mafia and for other gang-

3  related expenses.  During this call, co-conspirator Lopez explained

4  that he was in charge of "touching up" members with "calentada"

5  beatings, describing how he had beaten up an unindicted Vineland Boys

6  member, adding that any member who kept violating gang rules after

7  receiving "calentadas" should be "jumped out" of the gang.

8      Overt Act No. 288:  On April 11, 2017, defendant FONSECA told

9  CHS-1 the gang had jumped out one of the individuals who defendant

10  MIRANDA had identified as "no good" at the gang meeting on January

11  22, 2017.

12      Overt Act No. 289:  On May 27, 2017, using coded language in a

13  telephone call with CHS-1, defendant HERRERA confirmed that co-

14  conspirator Lopez and other Vineland Boys members had recently jumped

15  in some new members who were now "putting in work" for the gang.

16      Overt Act No. 290:  On June 1, 2017, using coded language in a

17  telephone call with CHS-1, co-conspirator Lopez confirmed that three

18  new Vineland Boys members had recently been jumped into the gang and

19  that there were now three generations of Vineland Boys members.

20      Overt Act No. 291:  On June 6, 2017, using coded language in

21  text messages, co-conspirator Lopez told CHS-1 that an unidentified

22  co-conspirator was willing to sell an assault rifle for $800 or trade

23  for a handgun and $300.

24      Overt Act No. 292:  On June 8, 2017, in Reseda, California, co-

25  conspirator Lopez sold a Norinco assault rifle to CHS-1 in exchange

26  for $800, and during this meeting, co-conspirator Lopez said that in

27  discussions with defendant MIRANDA and UM-1 he had agreed to give

28

1  "calentada" beatings to Vineland Boys members who violated the gang's
2  rules and orders.

3      Overt Act No. 293:  On August 1, 2017, using coded language in
4  text messages, defendant HERRERA offered to sell CHS-1 a .380 caliber
5  firearm.

6      Overt Act No. 294:  On August 3, 2017, outside the residence of
7  defendant BANDA on Elkwood Street in North Hollywood, California, in
8  Vineland Boys gang territory, defendant HERRERA sold CHS-1 a Taurus
9  .380 caliber handgun with an obliterated serial number for $420.

10     Overt Act No. 295:  On August 14, 2017, using coded language in
11 telephone calls and text messages, defendant HERRERA agreed to sell
12 CHS-1 an M1 rifle he said belonged to co-conspirator Paz for $600.

13     Overt Act No. 296:  On August 16, 2017, outside defendant
14 HERRERA's residence on Arvilla Avenue in Sun Valley, California, in
15 Vineland Boys gang territory, defendant HERRERA sold CHS-1 a
16 Universal Firearms M1 .30 caliber semiautomatic rifle for $600, and
17 he also offered to sell CHS-1 a Beretta 9mm firearm and a Sig Sauer
18 .45 caliber handgun, then defendant HERRERA described beating up
19 another Vineland Boys member for disrespecting defendant HERRERA's
20 family, saying it was to teach him "about the beatings that later on
21 in life they'll take for the hood."

22     Overt Act No. 297:  On September 1, 2017, using coded language
23 in a three-way call with CHS-1, co-conspirator Rodriguez, and a high-
24 ranking incarcerated Vineland Boys member ("UM-3"), UM-3 asked CHS-1
25 for $500 to pay for UM-3's contraband prison cell telephone and to
26 assemble a "crew" with "two righteous gunmen," arranged for co-
27 conspirator Rodriguez to have drugs smuggled into UM-3's prison,
28 declared that several Vineland Boys members whom UM-1 suspected of

cooperating with law enforcement "gotta go ASAP," and insisted that "a few bodies gotta drop" to help the gang avoid a "green light" from the Mexican Mafia, declaring that every Vineland Boys member must give money to the gang to pay taxes to the Mexican Mafia, buy guns for the gang, and buy drugs for imprisoned members to sell.

Overt Act No. 298:  On September 5, 2017, co-conspirator Rodriguez accepted $500 from CHS-1 to pay for UM-3's contraband prison cell telephone, and she offered to sell CHS-1 methamphetamine.

Overt Act No. 299:  On September 18, 2017, using coded language in telephone calls, co-conspirator Rodriguez agreed to sell CHS-1 four ounces of methamphetamine for $800, and they arranged to meet the following day.

Overt Act No. 300:  On September 19, 2017, co-conspirator Rodriguez sold CHS-1 approximately 108 grams of methamphetamine for $800 at her residence in Canoga Park, California.

Overt Act No. 301:  On September 24, 2017, using coded language in a telephone call, co-conspirator Rodriguez said that UM-2 and UM-3 had ordered her to pick up drugs later that day in Norwalk, California, and that she had previously delivered drugs at their direction to a location in Wilmington, California.

Overt Act No. 302:  On November 30, 2017, using coded language in telephone calls with CHS-1, UM-3 arranged for co-conspirator Rodriguez to deliver drugs supplied by defendant MIRANDA to La Puente, California, and asked CHS-1 to pick up drugs from co-conspirator Rodriguez that were destined for a Mexican Mafia member in Bakersfield, California, drug deals that would earn UM-3 a $1,500 profit, and UM-3 noted that defendant MIRANDA was paying the Vineland Boys gang's taxes to the Mexican Mafia himself.

Overt Act No. 303:  On December 1, 2017, using coded language in telephone calls, co-conspirator Rodriguez and UM-3 confirmed that co-conspirator Rodriguez would meet with CHS-1 later that day to give him heroin and methamphetamine supplied by an unindicted Vineland Boys member that was packaged for body cavity smuggling to deliver to UM-3's drug courier.

Overt Act No. 304:  On December 1, 2017, co-conspirator Rodriguez possessed approximately 26.52 grams of heroin and 38 grams of a mixture and substance containing methamphetamine, and the drugs were wrapped in small plastic balloons.

Overt Act No. 305:  On December 2, 2017, using coded language in a telephone call with CHS-1, UM-3 said that co-conspirator Zuniga had agreed to supply UM-3 with heroin and methamphetamine.

Overt Act No. 306:  On December 3, 2017, in a parking lot on Vineland Avenue in Sun Valley, California, in Vineland Boys gang territory, defendant GALLO pointed a loaded 9mm semi-automatic pistol at A.G. and asked, "Where are you from," then approached M.G. while still armed and said, "Where are you from? I'm from Vineland."

Overt Act No. 307:  On January 26, 2018, using coded language in text messages and telephone calls, defendant HERRERA offered to sell CHS-1 five firearms, including a Taurus handgun for $700, a Sig Sauer .45 caliber handgun, a .380/9mm caliber pistol, and a Beretta .32 caliber handgun that defendant HERRERA said he had recently used to chase down rival gang members, adding that he would have shot them but police were present, then defendant HERRERA offered to sell CHS-1 one half-pound of methamphetamine for $1,000, noting that he currently had three or four pounds of methamphetamine but would sell

1  only quarter-pound or half-pound amounts at a time in case he was
2  caught by law enforcement.

3      Overt Act No. 308:  On March 5, 2018, co-conspirator Lopez sent
4  text messages to CHS-1 with photographs of a revolver and a pistol
5  that he offered to sell to CHS-1.

6      Overt Act No. 309:  On March 6, 2018, outside a Carl's Jr.
7  restaurant in Sun Valley, California, in Vineland Boys gang
8  territory, co-conspirator Lopez sold CHS-1 two Smith & Wesson
9  revolvers and a Tanfoglio Super Titan .380 caliber pistol in exchange
10  for $800.

11     Overt Act No. 310:  On March 25, 2018, at defendant MORA's
12  residence on Mayall Street in North Hills, California (the "Mayall
13  residence"), defendant MORA and an unindicted Vineland Boys member
14  possessed a loaded Mossberg 12-gauge shotgun with a pistol grip and a
15  loaded Iver Johnson .32 caliber revolver.

16     Overt Act No. 311:  On April 11, 2018, using coded language in
17  telephone calls and text messages, co-conspirator Norona and an
18  unidentified co-conspirator agreed to sell a quarter-pound of
19  methamphetamine to CHS-1 for $700 later that day at co-conspirator
20  Norona's residence on Vineland Avenue in Sun Valley, California, in
21  Vineland Boys gang territory.

22     Overt Act No. 312:  On April 11, 2018, co-conspirator Norona
23  told CHS-1 that her methamphetamine supplier, later identified as co-
24  conspirator Medina, could supply CHS-1 with the quarter-pound of
25  methamphetamine at a restaurant in Burbank, California.

26     Overt Act No. 313:  On April 11, 2018, outside a restaurant on
27  San Fernando Road in Burbank, California, co-conspirator Medina sold
28  CHS-1 approximately 110.7 grams of methamphetamine that he said would

1    cost $750, and he accepted $700 from CHS-1 and $50 from co-

2    conspirator Norona, who agreed to pay the difference from the price

3    of $700 that she had previously promised CHS-1.

4        Overt Act No. 314:  On April 12, 2018, using coded language in a

5    telephone call, co-conspirator Norona gave CHS-1 co-conspirator

6    Medina's telephone number after CHS-1 agreed to pay her a $200

7    brokering fee.

8        Overt Act No. 315:  On April 20, 2018, at a meeting at the

9    Mayall residence, defendant MORA told CHS-1 that the Mossberg shotgun

10   recovered by police on March 25, 2018, during a search of his

11   residence belonged to him.

12       Overt Act No. 316:  On April 20, 2018, during the meeting at the

13   Mayall residence, defendant MORA gave CHS-1 "paperwork" that

14   defendant MORA claimed was proof that defendant FONSECA was

15   cooperating with law enforcement.

16       Overt Act No. 317:  On April 20, 2018, during the meeting at the

17   Mayall residence, defendant MORA told CHS-1 that co-conspirator

18   Medina was able to sell drugs in Vineland Boys gang territory because

19   he was related to a high-ranking Vineland Boys member.

20       Overt Act No. 318:  On May 30, 2018, using coded language in

21   telephone calls with CHS-1, co-conspirator Medina offered to sell

22   CHS-1 methamphetamine for $2,200 to $2,300 per pound, adding that he

23   was expecting to receive 25 pounds of methamphetamine from his

24   supplier and asked CHS-1 to help him sell the methamphetamine.

25       Overt Act No. 319:  On June 6, 2018, at a meeting with CHS-1 at

26   a restaurant on Van Nuys Boulevard in Panorama City, California, co-

27   conspirator Medina offered to sell heroin for $750 per 25-gram piece

28   and methamphetamine for $1,900 per pound, adding that his

methamphetamine supplier smuggled 15 pounds at a time from Mexico, and noted that he had regularly supplied drugs to defendant MORA and co-conspirator Darmandzhyan.

Overt Act No. 320:  On June 6, 2018, during the meeting with CHS-1, co-conspirator Medina said that defendant MIRANDA wanted to beat him up because defendant MIRANDA, co-conspirator Cardenas, and others wanted to "tax" him for selling drugs in Vineland Boys gang territory even though his relative was a respected incarcerated Vineland Boys member.

Overt Act No. 321:  On June 6, 2018, during the meeting with CHS-1, co-conspirator Medina said that defendant ESPINOSA had supplied him with methamphetamine, and that he had once seen defendant ESPINOSA with about 20 pounds of methamphetamine.

Overt Act No. 322:  On June 19, 2018, using coded language in a telephone call, co-conspirator Medina offered to sell CHS-1 methamphetamine, and he said he had a few pounds left of the 17 pounds he had last received from his source of supply.

Overt Act No. 323:  On June 20, 2018, outside a restaurant on Glenoaks Boulevard in Sun Valley, California, co-conspirator Medina sold CHS-1 approximately 443.3 grams of methamphetamine for $2,100, promised to tell CHS-1 when he received lower-quality methamphetamine that would cost $1,900 per pound, offered to sell heroin for $700 per piece, and said he was charging defendant RAMIREZ higher prices for pounds of methamphetamine as retaliation for high prices that defendant RAMIREZ had charged him in the past.

Overt Act No. 324:  On June 20, 2018, at a meeting with CHS-1 outside defendant HERRERA's residence, defendant HERRERA recounted an incident where defendant MIRANDA had ordered defendants HERRERA,

GONZALEZ, and AVILA to deliver a "calentada" beating to another
Vineland Boys member during a party at defendant HERRERA's residence,
but because defendants GONZALEZ and AVILA arrived late, defendant
HERRERA beat up the individual by himself.  During this meeting,
defendant HERRERA said that Vineland Boys members had recently
attempted to shoot a member suspected of cooperating with law
enforcement and had almost shot the member's girlfriend, who was
driving in the member's car.

Overt Act No. 325:  On June 27, 2018, using coded language in
text messages with CHS-1, defendant HERRERA said he had recently
encountered a rival gang member when their cars were next to each
other at a red light, and after a confrontation, defendant HERRERA
got out of his car wielding a hammer, and the other individual drove
away.

Overt Act No. 326:  On July 2, 2018, using coded language in
text messages and telephone calls, defendant HERRERA agreed to sell
CHS-1 a firearm and 50 rounds of ammunition for $800, requesting that
CHS-1 not re-sell the firearm so that defendant HERRERA could get it
back later.

Overt Act No. 327:  On July 5, 2018, outside defendant HERRERA's
residence on Arvilla Avenue in Sun Valley, California, in Vineland
Boys gang territory, defendant HERRERA sold CHS-1 a Sig Sauer .45
caliber handgun and 50 rounds of ammunition for $800.  During this
meeting, defendant HERRERA said he had previously "shot and missed"
with the handgun so it could not be traced back to a crime, then he
discussed other firearms he had recently sold, including a stolen new
Glock pistol in the box with paperwork that he sold to co-conspirator
Paz for $550.

1     Overt Act No. 328:  On July 12, 2018, using coded language in a
2 telephone call, defendant HERRERA confirmed that he could sell CHS-1
3 the .380 caliber firearm later that day and offered to obtain an SKS
4 assault rifle from a firearms source in Bell Gardens, California, and
5 he texted CHS-1 two photographs of himself holding an assault rifle.

6     Overt Act No. 329:  On July 12, 2018, outside a residence on
7 Cleon Avenue in Sun Valley, California, in Vineland Boys gang
8 territory, defendant HERRERA sold CHS-1 a Lorcin .380 caliber pistol
9 loaded with three rounds of ammunition for $450.

10    Overt Act No. 330:  On July 13, 2018, using coded language in
11 text messages with CHS-1, defendant HERRERA said that his firearms
12 source had 12 new firearms to sell for $700 or $800 each.

13    Overt Act No. 331:  On July 14, 2018, using coded language in a
14 telephone call, co-conspirator Solano offered to sell CHS-1 AR-15
15 rifles with two magazines for $1,400 each, blue methamphetamine that
16 he guaranteed was high quality for $2,200 per pound, and heroin,
17 which he indicated he was supplying to UM-3 in prison.

18    Overt Act No. 332:  On July 15, 2018, using coded language in a
19 telephone call, co-conspirator Solano introduced CHS-1 to his
20 firearms supplier, co-conspirator Hernandez, who offered to sell
21 unregistered "ghost gun" AR-15 type rifles he built to sell to
22 "homies" or people who could not purchase firearms from a store, and
23 co-conspirator Solano tried to negotiate a price of $1,250 on CHS-1's
24 behalf.

25    Overt Act No. 333:  On July 16, 2018, using coded language in
26 text messages and telephone calls, co-conspirator Solano agreed to
27 sell two AR-15 firearms, photographs of which he had texted to CHS-1,
28 for $2,000, and when CHS-1 offered to reimburse him later if he would

86

1  purchase the rifles on CHS-1's behalf, co-conspirator Solano refused,

2  explaining that he only had $2,000 in cash on hand and it was to be

3  used to purchase drugs for UM-3 and an unindicted co-conspirator in

4  prison.

5      Overt Act No. 334:  On July 16, 2018, using coded language in

6  text messages and a telephone call with CHS-1, defendant GONZALEZ,

7  who was using a contraband cell telephone to communicate from prison,

8  said that he had sold eight firearms while incarcerated and offered

9  to sell CHS-1 firearms that had been modified to be fully automatic,

10 and methamphetamine for $1,600 or $1,700 per pound.

11     Overt Act No. 335:  On July 17, 2018, co-conspirator Solano led

12 CHS-1 to a residence on Sheffield Drive in Palmdale, California,

13 where co-conspirator Solano's firearms supplier sold CHS-1 one AR-15

14 type rifle with no serial number, one AR-15 type pistol with no

15 serial number, and two magazines in exchange for $2,000, and co-

16 conspirator Solano accepted $50 from CHS-1 as a brokering fee.

17     Overt Act No. 336:  On July 17, 2018, using coded language in

18 text messages with CHS-1, co-conspirator Solano said that defendant

19 GONZALEZ had wanted to buy the two rifles that co-conspirator Solano

20 had sold CHS-1 in Palmdale.

21     Overt Act No. 337:  On July 18, 2018, using coded language in

22 text messages with CHS-1, co-conspirator SOLANO said there were seven

23 AR-15 type rifles available for $1,000 each and then texted CHS-1 a

24 photograph of rifle parts.

25     Overt Act No. 338:  On July 24, 2018, using coded language in

26 text messages and telephone calls, co-conspirator Solano agreed to

27 sell CHS-1 methamphetamine later that day, and he texted CHS-1 a

28 photograph of methamphetamine on a scale.

1     Overt Act No. 339:  On July 24, 2018, outside co-conspirator

2  Solano's residence on Arminta Street in Sun Valley, California, in

3  Vineland Boys gang territory, co-conspirator Solano sold CHS-1

4  approximately 112.46 grams of methamphetamine for $650 and showed

5  CHS-1 a bag containing at least one pound of additional

6  methamphetamine, then he said he had seen a video of UM-3 and another

7  incarcerated Vineland Boys member beating an inmate for not paying a

8  debt.

9     Overt Act No. 340:  On July 26, 2018, using coded language in

10  text messages, defendant GONZALEZ offered to sell CHS-1 a fully-

11  automatic M-16 rifle for $2,000, texted CHS-1 a photograph of the

12  rifle, then agreed to contact his methamphetamine supplier to provide

13  methamphetamine to CHS-1.

14     Overt Act No. 341:  On July 27, 2018, using coded language in

15  text messages, defendant GONZALEZ agreed to sell CHS-1 a quarter-

16  pound of methamphetamine.

17     Overt Act No. 342:  On July 27, 2018, using coded language in a

18  telephone call, co-conspirator Solano agreed to sell CHS-1 one

19  quarter-pound of methamphetamine in the transaction brokered by

20  defendant GONZALEZ.

21     Overt Act No. 343:  On July 27, 2018, using coded language in

22  text messages, defendant GONZALEZ told CHS-1 to contact co-

23  conspirator Solano to conduct the methamphetamine transaction because

24  the supplier was ready.

25     Overt Act No. 344:  On July 28, 2018, outside co-conspirator

26  Solano's residence on Arminta Street in Sun Valley, California, in

27  Vineland Boys gang territory, co-conspirator Solano sold CHS-1

28  approximately 110.8 grams of methamphetamine for $650, and he told

1  CHS-1 that he would send money to defendant GONZALEZ for brokering
2  the transaction, then he said he was smuggling drugs into prison
3  facilities with the help of a female associate.

4      Overt Act No. 345:  On August 1, 2018, using coded language in a
5  telephone call with CHS-1, co-conspirator Solano said his firearms
6  supplier, co-conspirator Hernandez, was building five new rifles to
7  sell.

8      Overt Act No. 346:  On August 13, 2018, during a meeting at the
9  Mayall residence, defendant MORA offered CHS-1 "China white" heroin
10  for $900 per piece and methamphetamine for $1,900 per pound, then he
11  said that in order to keep the Mexican Mafia from making demands on
12  the Vineland Boys gang as a whole, he had been kidnapping and beating
13  up victims who owed money to the Mexican Mafia, and he showed CHS-1 a
14  video of him in his backyard as he hit the face of an unidentified
15  man who was tied with duct tape and strapped to a chair.

16      Overt Act No. 347:  On August 14, 2018, using coded language in
17  telephone calls, co-conspirator Solano offered to sell CHS-1 blue
18  methamphetamine for $2,100 or $2,050 per pound if CHS-1 purchased at
19  least two pounds.

20      Overt Act No. 348:  On August 27, 2018, using coded language in
21  telephone calls with CHS-1, co-conspirator Solano explained that
22  defendant MIRANDA sold him the "shake," or remnants of defendant
23  MIRANDA's methamphetamine, that co-conspirator Solano cooked with
24  ephedrine to manufacture high quality "fire" methamphetamine that he
25  was selling for $230 an ounce, adding that other Vineland Boys
26  members were helping him sell the methamphetamine, and co-conspirator
27  Solano agreed to teach CHS-1 this method and sent CHS-1 two videos
28  showing methamphetamine spread out on a counter.

1    Overt Act No. 349:  On August 27, 2018, using coded language in
2    text messages and telephone calls, co-conspirator Solano agreed to
3    arrange for CHS-1's customer to purchase a firearm the following day
4    for $1,150 from the individual who built the firearm, later
5    identified as co-conspirator Hernandez, and requested an additional
6    $100 as his brokering fee.

7    Overt Act No. 350:  On August 28, 2018, at a residence on
8    Sheffield Drive in Palmdale, California, co-conspirators Solano and
9    Hernandez met with a customer who was, in fact, an agent of the
10   Federal Bureau of Investigation working in an undercover capacity
11   (the "UC"), and they sold the UC an AR-15 type .223 caliber rifle
12   with no serial number and 20 rounds of .223 Remington caliber
13   ammunition in exchange for $1,200, and co-conspirator Solano accepted
14   an additional $100 from the UC for the brokering fee.  During this
15   meeting, using coded language, co-conspirator Hernandez offered to
16   sell more rifles to the UC and explained that he manufactured the
17   rifles by drilling holes into unfinished lower receivers that bore no
18   serial numbers and could make rifles with barrels as short as eight
19   inches long, which would cost more to purchase.

20   Overt Act No. 351:  On August 28, 2018, using coded language in
21   text messages with CHS-1, defendant GONZALEZ said he had sold all the
22   firearms he had previously offered to CHS-1 at prices that CHS-1
23   could not afford, adding that he needed money while in prison and "I
24   have to get it one way or another."

25   Overt Act No. 352:  On August 31, 2018, at the Mayall residence,
26   defendant MORA possessed methamphetamine, cocaine, marijuana, a
27   digital scale, pay-owe sheets, a .762 caliber rifle, 52 rounds of
28   ammunition, documents relating to the Vineland Boys gang, and a Glock

1  9mm handgun with a laser sight, which defendant MORA discarded as he

2  attempted to flee from police.

3     Overt Act No. 353:  On September 21, 2018, using coded language

4  in telephone calls and a meeting with CHS-1, co-conspirator

5  Darmandzhyan agreed to sell CHS-1 one quarter-pound of

6  methamphetamine for $700 and explained that defendant MIRANDA was the

7  source of the methamphetamine.

8     Overt Act No. 354:  On September 21, 2018, outside his residence

9  on Klump Avenue in Sun Valley, California, in Vineland Boys gang

10  territory, co-conspirator Darmandzhyan sold CHS-1 approximately 109.6

11  grams of methamphetamine for $700.

12     Overt Act No. 355:  On September 26, 2018, using coded language

13  in a telephone call, UM-3 asked CHS-1 to help procure a firearm for

14  an unindicted co-conspirator whom UM-3 wanted to kill defendant

15  FONSECA and another Vineland Boys member for allegedly cooperating

16  with law enforcement, adding that another gang member, at UM-3's

17  direction, had previously hunted for them in the "Jokers Town" area

18  of Vineland Boys gang territory on two occasions before getting

19  arrested for an unrelated multiple-homicide case.

20     Overt Act No. 356:  On September 26, 2018, using coded language

21  in a telephone call with CHS-1, UM-3 noted that defendant ESPINOSA

22  was selling large amounts of marijuana, that UM-3 had sold 20 ounces

23  of drugs supplied by co-conspirator Solano, and that co-conspirator

24  Zuniga supplied UM-3 with high-quality methamphetamine, cocaine, and

25  heroin to smuggle into prisons, adding that co-conspirator Zuniga had

26  supplied drugs to other incarcerated Vineland Boys members, then UM-3

27  arranged a three-way telephone call with co-conspirator Zuniga, who

28  agreed to sell drugs to CHS-1.

1       Overt Act No. 357:  On September 27, 2018, using coded language
2  in telephone calls with CHS-1, co-conspirator Zuniga offered to sell
3  CHS-1 one quarter-pound of methamphetamine for $600 and arranged to
4  sell CHS-1 one ounce of cocaine for $800 later that day.

5       Overt Act No. 358:  On September 27, 2018, in the parking lot of
6  a shopping center located on Sherman Way in Burbank, California, in
7  Vineland Boys gang territory, co-conspirator Zuniga sold CHS-1
8  approximately 22.5 grams of cocaine in exchange for $800.

9       Overt Act No. 359:  On September 29, 2018, outside an El Pollo
10 Loco restaurant located on Sunland Boulevard in Sun Valley,
11 California, in Vineland Boys gang territory, co-conspirator Zuniga
12 sold CHS-1 approximately 110.9 grams of methamphetamine in exchange
13 for $600, and during this conversation, co-conspirator Zuniga said
14 that co-conspirator Solano had offered to sell him one pound of
15 methamphetamine.

16      Overt Act No. 360:  On October 19, 2018, using coded language in
17 a telephone call with CHS-1, UM-3 said that he owed a drug debt of
18 $3,000 to co-conspirator Zuniga, who was going to "front" him an
19 additional two ounces of drugs to sell, then asked CHS-1 to obtain a
20 firearm for two gang members who UM-3 was paying to kill someone for
21 an unpaid debt of $20,000, complaining that gang members used to
22 handle such business for the gang for free.

23      Overt Act No. 361:  On November 3, 2018, using coded language in
24 a telephone call with CHS-1, defendant MIRANDA offered to sell CHS-1
25 one half-pound of methamphetamine for $900 or one pound of
26 methamphetamine for $1,700.

27      Overt Act No. 362:  On November 7, 2018, at a store on Victory
28 Boulevard and Vineland Avenue in North Hollywood, California, in

1  Vineland Boys gang territory, defendant MIRANDA sold CHS-1
2  approximately 220.67 grams of methamphetamine for $900.

3  　　Overt Act No. 363:  On November 7, 2018, at a parking garage on
4  Robertson Boulevard in Los Angeles, California, co-conspirators
5  Solano and Hernandez sold CHS-1 two AR-15 type rifles with no serial
6  numbers, one of which was a short-barreled rifle, and an AR-15 type
7  pistol with no serial number, in exchange for $2,550.

8  D.　　NOTICE OF SPECIAL ALLEGATIONS

9  　　The Grand Jury further alleges that:

10  　　1.　　Beginning on a date unknown and continuing to the date of
11  this Indictment, in Los Angeles County, within the Central District
12  of California, and elsewhere, defendants MIRANDA, ESPINOSA, BOTELLO,
13  MORA, GONZALEZ, RAMIREZ, CONTRERAS, BANDA, HERRERA, GALLO, FONSECA,
14  and D. VASQUEZ, and others known and unknown to the Grand Jury,
15  conspired and agreed with one another to knowingly and intentionally
16  possess with intent to distribute, and distribute at least 50 grams
17  of methamphetamine, a Schedule II controlled substance, in violation
18  of Title 21, United States Code, Sections 846, 841(a)(1), and
19  841(b)(1)(A)(viii).

20  　　2.　　On or about April 3, 2016, in Los Angeles County, within
21  the Central District of California, defendant GONZALEZ unlawfully and
22  knowingly attempted to murder victim J.P., in violation of California
23  Penal Code Sections 21a, 31, 187, 188, 189, 664.

24  　　3.　　On or about April 23, 2016, in Los Angeles County, within
25  the Central District of California, defendant GONZALEZ unlawfully and
26  knowingly attempted to murder victim A.G., in violation of California
27  Penal Code Sections 21a, 31, 187, 188, 189, 664.

28

COUNT TWO

[18 U.S.C. § 1959(a)(5)]

1.    At all times relevant to this Indictment, the Vineland Boys
gang, as described more particularly in Paragraphs 1 through 28 of
the General Allegations, which paragraphs are re-alleged and
incorporated by reference as if fully set forth herein, including its
leaders, members, and associates, constitutes an enterprise, as that
term is defined in Title 18, United States Code, Section 1959(b)(2),
that is, a group of individuals associated in fact which was engaged
in, and the activities of which affected, interstate and foreign
commerce.  The enterprise constitutes an ongoing organization whose
members functioned as a continuing unit for a common purpose of
achieving the objectives of the enterprise.

2.    At all times relevant to this Indictment, the Vineland Boys
gang, through its members and associates, engaged in racketeering
activity, as defined in Title 18, United States Code, Sections
1959(b)(1) and 1961(1), that is:

        a.    Multiple acts involving murder, extortion, and
robbery, in violation of California state law; and

        b.    Multiple offenses involving trafficking in controlled
substances, including methamphetamine, heroin, and cocaine, in
violation of Title 21, United States Code, Sections 841(a)(1) and
846.

3.    On or about April 3, 2016, in Los Angeles County, within
the Central District of California, for the purpose of maintaining
and increasing position in the Vineland Boys gang, an enterprise
engaged in racketeering activity, defendant JESUS GONZALEZ, JR., also
known as ("aka") "Lil' Chito," aka "Chito," aka "Gunner," aka "Chuy,"

94

1    aka "Chuyito," willfully, deliberately, and with premeditation,

2    attempted to murder victim J.P., in violation of California Penal

3    Code Sections 21a, 31, 187, 188, 189, 664.

COUNT THREE

[18 U.S.C. § 1959(a)(3)]

1.    Paragraphs 1 through 28 of the General Allegations and Paragraphs 1 and 2 of Count Two are hereby re-alleged and incorporated by reference as if fully set forth herein.

2.    On or about April 3, 2016, in Los Angeles County, within the Central District of California, for the purpose of maintaining and increasing position in the Vineland Boys gang, an enterprise engaged in racketeering activity, defendant JESUS GONZALEZ, JR., also known as ("aka") "Lil' Chito," aka "Chito," aka "Gunner," aka "Chuy," aka "Chuyito," unlawfully and knowingly assaulted victim J.P. with a dangerous weapon, to wit, a semiautomatic firearm, in violation of California Penal Code Section 245(a)(2).

COUNT FOUR

[18 U.S.C. § 1959(a)(5)]

1. Paragraphs 1 through 28 of the General Allegations and Paragraphs 1 and 2 of Count Two are hereby re-alleged and incorporated by reference as if fully set forth herein.

2. On or about April 23, 2016, in Los Angeles County, within the Central District of California, for the purpose of maintaining and increasing position in the Vineland Boys gang, an enterprise engaged in racketeering activity, defendant JESUS GONZALEZ, JR., also known as ("aka") "Lil' Chito," aka "Chito," aka "Gunner," aka "Chuy," aka "Chuyito," willfully, deliberately, and with premeditation, attempted to murder victim A.G., in violation of California Penal Code Sections 21a, 31, 187, 188, 189, 664.

COUNT FIVE

[18 U.S.C. § 1959(a)(3)]

1.    Paragraphs 1 through 28 of the General Allegations and Paragraphs 1 and 2 of Count Two are hereby re-alleged and incorporated by reference as if fully set forth herein.

2.    On or about April 23, 2016, in Los Angeles County, within the Central District of California, for the purpose of maintaining and increasing position in the Vineland Boys gang, an enterprise engaged in racketeering activity, defendant JESUS GONZALEZ, JR., also known as ("aka") "Lil' Chito," aka "Chito," aka "Gunner," aka "Chuy," aka "Chuyito," unlawfully and knowingly assaulted victim A.G. with a dangerous weapon, to wit, a semiautomatic firearm, in violation of California Penal Code Section 245(a)(2).

COUNT SIX

[18 U.S.C. §§ 1959(a)(3), 2(a)]

1.    Paragraphs 1 through 28 of the General Allegations and Paragraphs 1 and 2 of Count Two are hereby re-alleged and incorporated by reference as if fully set forth herein.

2.    On or about September 16, 2016, in Los Angeles County, within the Central District of California, for the purpose of maintaining and increasing position in the Vineland Boys gang, an enterprise engaged in racketeering activity, defendants ANTHONY CARLOS AVILA, also known as ("aka") "Baby Raskal," aka "Casper," and FRANCISCO JAVIER NAVARRETE, aka "Chowder," each aiding and abetting the other, unlawfully and knowingly assaulted victim J.G. with a dangerous weapon, to wit, a firearm, in violation of California Penal Code Section 245(a)(2).

1                              COUNT SEVEN

2                          [21 U.S.C. § 846]

3          Paragraphs 1 through 28 of the General Allegations are re-

4     alleged and incorporated by reference as if fully set forth herein.

5     A.    OBJECTS OF THE CONSPIRACY

6          Beginning on an unknown date, but at least as early as November

7     19, 2003, and continuing to on or about the date of this Indictment,

8     in Los Angeles County, within the Central District of California, and

9     elsewhere, defendants MARIO ALBERTO MIRANDA, also known as ("aka")

10    "Last," aka "L," aka "Ultimo," aka "Shot-Caller" ("MIRANDA"), MARK

11    ANTHONY ESPINOSA, aka "Fatman," aka "Marcos" ("ESPINOSA"), ULISES

12    BOTELLO, aka "Squirt," aka "SQ" ("BOTELLO"), LUIS ALBERTO MORA, aka

13    "Liar," aka "Liar Liar," aka "Little L," aka "Uno" ("MORA"), JESUS

14    GONZALEZ, JR., aka "Lil' Chito," aka "Chito," aka "Gunner," aka

15    "Chuy," aka "Chuyito" ("GONZALEZ"), LUIS FERNANDO RAMIREZ, aka

16    "Frosty," aka "Frost" ("RAMIREZ"), IGNACIO JESUS CONTRERAS, aka

17    "Nacho" ("CONTRERAS"), JOSE LUIS BANDA, aka "Lil Raskal," aka

18    "Donkey" ("BANDA"), JOSEPH PETER HERRERA, aka "Baby Shadow," aka

19    "Shadow," aka "Baby Shitface" ("HERRERA"), JOSE MANUEL GALLO, aka

20    "Rooster" ("GALLO"), DAVID ROQUE FONSECA, aka "Monster" ("FONSECA"),

21    DAVID VASQUEZ, aka "Malo," aka "Sonic," aka "Evil" ("D. VASQUEZ"),

22    OSCAR CARDENAS, aka "Taliban," aka "Tali" ("CARDENAS"), KEVIN JASON

23    PAZ, aka "Cheesecake," aka "Firme" ("PAZ"), IVAN LAUREL, aka "Little

24    Gallo," aka "Little Psycho" ("LAUREL"), DENNIS ALEXIS MOLINA, aka

25    "Laso" ("MOLINA"), OSBALDO ZUNIGA, aka "Bayo" ("ZUNIGA"), SERGIO

26    ESPINOZA SOLANO, aka "Cholo" ("SOLANO"), JOSE ALBERTO ACEVES, aka

27    "Chito" ("ACEVES"), ALENA ROSEANNA RODRIGUEZ ("RODRIGUEZ"), APRIL

28    CHRISTINE HARREL, aka "April Dawn Harrell," aka "Loca" ("HARREL"),

ERNESTO SALVADOR MEDINA, aka "Kid" ("MEDINA"), AREANA NORONA ("NORONA"), AKOP DARMANDZHYAN, aka "Armenian Jack," aka "Jack" ("DARMANDZHYAN"), JORGE MARCIAL VASQUEZ, aka "T" ("J. VASQUEZ"), and OSCAR QUINTERO JIMENEZ, aka "Cheech," aka "Alex Ramos Banuelos" ("QUINTERO"), and others known and unknown to the Grand Jury, conspired and agreed with each other to knowingly and intentionally (i) possess with intent to distribute, and (ii) distribute, the following controlled substances:

1.   at least 50 grams of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A)(viii);

2.   at least five grams of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B)(viii);

3.   at least 100 marijuana plants, a Schedule I controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B)(ii);

4.   cocaine, a Schedule II narcotic drug controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C); and

5.   heroin, a Schedule I narcotic drug controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C).

B.   MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE ACCOMPLISHED

The objects of the conspiracy were to be accomplished, in substance, as follows:

1       1.    Defendant MIRANDA, and others known and unknown to the

2   Grand Jury, would authorize Vineland Boys members to control drug

3   trafficking in Vineland Boys gang territory.

4       2.    Defendants MIRANDA, ESPINOSA, BOTELLO, MORA, GONZALEZ,

5   RAMIREZ, CONTRERAS, BANDA, HERRERA, GALLO, FONSECA, D. VASQUEZ,

6   CARDENAS, PAZ, LAUREL, MOLINA, ZUNIGA, SOLANO, ACEVES, RODRIGUEZ,

7   HARREL, MEDINA, NORONA, DARMANDZHYAN, J. VASQUEZ, and QUINTERO, and

8   others known and unknown to the Grand Jury, would possess and

9   distribute controlled substances in the neighborhoods controlled by

10  the Vineland Boys gang.

11      3.    Defendant MIRANDA would rent properties in which to grow

12  large quantities of marijuana.

13      4.    Defendant MIRANDA would direct defendants MORA, BOTELLO,

14  CARDENAS, and ESPINOSA to assist in the maintenance of the marijuana

15  grow houses.

16      5.    Defendants MIRANDA, FONSECA, and RODRIGUEZ would supply and

17  deliver drugs intended for smuggling into prison facilities.

18      6.    Defendant MIRANDA would direct defendant FONSECA to package

19  drugs for smuggling into prison facilities.

20      7.    Defendants MIRANDA, BOTELLO, and MORA, and others known and

21  unknown to the Grand Jury, would direct individuals selling drugs in

22  Vineland Boys gang territory, including defendants RAMIREZ,

23  CONTRERAS, CARDENAS, and ESPINOSA, to pay a portion of their drug

24  trafficking proceeds to the Vineland Boys gang.

25      8.    Defendants BOTELLO and MORA, and others known and unknown

26  to the Grand Jury, would deliver payments collected by Vineland Boys

27  members to defendant MIRANDA.

28

1     9.    Defendants MIRANDA, ESPINOSA, BOTELLO, MORA, GONZALEZ,

2   BANDA, HERRERA, GALLO, FONSECA, CARDENAS, PAZ, MOLINA, ZUNIGA,

3   SOLANO, ACEVES, RODRIGUEZ, HARREL, MEDINA, and DARMANDZHYAN, and

4   others known and unknown to the Grand Jury, would supply members of

5   the Vineland Boys gang with controlled substances to distribute to

6   drug customers in Vineland Boys gang territory.

7     10.    Defendant NORONA would broker drug transactions between

8   defendant MEDINA and drug customers.

9     11.    Defendant J. VASQUEZ would act as a courier and deliver

10   drugs supplied by defendant BOTELLO to defendant BOTELLO's drug

11   customers.

12     12.    Defendants MIRANDA, ESPINOSA, MORA, GONZALEZ, RAMIREZ,

13   CONTRERAS, BANDA, HERRERA, GALLO, FONSECA, D. VASQUEZ, CARDENAS, PAZ,

14   LAUREL, MOLINA, and SOLANO, and others known and unknown to the Grand

15   Jury, would participate in Vineland Boys gang meetings in order to

16   discuss the gang's control of drug trafficking in its territory.

17     13.    Defendants MIRANDA, MORA, GONZALEZ, RAMIREZ, HERRERA,

18   GALLO, FONSECA, D. VASQUEZ, CARDENAS, PAZ, LAUREL, and MOLINA, and

19   others known and unknown to the Grand Jury, would plan, commit, and

20   threaten to commit acts of violence on behalf of the Vineland Boys

21   gang in order to enhance the reputation and authority of the Vineland

22   Boys gang, and permit the Vineland Boys gang to maintain control of

23   the drug trafficking activity in Vineland Boys gang territory.

24     14.    Defendants MIRANDA, MORA, GONZALEZ, RAMIREZ, CONTRERAS,

25   HERRERA, D. VASQUEZ, GALLO, PAZ, LAUREL, and SOLANO, and others known

26   and unknown to the Grand Jury, would obtain and possess firearms and

27   other dangerous weapons, and would broker firearms transactions, in

28   order to enforce the authority of the Vineland Boys gang in the

1    gang's territory, exclude others from Vineland Boys gang territory,

2    and permit the Vineland Boys gang to control the drug trafficking

3    activity in its territory.

4    C.    OVERT ACTS

5         In furtherance of the conspiracy, and to accomplish the objects

6    of the conspiracy, defendants MIRANDA, ESPINOSA, BOTELLO, MORA,

7    GONZALEZ, RAMIREZ, CONTRERAS, BANDA, HERRERA, GALLO, FONSECA, D.

8    VASQUEZ, CARDENAS, PAZ, LAUREL, MOLINA, ZUNIGA, SOLANO, ACEVES,

9    RODRIGUEZ, HARREL, MEDINA, NORONA, DARMANDZHYAN, J. VASQUEZ, and

10   QUINTERO, and others known and unknown to the Grand Jury, committed

11   various overt acts, within the Central District of California, and

12   elsewhere, including, but not limited to, the overt acts numbered 1

13   through 363 as set forth in Count One, which are hereby re-alleged

14   and incorporated by reference as if fully set forth herein.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COUNT EIGHT

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

On or about September 24, 2014, in Los Angeles County, within the Central District of California, defendant JOSE ALBERTO ACEVES, also known as "Chito," knowingly and intentionally distributed at least 50 grams, that is, approximately 81.73 grams, of methamphetamine, a Schedule II controlled substance.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COUNT NINE

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

On or about January 22, 2015, in Los Angeles County, within the Central District of California, defendant APRIL CHRISTINE HARREL, also known as ("aka") "April Dawn Harrell," aka "Loca," knowingly and intentionally distributed at least 50 grams, that is, approximately 82.8 grams, of methamphetamine, a Schedule II controlled substance.

COUNT TEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

On or about November 18, 2015, in Los Angeles County, within the Central District of California, defendant MARIO ALBERTO MIRANDA, also known as ("aka") "Last," aka "L," aka "Ultimo," aka "Shot-Caller," knowingly and intentionally distributed at least 50 grams, that is, approximately 111.4 grams, of methamphetamine, a Schedule II controlled substance.

COUNT ELEVEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(C); 18 U.S.C. § 2(a)]

On or about November 24, 2015, in Los Angeles County, within the Central District of California, defendants JOSEPH PETER HERRERA, also known as ("aka") "Shadow," aka "Baby Shadow," aka "Baby Shitface," and JOSE MANUEL GALLO, aka "Rooster," each aiding and abetting the other, knowingly and intentionally distributed heroin, a Schedule I narcotic drug controlled substance.

## COUNT TWELVE

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

On or about December 1, 2015, in Los Angeles County, within the Central District of California, defendant MARIO ALBERTO MIRANDA, also known as ("aka") "Last," aka "L," aka "Ultimo," aka "Shot-Caller," knowingly and intentionally distributed at least 50 grams, that is, approximately 110.9 grams, of methamphetamine, a Schedule II controlled substance.

COUNT THIRTEEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(C)]

On or about December 3, 2015, in Los Angeles County, within the Central District of California, defendant JOSE MANUEL GALLO, also known as "Rooster," knowingly and intentionally distributed heroin, a Schedule I narcotic drug controlled substance.

COUNT FOURTEEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

On or about December 15, 2015, in Los Angeles County, within the Central District of California, defendant JOSE MANUEL GALLO, also known as "Rooster," knowingly and intentionally distributed at least 50 grams, that is, approximately 54.7 grams, of methamphetamine, a Schedule II controlled substance.

COUNT FIFTEEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(C)]

On or about February 5, 2016, in Los Angeles County, within the Central District of California, defendant OSCAR CARDENAS, also known as "Taliban," knowingly and intentionally distributed cocaine, a Schedule II narcotic drug controlled substance.

COUNT SIXTEEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(B)(viii)]

On or about April 5, 2016, in Los Angeles County, within the Central District of California, defendant JOSE LUIS BANDA, also known as ("aka") "Lil Raskal," aka "Donkey," knowingly and intentionally distributed at least five grams, that is, approximately 27.52 grams, of methamphetamine, a Schedule II controlled substance.

COUNT SEVENTEEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(B)(viii)]

On or about April 14, 2016, in Los Angeles County, within the Central District of California, defendant JOSE LUIS BANDA, also known as ("aka") "Lil Raskal," aka "Donkey," knowingly and intentionally distributed at least five grams, that is, approximately 28.92 grams, of methamphetamine, a Schedule II controlled substance.

COUNT EIGHTEEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

On or about April 20, 2016, in Los Angeles County, within the Central District of California, defendant KEVIN JASON PAZ, also known as ("aka") "Cheesecake," aka "Firme," knowingly and intentionally distributed at least 50 grams, that is, approximately 53.19 grams, of methamphetamine, a Schedule II controlled substance.

COUNT NINETEEN

[21 U.S.C. § 860(a)]

On or about April 20, 2016, in Los Angeles County, within the Central District of California, defendant KEVIN JASON PAZ, also known as ("aka") "Cheesecake," aka "Firme," knowingly and intentionally distributed at least 50 grams, that is, approximately 53.19 grams, of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(A)(viii), outside a restaurant located at 8875 Glenoaks Boulevard in Sun Valley, California, which is within 1,000 feet of the real property comprising schools, namely, Fenton STEM Academy and Fenton Charter Leadership Academy, public elementary schools located at 8926 Sunland Boulevard in Sun Valley, California.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

COUNT TWENTY

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

On or about May 3, 2016, in Los Angeles County, within the Central District of California, defendant KEVIN JASON PAZ, also known as ("aka") "Cheesecake," aka "Firme," knowingly and intentionally distributed at least 50 grams, that is, approximately 54.91 grams, of methamphetamine, a Schedule II controlled substance.

1                       COUNT TWENTY-ONE

2                      [21 U.S.C. § 860(a)]

3       On or about May 3, 2016, in Los Angeles County, within the

4 Central District of California, defendant KEVIN JASON PAZ, also known

5 as ("aka") "Cheesecake," aka "Firme," knowingly and intentionally

6 distributed at least 50 grams, that is, approximately 54.91 grams, of

7 methamphetamine, a Schedule II controlled substance, in violation of

8 Title 21, United States Code, Sections 841(a)(1), (b)(1)(A)(viii),

9 outside a restaurant located at 8875 Glenoaks Boulevard in Sun

10 Valley, California, which is within 1,000 feet of the real property

11 comprising schools, namely, Fenton STEM Academy and Fenton Charter

12 Leadership Academy, public elementary schools located at 8926 Sunland

13 Boulevard in Sun Valley, California.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COUNT TWENTY-TWO

[21 U.S.C. §§ 841(a)(1), (b)(1)(B)(viii)]

On or about June 7, 2016, in Los Angeles County, within the Central District of California, defendant KEVIN JASON PAZ, also known as ("aka") "Cheesecake," aka "Firme," knowingly and intentionally distributed at least five grams, that is, approximately 23.27 grams, of methamphetamine, a Schedule II controlled substance.

COUNT TWENTY-THREE

[21 U.S.C. § 860(a)]

On or about June 7, 2016, in Los Angeles County, within the Central District of California, defendant KEVIN JASON PAZ, also known as ("aka") "Cheesecake," aka "Firme," knowingly and intentionally distributed at least five grams, that is, approximately 23.27 grams, of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(B)(viii), outside a restaurant located at 8875 Glenoaks Boulevard in Sun Valley, California, which is within 1,000 feet of the real property comprising schools, namely, Fenton STEM Academy and Fenton Charter Leadership Academy, public elementary schools located at 8926 Sunland Boulevard in Sun Valley, California.

COUNT TWENTY-FOUR

[21 U.S.C. §§ 841(a)(1), (b)(1)(C)]

On or about June 8, 2016, in Los Angeles County, within the Central District of California, defendant IGNACIO JESUS CONTRERAS, also known as "Nacho," knowingly and intentionally possessed with intent to distribute methamphetamine, a Schedule II controlled substance.

COUNT TWENTY-FIVE

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

On or about June 17, 2016, in Los Angeles County, within the Central District of California, defendant DAVID ROQUE FONSECA, also known as "Monster," knowingly and intentionally distributed at least 50 grams, that is, approximately 55.13 grams, of methamphetamine, a Schedule II controlled substance.

COUNT TWENTY-SIX

[21 U.S.C. §§ 841(a)(1), (b)(1)(C)]

On or about June 17, 2016, in Los Angeles County, within the Central District of California, defendant DAVID ROQUE FONSECA, also known as "Monster," knowingly and intentionally distributed cocaine, a Schedule II narcotic drug controlled substance.

COUNT TWENTY-SEVEN

[21 U.S.C. § 860a]

On or about June 17, 2016, in Los Angeles County, within the Central District of California, defendant DAVID ROQUE FONSECA, also known as "Monster," knowingly and intentionally distributed approximately 55.13 grams of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1), (b)(1)(A)(viii), as charged in Count Twenty-Five of this Indictment, on premises in which, at that time, an individual who was under the age of 18 years was present and resided.

COUNT TWENTY-EIGHT

[21 U.S.C. § 860(a)]

On or about June 17, 2016, in Los Angeles County, within the Central District of California, defendant DAVID ROQUE FONSECA, also known as "Monster," knowingly and intentionally distributed at least 50 grams, that is, approximately 55.13 grams, of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(A)(viii), at a residence located at 8148 De Garmo Avenue in Sun Valley, California, which is within 1,000 feet of the real property comprising a school, namely, Glenwood Elementary School, a public elementary school located at 8001 Ledge Avenue in Sun Valley, California.

COUNT TWENTY-NINE

[21 U.S.C. § 860(a)]

On or about June 17, 2016, in Los Angeles County, within the Central District of California, defendant DAVID ROQUE FONSECA, also known as "Monster," knowingly and intentionally distributed cocaine, a Schedule II narcotic drug controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(C), at a residence located at 8148 De Garmo Avenue in Sun Valley, California, which is within 1,000 feet of the real property comprising a school, namely, Glenwood Elementary School, a public elementary school located at 8001 Ledge Avenue in Sun Valley, California.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COUNT THIRTY

[21 U.S.C. §§ 841(a)(1), (b)(1)(C)]

On or about June 21, 2016, in Los Angeles County, within the Central District of California, defendant DAVID VASQUEZ, also known as ("aka") "Malo," aka "Sonic," aka "Evil," knowingly and intentionally possessed with intent to distribute methamphetamine, a Schedule II controlled substance.

COUNT THIRTY-ONE

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii); 18 U.S.C. § 2(a)]

On or about June 23, 2016, in Los Angeles County, within the Central District of California, defendants MARIO ALBERTO MIRANDA, also known as ("aka") "Last," aka "L," aka "Ultimo," aka "Shot-Caller," and MARK ANTHONY ESPINOSA, aka "Fatman," aka "Marcos," each aiding and abetting the other, knowingly and intentionally distributed at least 50 grams, that is, approximately 109 grams, of methamphetamine, a Schedule II controlled substance.

COUNT THIRTY-TWO

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

On or about July 6, 2016, in Los Angeles County, within the Central District of California, defendant JOSEPH PETER HERRERA, also known as ("aka") "Shadow," aka "Baby Shadow," aka "Baby Shitface," knowingly and intentionally distributed at least 50 grams, that is, approximately 55.03 grams, of methamphetamine, a Schedule II controlled substance.

1  COUNT THIRTY-THREE

2  [21 U.S.C. § 860(a)]

3      On or about July 6, 2016, in Los Angeles County, within the

4  Central District of California, defendant JOSEPH PETER HERRERA, also

5  known as ("aka") "Shadow," aka "Baby Shadow," aka "Baby Shitface,"

6  knowingly and intentionally distributed at least 50 grams, that is,

7  approximately 55.03 grams, of methamphetamine, a Schedule II

8  controlled substance, in violation of Title 21, United States Code,

9  Sections 841(a)(1), (b)(1)(A)(viii), outside a restaurant located at

10  8875 Glenoaks Boulevard in Sun Valley, California, which is within

11  1,000 feet of the real property comprising schools, namely, Fenton

12  STEM Academy and Fenton Charter Leadership Academy, public elementary

13  schools located at 8926 Sunland Boulevard in Sun Valley, California.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COUNT THIRTY-FOUR

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

On or about August 22, 2016, in Los Angeles County, within the Central District of California, defendant DENNIS ALEXIS MOLINA, also known as "Laso," knowingly and intentionally distributed at least 50 grams, that is, approximately 116 grams, of methamphetamine, a Schedule II controlled substance.

COUNT THIRTY-FIVE

[21 U.S.C. §§ 841(a)(1), (b)(1)(B)(viii)]

On or about September 16, 2016, in Los Angeles County, within the Central District of California, defendant MARIO ALBERTO MIRANDA, also known as ("aka") "Last," aka "L," aka "Ultimo," aka "Shot-Caller," knowingly and intentionally distributed at least 50 grams, that is, approximately 222.21 grams, of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II controlled substance.

COUNT THIRTY-SIX

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii); 18 U.S.C. § 2(a)]

On or about September 21, 2016, in Los Angeles County, within the Central District of California, defendants MARIO ALBERTO MIRANDA, also known as ("aka") "Last," aka "L," aka "Ultimo," aka "Shot-Caller," and OSCAR CARDENAS, aka "Taliban," aka "Tali," each aiding and abetting the other, knowingly and intentionally distributed at least 50 grams, that is, approximately 408 grams, of methamphetamine, a Schedule II controlled substance.

COUNT THIRTY-SEVEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii); 18 U.S.C. § 2(a)]

On or about September 27, 2016, in Los Angeles County, within the Central District of California, defendants ULISES BOTELLO, also known as ("aka") "Squirt," aka "SQ," and JORGE MARCIAL VASQUEZ, aka "T," each aiding and abetting the other, knowingly and intentionally distributed at least 50 grams, that is, approximately 224 grams, of methamphetamine, a Schedule II controlled substance.

COUNT THIRTY-EIGHT

[21 U.S.C. § 860(a)]

On or about September 27, 2016, in Los Angeles County, within the Central District of California, defendants ULISES BOTELLO, also known as ("aka") "Squirt," aka "SQ," and JORGE MARCIAL VASQUEZ, aka "T," knowingly and intentionally distributed at least 50 grams, that is, approximately 224 grams, of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(A)(viii), in a parking lot located at 8658 Woodman Avenue, in Arleta, California, which is within 1,000 feet of the real property comprising a school, namely, the Girls Athletic Leadership School, a public charter middle school, located at 8755 Woodman Avenue in Arleta, California.

COUNT THIRTY-NINE

[21 U.S.C. §§ 841(a)(1), (b)(1)(B)(viii); 18 U.S.C. § 2(a)]

On or about October 5, 2016, in Los Angeles County, within the Central District of California, defendants MARIO ALBERTO MIRANDA, also known as ("aka") "Last," aka "L," aka "Ultimo," aka "Shot-Caller," and OSCAR CARDENAS, aka "Taliban," aka "Tali," each aiding and abetting the other, knowingly and intentionally distributed at least five grams, that is, approximately 28.01 grams, of methamphetamine, a Schedule II controlled substance.

1

COUNT FORTY

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

On or about November 5, 2016, in Los Angeles County, within the Central District of California, defendant MARIO ALBERTO MIRANDA, also known as ("aka") "Last," aka "L," aka "Ultimo," aka "Shot-Caller," knowingly and intentionally distributed at least 50 grams, that is, approximately 54.93 grams, of methamphetamine, a Schedule II controlled substance.

COUNT FORTY-ONE

[21 U.S.C. §§ 841(a)(1), (b)(1)(C)]

On or about December 26, 2016, in Los Angeles County, within the Central District of California, defendant IVAN LAUREL, also known as ("aka") "Little Gallo," aka "Little Psycho," knowingly and intentionally possessed with intent to distribute methamphetamine, a Schedule II controlled substance.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COUNT FORTY-TWO

[21 U.S.C. § 860(a)]

On or about December 26, 2016, in Los Angeles County, within the Central District of California, defendant IVAN LAUREL, also known as ("aka") "Little Gallo," aka "Little Psycho," knowingly and intentionally possessed with intent to distribute methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(C), on and within 1,000 feet of the real property comprising a school, namely, Roscoe Elementary School, a public elementary school located at 10765 Strathern Street.

COUNT FORTY-THREE

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

On or about January 31, 2017, in Los Angeles County, within the Central District of California, defendant LUIS ALBERTO MORA, also known as ("aka") "Liar," aka "Liar Liar," aka "Little L," aka "Uno," knowingly and intentionally distributed at least 50 grams, that is, approximately 83.04 grams, of methamphetamine, a Schedule II controlled substance.

COUNT FORTY-FOUR

[21 U.S.C. § 860(a)]

On or about January 31, 2017, in Los Angeles County, within the Central District of California, defendant LUIS ALBERTO MORA, also known as ("aka") "Liar," aka "Liar Liar," aka "Little L," aka "Uno," knowingly and intentionally distributed at least 50 grams, that is, approximately 83.04 grams, of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(A)(viii), at a residence located at 3651 Comet Court in Palmdale, California, which is within 1,000 feet of the real property comprising a school, namely, Guidance Charter School, a public charter school located at 37230 37th Street East, in Palmdale, California.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COUNT FORTY-FIVE

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

On or about February 2, 2017, in Los Angeles County, within the Central District of California, defendant LUIS ALBERTO MORA, also known as ("aka") "Liar," aka "Liar Liar," aka "Little L," aka "Uno," knowingly and intentionally distributed at least 50 grams, that is, approximately 222 grams, of methamphetamine, a Schedule II controlled substance.

COUNT FORTY-SIX

[21 U.S.C. § 860(a)]

On or about February 2, 2017, in Los Angeles County, within the Central District of California, defendant LUIS ALBERTO MORA, also known as ("aka") "Liar," aka "Liar Liar," aka "Little L," aka "Uno," knowingly and intentionally distributed at least 50 grams, that is, approximately 222 grams, of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(A)(viii), at a residence located at 3651 Comet Court in Palmdale, California, which is within 1,000 feet of the real property comprising a school, namely, Guidance Charter School, a public charter school located at 37230 37th Street East, in Palmdale, California.

COUNT FORTY-SEVEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

On or about September 19, 2017, in Los Angeles County, within the Central District of California, defendant ALENA ROSEANNA RODRIGUEZ knowingly and intentionally distributed at least 50 grams, that is, approximately 108 grams, of methamphetamine, a Schedule II controlled substance.

144

COUNT FORTY-EIGHT

[21 U.S.C. § 860(a)]

On or about September 19, 2017, in Los Angeles County, within the Central District of California, defendant ALENA ROSEANNA RODRIGUEZ knowingly and intentionally distributed at least 50 grams, that is, approximately 108 grams, of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(A)(viii), at a residence located at 7021 Independence Blvd in Canoga Park, California, which is within 1,000 feet of the real property comprising a school, namely, Hart Street Elementary School, a public elementary school located at 21040 Hart Street in Canoga Park, California, and a park, namely, Quimby Park, located at 7008 De Soto Avenue in Canoga Park, California.

COUNT FORTY-NINE

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii); 18 U.S.C. § 2(a)]

On or about April 11, 2018, in Los Angeles County, within the Central District of California, defendants ERNESTO SALVADOR MEDINA, also known as "Kid," and AREANA NORONA, each aiding and abetting the other, knowingly and intentionally distributed at least 50 grams, that is, approximately 110.7 grams, of methamphetamine, a Schedule II controlled substance.

COUNT FIFTY

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

On or about June 20, 2018, in Los Angeles County, within the Central District of California, defendant ERNESTO SALVADOR MEDINA, also known as "Kid," knowingly and intentionally distributed at least 50 grams, that is, approximately 443.3 grams, of methamphetamine, a Schedule II controlled substance.

1
2

COUNT FIFTY-ONE

[21 U.S.C. § 860(a)]

3    On or about June 20, 2018, in Los Angeles County, within the
4  Central District of California, defendant ERNESTO SALVADOR MEDINA,
5  also known as "Kid," knowingly and intentionally distributed at least
6  50 grams, that is, approximately 443.3 grams, of methamphetamine, a
7  Schedule II controlled substance, in violation of Title 21, United
8  States Code, Sections 841(a)(1), (b)(1)(A)(viii), outside a
9  restaurant located at 8742 Glenoaks Boulevard in Sun Valley,
10 California, which is within 1,000 feet of the real property
11 comprising schools, namely, Fenton STEM Academy and Fenton Charter
12 Leadership Academy, public elementary schools located at 8926 Sunland
13 Boulevard in Sun Valley, California.

14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

COUNT FIFTY-TWO

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

On or about July 24, 2018, in Los Angeles County, within the Central District of California, defendant SERGIO ESPINOZA SOLANO, also known as "Cholo," knowingly and intentionally distributed at least 50 grams, that is, approximately 112.46 grams, of methamphetamine, a Schedule II controlled substance.

COUNT FIFTY-THREE

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii); 18 U.S.C. § 2(a)]

On or about July 28, 2018, in Los Angeles County, within the Central District of California, defendants JESUS GONZALEZ, JR., also known as ("aka") "Lil' Chito," aka "Chito," aka "Gunner," aka "Chuy," aka "Chuyito," and SERGIO ESPINOZA SOLANO, aka "Cholo," each aiding and abetting the other, knowingly and intentionally possessed with intent to distribute at least 50 grams, that is, approximately 110.8 grams, of methamphetamine, a Schedule II controlled substance.

COUNT FIFTY-FOUR

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

On or about September 21, 2018, in Los Angeles County, within the Central District of California, defendant AKOP DARMANDZHYAN, also known as ("aka") "Armenian Jack," aka "Jack," knowingly and intentionally distributed at least 50 grams, that is, approximately 109.6 grams, of methamphetamine, a Schedule II controlled substance.

COUNT FIFTY-FIVE

[21 U.S.C. §§ 841(a)(1), (b)(1)(C)]

On or about September 27, 2018, in Los Angeles County, within the Central District of California, defendant OSBALDO ZUNIGA, also known as "Bayo," knowingly and intentionally distributed cocaine, a Schedule II narcotic drug controlled substance.

COUNT FIFTY-SIX

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

On or about September 29, 2018, in Los Angeles County, within the Central District of California, defendant OSBALDO ZUNIGA, also known as "Bayo," knowingly and intentionally distributed at least 50 grams, that is, approximately 110.9 grams, of methamphetamine, a Schedule II controlled substance.

1

COUNT FIFTY-SEVEN

2

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)]

3     On or about November 7, 2018, in Los Angeles County, within the

4 Central District of California, defendant MARIO ALBERTO MIRANDA, also

5 known as ("aka") "Last," aka "L," aka "Ultimo," aka "Shot-Caller"

6 knowingly and intentionally distributed at least 50 grams, that is,

7 approximately 220.6 grams, of methamphetamine, a Schedule II

8 controlled substance.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

COUNT FIFTY-EIGHT

2

[21 U.S.C. § 856(a)(1); 18 U.S.C. § 2(a)]

3  Beginning on a date unknown, at least as early as November 13,

4 2015, and continuing through on or about February 8, 2017, in Los

5 Angeles County, within the Central District of California, defendants

6 MARIO ALBERTO MIRANDA, also known as ("aka") "Last," aka "L," aka

7 "Ultimo," aka "Shot-Caller," MARK ANTHONY ESPINOSA, aka "Fatman," aka

8 "Marcos," and OSCAR CARDENAS, aka "Taliban," aka "Tali," each aiding

9 and abetting the other, knowingly and intentionally used and

10 maintained a place, namely, the residence located at 12504 Bromwich

11 Street in Pacoima, California, for the purpose of manufacturing and

12 distributing marijuana, a Schedule I controlled substance, and

13 distributing methamphetamine, a Schedule II controlled substance.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

COUNT FIFTY-NINE

[21 U.S.C. § 856(a)(1); 18 U.S.C. § 2(a)]

Beginning on a date unknown, at least as early as September 15, 2016, and continuing through on or about February 2, 2017, in Los Angeles County, within the Central District of California, defendants MARIO ALBERTO MIRANDA, also known as ("aka") "Last," aka "L," aka "Ultimo," aka "Shot-Caller," ULISES BOTELLO, aka "Squirt," aka "SQ," and LUIS ALBERTO MORA, aka "Liar," aka "Liar Liar," aka "Little L," aka "Uno," each aiding and abetting the other, knowingly and intentionally used and maintained a place, namely, the residence located at 3651 Comet Court in Palmdale, California, for the purpose of manufacturing and distributing marijuana, a Schedule I controlled substance.

COUNT SIXTY

[18 U.S.C. § 924(c)(1)(A)(iii)]

On or about April 3, 2016, in Los Angeles County, within the Central District of California, defendant JESUS GONZALEZ, JR., also known as ("aka") "Lil' Chito," aka "Chito," aka "Gunner," aka "Chuy," aka "Chuyito," knowingly used and carried a loaded firearm during and in relation to, and possessed that firearm in furtherance of, a crime of violence, namely, attempted murder and assault with a dangerous weapon in aid of racketeering activity, in violation of Title 18, United States Code, Sections 1959(a)(5), (a)(3), as charged in Counts Two and Three of this Indictment, respectively, and in so doing, discharged the firearm.

COUNT SIXTY-ONE

[18 U.S.C. § 924(c)(1)(A)(iii)]

On or about April 23, 2016, in Los Angeles County, within the Central District of California, defendant JESUS GONZALEZ, JR., also known as ("aka") "Lil' Chito," aka "Chito," aka "Gunner," aka "Chuy," aka "Chuyito," knowingly used and carried a loaded firearm during and in relation to, and possessed that firearm in furtherance of, a crime of violence, namely, attempted murder and assault with a dangerous weapon in aid of racketeering activity, in violation of Title 18, United States Code, Sections 1959(a)(5), (a)(3), as charged in Counts Four and Five of this Indictment, respectively, and in so doing, discharged the firearm.

COUNT SIXTY-TWO

[18 U.S.C. § 924(c)(1)(A)(i)]

On or about June 8, 2016, in Los Angeles County, within the Central District of California, defendant IGNACIO JESUS CONTRERAS, also known as "Nacho," knowingly possessed firearms, namely, a Colt model Super .38 Automatic Pistol .38 Super caliber pistol, bearing serial number 118379, and a Smith & Wesson model SD40 VE 40 S&W caliber semiautomatic pistol, bearing serial number HEX2193, in furtherance of drug trafficking crimes, namely, Conspiracy to Distribute Controlled Substances, in violation of Title 21, United States Code, Section 846, as charged in Count Seven of this Indictment, and Possession With Intent to Distribute Methamphetamine, in violation of Title 21, United States Code, Section 841(a)(1), as charged in Count Twenty-Four of this Indictment.

COUNT SIXTY-THREE

[18 U.S.C. § 924(c)(1)(A)(i)]

On or about June 21, 2016, in Los Angeles County, within the Central District of California, defendant DAVID VASQUEZ, also known as ("aka") "Malo," aka "Sonic," aka "Evil," knowingly possessed a firearm, namely, a North American Arms model HGLR .22 caliber pistol, bearing serial number L036563, in furtherance of drug trafficking crimes, namely, Conspiracy to Distribute Controlled Substances, in violation of Title 21, United States Code, Section 846, as charged in Count Seven of this Indictment, and Possession With Intent to Distribute Methamphetamine, in violation of Title 21, United States Code, Section 841(a)(1), as charged in Count Thirty of this Indictment.

1

2

COUNT SIXTY-FOUR

[18 U.S.C. § 924(c)(1)(A)(ii)]

On or about September 16, 2016, in Los Angeles County, within the Central District of California, defendant ANTHONY CARLOS AVILA, also known as ("aka") "Baby Raskal," aka "Casper," knowingly used and carried a firearm during and in relation to, and possessed that firearm in furtherance of, a crime of violence, namely, assault with a dangerous weapon in aid of racketeering activity, in violation of Title 18, United States Code, Section 1959(a)(3), as charged in Count Six of this Indictment, and in so doing, brandished the firearm.

161

## COUNT SIXTY-FIVE

### [18 U.S.C. § 924(c)(1)(A)(ii)]

On or about September 16, 2016, in Los Angeles County, within the Central District of California, defendant FRANCISCO JAVIER NAVARRETE, also known as "Chowder," knowingly used and carried a firearm during and in relation to, and possessed that firearm in furtherance of, a crime of violence, namely, assault with a dangerous weapon in aid of racketeering activity, in violation of Title 18, United States Code, Section 1959(a)(3), as charged in Count Six of this Indictment, and in so doing, brandished the firearm.

COUNT SIXTY-SIX

[18 U.S.C. § 924(c)(1)(A)(i)]

On or about December 26, 2016, in Los Angeles County, within the Central District of California, defendant IVAN LAUREL, also known as ("aka") "Little Gallo," aka "Little Psycho," knowingly possessed a firearm, namely, a Ruger model P345 .45 auto caliber pistol, bearing serial number 66449721, in furtherance of drug trafficking crimes, namely, Conspiracy to Distribute Controlled Substances, in violation of Title 21, United States Code, Section 846, as charged in Count Seven of this Indictment, and Possession With Intent to Distribute Methamphetamine, in violation of Title 21, United States Code, Section 841(a)(1), as charged in Count Forty-One of this Indictment.

COUNT SIXTY-SEVEN

[18 U.S.C. § 922(a)(1)(A)]

From on or about November 1, 2015, through on or about July 13, 2018, in Los Angeles County, within the Central District of California, and elsewhere, defendant JOSEPH PETER HERRERA, also known as ("aka") "Shadow," aka "Baby Shadow," aka "Baby Shitface," not being licensed as an importer, manufacturer, or dealer in firearms, willfully engaged in the business of dealing in firearms, including, specifically, the following firearms on or about the following dates:

| Date | Firearm |
| --- | --- |
| January 12, 2016 | Fabrique Nationale model 1900-FN .32 ACP caliber pistol, bearing serial number 433614 |
| August 24, 2016 | Mossberg International model 715T .22 Long Rifle caliber rifle, bearing serial number ELL3608280 |
| August 3, 2017 | Taurus model PT738 .380 Auto caliber pistol, with an obliterated serial number |
| August 16, 2017 | Universal Firearms model M1 .30 caliber rifle, bearing serial number 199457 |
| July 5, 2018 | Sig Sauer model P220 .45 Auto caliber pistol, bearing serial number G131402 |
| July 12, 2018 | Lorcin model L380 .380 caliber pistol, bearing serial number 044899 |

COUNT SIXTY-EIGHT

[18 U.S.C. § 922(a)(1)(A)]

From on or before December 8, 2015, through on or about July 26, 2018, in Los Angeles County, within the Central District of California, and elsewhere, defendant JESUS GONZALEZ, JR., also known as ("aka") "Lil' Chito," aka "Chito," aka "Gunner," aka "Chuy," aka "Chuyito," not being licensed as an importer, manufacturer, or dealer in firearms, willfully engaged in the business of dealing in firearms, including, specifically, the following firearms on or about the following dates:

| Date | Firearm(s) |
|------|------------|
| February 2, 2016 | (1) Bersa model Thunder 380 .380 ACP caliber pistol, bearing serial number 642884; and (2) APOC Armory .556 caliber AR-15-type rifle, bearing no serial number |
| May 3, 2016 | American Tactical Imports model OMNI Hybrid 5.56 NATO caliber rifle, bearing serial number NS013386 |
| May 11, 2016 | Beretta model Px4 Storm 9mm Parabelllum caliber pistol, bearing serial number PX137629 |
| May 20, 2016 | black and gold AR-15 type rifle, bearing no serial number |

COUNT SIXTY-NINE

[18 U.S.C. § 922(a)(1)(A)]

From on or about August 19, 2016, through on or about March 6, 2018, in Los Angeles County, within the Central District of California, and elsewhere, defendant LUIS FRANCISCO LOPEZ, also known as ("aka") "Subs," aka "Substitute," not being licensed as an importer, manufacturer, or dealer in firearms, willfully engaged in the business of dealing in firearms, including, specifically, the following firearms on or about the following dates:

| Date | Firearm(s) |
|---|---|
| October 29, 2016 | (1) Kimel Industries Inc. model Western Six .22 long rifle caliber revolver, bearing serial number K31997; and (2) Armalite Inc. model M4C 5.56 mm caliber rifle, bearing serial number 42407 |
| June 8, 2017 | Norinco model SKS 7.62 x 39 mm caliber rifle, bearing serial number 10051244 |
| March 6, 2018 | (1) Tanfoglio model Super Titan .380 caliber pistol, bearing serial number MB01837; (2) Smith & Wesson model K38 .38 S&W Special caliber revolver, bearing serial number 906341; and (3) Smith & Wesson model 14-1 .38 S&W Special caliber revolver, bearing serial number K414449 |

COUNT SEVENTY

[18 U.S.C. § 922(a)(1)(A)]

From on or about July 14, 2018, through on or about January 5, 2019, in Los Angeles County, within the Central District of California, and elsewhere, defendant SERGIO ESPINOZA SOLANO, also known as "Cholo," not being licensed as an importer, manufacturer, or dealer in firearms, willfully engaged in the business of dealing in firearms, including, specifically, the following firearms on or about the following dates:

| Date | Firearm(s) |
|---|---|
| July 17, 2018 | (1) One AR-15 type .223/5.56 caliber pistol, bearing no serial number; and (2) One AR-15 type 5.56 caliber rifle, bearing no serial number |
| August 28, 2018 | One AR-15 type .223 caliber rifle, bearing no serial number |
| November 7, 2018 | (1) One AR-15 type .223 caliber rifle, bearing no serial number; (2) One short-barreled AR-15 type .223 Remington caliber rifle, bearing no serial number; and (3) One AR-15 type 5.56 caliber pistol, bearing no serial number |

COUNT SEVENTY-ONE

[18 U.S.C. § 922(a)(1)(A)]

From on or about July 15, 2018, through on or about November 7, 2018, in Los Angeles County, within the Central District of California, and elsewhere, defendant JESUS HERNANDEZ, also known as "Jesse," not being licensed as an importer, manufacturer, or dealer in firearms, willfully engaged in the business of manufacturing and dealing in firearms, including, specifically, the following firearms on or about the following dates:

| Date | Firearm(s) |
|---|---|
| July 17, 2018 | (1) One AR-15 type .223/5.56 caliber pistol, bearing no serial number; and (2) One AR-15 type 5.56 caliber rifle, bearing no serial number |
| August 28, 2018 | One AR-15 type .223 caliber rifle, bearing no serial number |
| November 7, 2018 | (1) One AR-15 type .223 caliber rifle, bearing no serial number; (2) One short-barreled AR-15 type .223 Remington caliber rifle, bearing no serial number; and (3) One AR-15 type 5.56 caliber pistol, bearing no serial number |

COUNT SEVENTY-TWO

[18 U.S.C. § 922(g)(1)]

On or about November 18, 2015, in Los Angeles County, within the Central District of California, defendant ANTHONY CARLOS AVILA, also known as ("aka") "Baby Rascal," aka "Lil Rascal," aka "Casper" ("AVILA"), knowingly possessed a firearm, namely, a Burgo model HW-38-4T .38 Special caliber revolver, bearing an obliterated serial number, and ammunition, namely, two rounds of Poongsan Metal Corporation .38 Special caliber ammunition, in and affecting interstate and foreign commerce.

Such possession occurred after defendant AVILA had been convicted of a felony crime punishable by a term of imprisonment exceeding one year, namely, Taking Vehicle Without Owner's Consent, in violation of California Vehicle Code Section 10851(a), in the Superior Court of the State of California, County of Los Angeles, case number PA080228, on or about May 28, 2014.

COUNT SEVENTY-THREE

[18 U.S.C. § 922(g)(1)]

On or about January 12, 2016, in Los Angeles County, within the Central District of California, defendant JOSE MANUEL GALLO, also known as "Roster" ("GALLO"), knowingly possessed a firearm, namely, a Fabrique Nationale model 1900-FN .32 ACP caliber pistol, bearing serial number 433614, and ammunition, namely, eight rounds of Aguila .32 Auto caliber ammunition, in and affecting interstate and foreign commerce.

Such possession occurred after defendant GALLO had been convicted of felony crimes punishable by a term of imprisonment exceeding one year, namely, Carrying a Concealed Firearm, in violation of California Penal Code Section 33215, and Carrying a Loaded Firearm in a Vehicle or Public Place, in violation of California Penal Code Section 25850(a), in the Superior Court of the State of California, County of Los Angeles, case number LA078185, on or about July 31, 2014.

COUNT SEVENTY-FOUR

[18 U.S.C. § 922(g)(1)]

On or about January 12, 2016, in Los Angeles County, within the Central District of California, defendant IVAN LAUREL, also known as ("aka") "Lil Gallo," aka "Lil Psycho" ("LAUREL"), knowingly possessed a firearm, namely, a Fabrique Nationale model 1900-FN .32 ACP caliber pistol, bearing serial number 433614, and ammunition, namely, eight rounds of Aguila .32 Auto caliber ammunition, in and affecting interstate and foreign commerce.

Such possession occurred after defendant LAUREL had been convicted of felony crimes punishable by a term of imprisonment exceeding one year, namely, Felon in Possession of a Firearm, in violation of California Penal Code Section 29800(a)(1), and Possession of a Loaded Firearm in Public Place or Vehicle, in violation of California Penal Code Section 25850(a), in the Superior Court of the State of California, County of Los Angeles, case number LAVLA078186, on or about July 21, 2014.

COUNT SEVENTY-FIVE

[18 U.S.C. § 922(g)(1)]

On or about February 2, 2016, in Los Angeles County, within the Central District of California, defendant JESUS GONZALEZ, JR., also known as ("aka") "Lil' Chito," aka "Chito," aka "Gunner," aka "Chuy," aka "Chuyito" ("GONZALEZ"), knowingly possessed a firearm, namely, a Bersa model Thunder 380 .380 ACP caliber pistol, bearing serial number 642884, and ammunition, namely, thirteen rounds of .223 Remington ammunition, in and affecting interstate and foreign commerce.

Such possession occurred after defendant GONZALEZ had been convicted of a felony crime punishable by a term of imprisonment exceeding one year, namely, Possession of Controlled Substance for Sale, in violation of California Health & Safety Code Section 11378, in the Superior Court of the State of California, County of Los Angeles, case number LA078222, on or about October 24, 2014.

COUNT SEVENTY-SIX

[18 U.S.C. §§ 922(g)(1), (9)]

On or about March 24, 2016, in Los Angeles County, within the Central District of California, defendant IGNACIO CONTRERAS, also known as "Nacho" ("CONTRERAS"), knowingly possessed ammunition, namely, two rounds of Winchester .380 Auto caliber ammunition, one round of Companhia Brasileira de Caruchos .380 Auto caliber ammunition, one round of Federal Premium .380 Auto caliber ammunition, one round of Poongsan Metals Corporation .380 Auto caliber ammunition, and one round of Remington Arms Company .380 Auto caliber ammunition, in and affecting interstate and foreign commerce.

Such possession occurred after defendant CONTRERAS had been convicted of at least one of the following felony crimes, each punishable by a term of imprisonment exceeding one year:

1.    Possession of a Controlled Substance, in violation of California Health & Safety Code Section 11350(a), in the Superior Court of the State of California, County of Los Angeles, case number LA032746, on or about January 24, 2001;

2.    Felon in Possession of a Firearm, in violation of California Penal Code Section 29800(a)(1), in the Superior Court of the State of California, County of Los Angeles, case number MA063799, on or about October 2, 2014.

Furthermore, such possession occurred after defendant CONTRERAS had been convicted of a misdemeanor crime of domestic violence, namely, Inflict Corporal Injury on Spouse or Cohabitant, in violation of California Penal Code Section 273.5(a), in the Superior Court of the State of California, County of Los Angeles, case number LAS1SR0500301, on or about October 17, 2011.

173

COUNT SEVENTY-SEVEN

[18 U.S.C. § 922(g)(1)]

On or about April 7, 2016, in Los Angeles County, within the Central District of California, defendant IVAN LAUREL, also known as ("aka") "Lil Gallo," aka "Lil Psycho" ("LAUREL"), knowingly possessed ammunition, namely, four rounds of Hornady .380 Auto caliber ammunition, and three rounds of Speer .380 Auto caliber ammunition, in and affecting interstate and foreign commerce.

Such possession occurred after defendant LAUREL had been convicted of a felony crime punishable by a term of imprisonment exceeding one year, namely, Possession of a Loaded Firearm, in violation of California Penal Code Sections 29800(a)(1) and 25850(a), in the Superior Court of the State of California, County of Los Angeles, case number LAVLA078186, on or about July 21, 2014.

COUNT SEVENTY-EIGHT

[18 U.S.C. § 922(g)(1)]

On or about April 20, 2016, in Los Angeles County, within the Central District of California, defendant KEVIN JASON PAZ, also known as ("aka") "Cheesecake," aka "Firme" ("PAZ"), knowingly possessed a firearm, namely, an Iver Johnson's Arms & Cycles Works model Champion .410 gauge shotgun, bearing serial number 30862, in and affecting interstate and foreign commerce.

Such possession occurred after defendant PAZ had been convicted of a felony crime punishable by a term of imprisonment exceeding one year, namely, Second-Degree Robbery, in violation of California Penal Code Section 211, in the Superior Court of the State of California, County of Los Angeles, case number LA061577, on or about April 1, 2010.

COUNT SEVENTY-NINE

[18 U.S.C. § 922(g)(1)]

On or about May 3, 2016, in Los Angeles County, within the Central District of California, defendant JESUS GONZALEZ, JR., also known as ("aka") "Lil' Chito," aka "Chito," aka "Gunner," aka "Chuy," aka "Chuyito" ("GONZALEZ"), knowingly possessed a firearm, namely, an American Tactical Imports model OMNI Hybrid 5.56 NATO caliber rifle, bearing serial number NS013386, in and affecting interstate and foreign commerce.

Such possession occurred after defendant GONZALEZ had been convicted of a felony crime punishable by a term of imprisonment exceeding one year, namely, Possession of Controlled Substance for Sale, in violation of California Health & Safety Code Section 11378, in the Superior Court of the State of California, County of Los Angeles, case number LA078222, on or about October 24, 2014.

COUNT EIGHTY

[18 U.S.C. § 922(g)(1)]

On or about May 11, 2016, in Los Angeles County, within the Central District of California, defendant JESUS GONZALEZ, JR., also known as ("aka") "Lil' Chito," aka "Chito," aka "Gunner," aka "Chuy," aka "Chuyito" ("GONZALEZ"), knowingly possessed a firearm, namely, a Beretta model Px4 Storm 9mm Parabellum caliber pistol, bearing serial number PX137629, and ammunition, namely, four rounds of 9mm Luger ammunition and four rounds of LCW 9mm ammunition, in and affecting interstate and foreign commerce.

Such possession occurred after defendant GONZALEZ had been convicted of a felony crime punishable by a term of imprisonment exceeding one year, namely, Possession of Controlled Substance for Sale, in violation of California Health & Safety Code Section 11378, in the Superior Court of the State of California, County of Los Angeles, case number LA078222, on or about October 24, 2014.

COUNT EIGHTY-ONE

[18 U.S.C. § 922(g)(1)]

On or about May 20, 2016, in Los Angeles County, within the Central District of California, defendant JESUS GONZALEZ, JR., also known as ("aka") "Lil' Chito," aka "Chito," aka "Gunner," aka "Chuy," aka "Chuyito" ("GONZALEZ"), knowingly possessed ammunition, namely, 26 rounds of Remington .223 caliber ammunition, in and affecting interstate and foreign commerce.

Such possession occurred after defendant GONZALEZ had been convicted of a felony crime punishable by a term of imprisonment exceeding one year, namely, Possession of Controlled Substance for Sale, in violation of California Health & Safety Code Section 11378, in the Superior Court of the State of California, County of Los Angeles, case number LA078222, on or about October 24, 2014.

COUNT EIGHTY-TWO

[18 U.S.C. §§ 922(g)(1), (9)]

On or about June 8, 2016, in Los Angeles County, within the Central District of California, defendant IGNACIO JESUS CONTRERAS, also known as "Nacho" ("CONTRERAS"), knowingly possessed firearms, namely, a Colt model Super .38 Automatic Pistol .38 Super caliber pistol, bearing serial number 118379, and a Smith & Wesson model SD40 VE 40 S&W caliber semiautomatic pistol, bearing serial number HEX2193; and ammunition, namely, seven rounds of Remington Arms .38 Super caliber ammunition, and fourteen rounds of Poongsan Metals .22 caliber ammunition, in and affecting interstate and foreign commerce.

Such possession occurred after defendant CONTRERAS had been convicted of at least one of the following felony crimes, each punishable by a term of imprisonment exceeding one year:

1.    Possession of a Controlled Substance, in violation of California Health & Safety Code Section 11350(a), in the Superior Court of the State of California, County of Los Angeles, case number LA032746, on or about January 24, 2001;

2.    Felon in Possession of a Firearm, in violation of California Penal Code Section 29800(a)(1), in the Superior Court of the State of California, County of Los Angeles, case number MA063799, on or about October 2, 2014.

Furthermore, such possession occurred after defendant CONTRERAS had been convicted of a misdemeanor crime of domestic violence, namely, Inflict Corporal Injury on Spouse or Cohabitant, in violation of California Penal Code Section 273.5(a), in the Superior Court of the State of California, County of Los Angeles, case number LAS1SR0500301, on or about October 17, 2011.

179

COUNT EIGHTY-THREE

[18 U.S.C. § 922(g)(1)]

On or about June 21, 2016, in Los Angeles County, within the Central District of California, defendant DAVID VASQUEZ, also known as ("aka") "Malo," aka "Sonic," aka "Evil" ("D. VASQUEZ"), knowingly possessed a firearm, namely, a North American Arms model HGLR .22 caliber pistol, bearing serial number L036563, in and affecting interstate and foreign commerce.

Such possession occurred after defendant D. VASQUEZ had been convicted of at least one of the following felony crimes, each punishable by a term of imprisonment exceeding one year:

1.   Assault With Deadly Weapon, in violation of California Penal Code Section 245(a)(2), in the Superior Court of the State of California, County of Los Angeles, case number LA044773, on or about July 6, 2004;

2.   Grand Theft, in violation of California Penal Code Section 487(a), in the Superior Court of the State of California, County of Los Angeles, case number LA057907, on or about March 26, 2008;

3.   Possession of a Controlled Substance, in violation of California Health & Safety Code Section 11377(a), in the Superior Court of the State of California, County of Los Angeles, case number PA075704, on or about February 28, 2013.

COUNT EIGHTY-FOUR

[18 U.S.C. § 922(g)(1)]

On or about October 12, 2016, in Los Angeles County, within the Central District of California, defendant JOSE MANUEL GALLO, also known as "Rooster" ("GALLO"), knowingly possessed a firearm, namely, a Glock model 27 .40 caliber semi-automatic pistol, bearing serial number UKX354, and ammunition, namely, 10 rounds of Smith & Wesson .40 caliber ammunition, in and affecting interstate and foreign commerce.

Such possession occurred after defendant GALLO had been convicted of felony crimes punishable by a term of imprisonment exceeding one year, namely, Carrying a Concealed Firearm, in violation of California Penal Code Section 33215, and Carrying a Loaded Firearm in a Vehicle or Public Place, in violation of California Penal Code Section 25850(a), in the Superior Court of the State of California, County of Los Angeles, case number LA078185, on or about July 31, 2014.

COUNT EIGHTY-FIVE

[18 U.S.C. § 922(g)(1)]

On or about December 26, 2016, in Los Angeles County, within the Central District of California, defendant IVAN LAUREL, also known as ("aka") "Lil Gallo," aka "Lil Psycho" ("LAUREL"), knowingly possessed a firearm, namely, Ruger model P345 .45 auto caliber pistol, bearing serial number 66449721, and ammunition, namely, nine rounds of Federal Premium .45 auto caliber ammunition, in and affecting interstate and foreign commerce.

Such possession occurred after defendant LAUREL had been convicted of a felony crime punishable by a term of imprisonment exceeding one year, namely, Possession of a Loaded Firearm, in violation of California Penal Code Sections 29800(a)(1) and 25850(a), in the Superior Court of the State of California, County of Los Angeles, case number LAVLA078186, on or about July 21, 2014.

COUNT EIGHTY-SIX

[18 U.S.C. § 922(g)(1)]

On or about March 8, 2017, in Los Angeles County, within the Central District of California, defendant OSCAR ALVARADO, also known as "Smurf" ("ALVARADO"), knowingly possessed a firearm, namely, a Glock model 19 9x19mm caliber pistol, bearing serial number KTE642, and ammunition, namely, 42 rounds of Norinco 9mm caliber ammunition, in and affecting interstate and foreign commerce.

Such possession occurred after defendant ALVARADO had been convicted of at least one of the following felony crimes, each punishable by a term of imprisonment exceeding one year:

1. Possession of Heroin, in violation of California Health & Safety Code Section 11350(a), in the Superior Court of the State of California, County of Los Angeles, case number PA016364, on or about November 28, 1994;

2. Unlawful Driving or Taking of a Vehicle, in violation of California Vehicle Code Section 10851(a), in the Superior Court of the State of California, County of Los Angeles, case number LA025972, on or about January 16, 1997;

3. Grand Theft, in violation of California Penal Code Section 487(a), in the Superior Court of the State of California, County of Los Angeles, case number GA068875, on or about November 14, 2007;

4. Assault with a Deadly Weapon, in violation of California Penal Code Section 245(a)(1), in the Superior Court of the State of California, County of Los Angeles, case number LA0672313, on or about March 22, 2011;

5. Possession of Heroin, in violation of California Health & Safety Code Section 11350(a), in the Superior Court of the State of

California, County of Los Angeles, case number PA074981, on or about February 4, 2013;

     6.   Felon in Possession of Ammunition, in violation of California Penal Code Section 30305(a)(1), in the Superior Court of the State of California, County of Los Angeles, case number LA080255, on or about April 22, 2015.

184

COUNT EIGHTY-SEVEN

[18 U.S.C. § 922(g)(1)]

On or about March 25, 2018, in Los Angeles County, within the Central District of California, defendant LUIS ALBERTO MORA, also known as ("aka") "Liar," aka "Liar Liar," aka "Little L," aka "Uno" ("MORA"), knowingly possessed a firearm, namely, a Mossberg model 500A 12-gauge shotgun, bearing serial number K764851, in and affecting interstate and foreign commerce.

Such possession occurred after defendant MORA had been convicted of the following felony crimes, each punishable by a term of imprisonment exceeding one year: Sale or Transportation of Controlled Substance, in violation of California Health & Safety Code Section 11379(a); Possession of Controlled Substance for Sale, in violation of California Health & Safety Code Section 11378; and Possession of a Controlled Substance With Firearm, in violation of California Health & Safety Code Section 11370.1(a), in the Superior Court of the State of California, County of Los Angeles, case number BA413781, on or about April 30, 2014.

COUNT EIGHTY-EIGHT

[18 U.S.C. § 922(g)(1)]

On or about August 31, 2018, in Los Angeles County, within the Central District of California, defendant LUIS ALBERTO MORA, also known as ("aka") "Liar," aka "Liar Liar," aka "Little L," aka "Uno" ("MORA"), knowingly possessed ammunition, namely, one round of Tula .380 caliber ammunition, two rounds of Winchester 12-gauge ammunition, 13 rounds of Winchester 20-gauge ammunition, 16 rounds of Federal .22 Long Rifle caliber ammunition, eight rounds of Federal 12-gauge ammunition, one round of Remington .38 Special caliber ammunition, and one round of Remington 12-gauge ammunition, in and affecting interstate and foreign commerce.

Such possession occurred after defendant MORA had been convicted of the following felony crimes, each punishable by a term of imprisonment exceeding one year: Sale or Transportation of Controlled Substance, in violation of California Health & Safety Code Section 11379(a); Possession of Controlled Substance for Sale, in violation of California Health & Safety Code Section 11378; and Possession of a Controlled Substance With Firearm, in violation of California Health & Safety Code Section 11370.1(a), in the Superior Court of the State of California, County of Los Angeles, case number BA413781, on or about April 30, 2014.

COUNT EIGHTY-NINE

[26 U.S.C. § 5861(d); 18 U.S.C. § 2(a)]

On or about November 7, 2018, in Los Angeles County, within the Central District of California, and elsewhere, defendants SERGIO ESPINOZA SOLANO, also known as ("aka") "Cholo" ("SOLANO"), and JESUS HERNANDEZ, aka "Jesse" ("HERNANDEZ"), each aiding and abetting the other, knowingly possessed a firearm, namely, an AR-15 type .223 Remington caliber firearm, bearing no serial number, which defendants SOLANO and HERNANDEZ knew to be a firearm and short-barreled rifle, as defined in Title 26, United States Code, Sections 5845(a)(3) and 5845(c), and which had not been registered to defendants SOLANO and HERNANDEZ in the National Firearms Registration and Transfer Record as required by Chapter 53, Title 26, United States Code.

187

FORFEITURE ALLEGATION ONE

[18 U.S.C. § 1963]

1.   Pursuant to Federal Rule of Criminal Procedure 32.2, notice is hereby given that the United States of America will seek forfeiture as party of any sentence, pursuant to Title 18, United States Code, Section 1963, and Title 28 United States Code, Section 2461(c), in the event of any defendant's conviction of the offense set forth in Count One of this Indictment.

2.   Any defendant so convicted shall forfeit to the United States of America the following:

(a)   Any interest the convicted defendant has acquired or maintained as a result of any such offense;

(b)   Any interest in, security of, claim against, or property or contractual right of any kind affording a source or influence over, any enterprise which the convicted defendant has established, operated, controlled, conducted, or participated in the conduct of, as a result of any such offense;

(c)   Any property constituting, or derived from, any proceeds which the person obtained, directly or indirectly, from racketeering activity or unlawful debt collection as a result of any such offense; and

(d)   To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraphs (a), (b), and (c).

3.   Pursuant to Title 18, United States Code, Section 1963(m), any defendant so convicted shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as the result of any act or omission of said defendant, the

property described in the preceding paragraph, or any portion thereof
(a) cannot be located upon the exercise of due diligence; (b) has
been transferred, sold to or deposited with a third party; (c) has
been placed beyond the jurisdiction of the court; (d) has been
substantially diminished in value; or (e) has been commingled with
other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION TWO

[21 U.S.C. § 853]

1.   Pursuant to Rule 32.2(a) of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 21, United States Code, Section 853 and Title 28, United States Code, Section 2461(c), in the event of any defendant's conviction of any of the offenses set forth in Counts Seven through Fifty-Nine of this Indictment.

2.   Any defendant so convicted shall forfeit to the United States of America the following:

(a)   All right, title and interest in any and all property, real or personal, constituting or derived from, any proceeds which the defendant obtained, directly or indirectly, from any such offense;

(b)   All right, title and interest in any and all property, real or personal, used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of any such offense; and

(c)   To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraphs (a) and (b).

3.   Pursuant to Title 21, United States Code, Section 853(p), any defendant so convicted shall forfeit substitute property if, by any act or omission of said defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the

jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION THREE

[18 U.S.C. § 924(d)(1), 26 U.S.C. § 5872, and 28 U.S.C. § 2461(c)]

1.    Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 924(d)(1), Title 26, United States Code, Section 5872, and Title 28, United States Code, Section 2461(c), in the event of any defendant's conviction of any of the offenses set forth in any of Counts Sixty through Eighty-Nine of this Indictment.

2.    Any defendant so convicted shall forfeit to the United States of America the following:

(a)   All right, title, and interest in any firearm or ammunition involved in or used in or used in any such offense; and

(b)   To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3.    Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), the convicted defendant shall forfeit substitute property, up to the value of the property described in the preceding paragraph if, as the result of any act or omission of said defendant, the property

//

//

//

described in the preceding paragraph or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

A TRUE BILL

/s/
_____
Foreperson

NICOLA T. HANNA
United States Attorney

LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division

JUSTIN R. RHOADES
Assistant United States Attorney
Chief, Violent and Organized
Crime Section

JENNIFER CHOU
Assistant United States Attorney
Violent and Organized Crime
Section